FILED ___ LODGED
___ RECEIVED ___ COPY

APR 2 2003

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 01-1062-PCT-MHM |
| Plaintiff, | |
| vs. | **ORDER** |
| Lezmond Mitchell, et al. | |
| Defendants. | |

Defendant Lezmond Mitchell has filed a motion to dismiss the indictment or to stay proceedings on the ground that there has been a substantial failure to comply with applicable law in selecting the petit jury venire in this matter. See 28 U.S.C. § 1867(a). Defendant Johnny Orsinger has joined in the motion. (Dkt. 245). The Government has filed an opposition. (Dkt. 249). On March 26, 2003, the Court heard oral argument. For the reasons set forth herein, the motion is denied.

## BACKGROUND

In preparation for the commencement of trial in this matter, the Court directed the Jury Administrator to begin the process of gathering potential jurors to sit on the jury venire. Pursuant to the Jury Plan for this District, as well as the Jury Selection and Service Act of 1968 ("JSSA"), 28 U.S.C. §§ 1861-1878, the administrator summoned about 3,000 randomly

selected potential jurors from the Prescott Division master jury wheel.[1] (Transcript of Motions Hearings, Mar. 12, 2003, at 5). The initial mailing included a summons, standard jury qualification questionnaire and cover letter. The letter indicated that trial could be moved from the Prescott courthouse to the Phoenix courthouse and asked potential jurors to answer the following three questions on the back of the standard questionnaire:

1. Can you serve on a five week trial that will start April 1, 2003?
2. Can you serve on a five week trial if it is held in the Prescott courthouse?
3. Can you serve on a five week trial if it is held in the Phoenix courthouse?

Of the 3,000 summoned, the Jury Administrator determined only 295 were actually qualified pursuant to the District's plan and the JSSA.[2] (Id. at 8-9). The remainder either did not return the initial questionnaire, could not be located by mail or were exempt or excused from jury service. (Id. at 9). Of the 295 deemed qualified, 32 indicated they could not serve based on either a claimed inability to travel to Phoenix or the timing and length of trial. The Jury Administrator then mailed a more detailed 24-page supplemental pre-screening questionnaire to the remaining 263 qualified jurors.[3] This questionnaire was drafted by the Court following submission of proposed questions from both parties.

On March 11, 2003, the Court directed the Jury Administrator to immediately provide counsel with copies of all supplemental questionnaires received to date and to make available daily copies of additional questionnaires received. (Dkts. 235, 238). The Court also directed counsel for the parties to confer and provide to the Court a list of jurors they agreed should

---

[1] The Prescott Division master jury wheel contains approximately 70,000 names drawn from voter registration lists for the Northern Arizona counties of Apache, Coconino, Mohave, Navajo and Yavapai. (Transcript of Motions Hearings, Mar. 12, 2003, at 6-7).

[2] The Jury Administrator testified to this figure on March 12, 2003; however, she continues to receive responses from the initial mailing. As of March 27, 2003, the Jury Administrator and her staff had deemed 329 jurors qualified.

[3] Again, the Jury Administrator continues to receive initial questionnaires and to send out supplemental questionnaires. As of March 27, 2003, the Jury Administrator and her staff had mailed 296 supplemental questionnaires, and 268 had been returned to the Court.

be excused for cause. (Id.). The next day, during a motions hearing, counsel for Defendant Mitchell examined the Jury Administrator, and the Court granted counsel's motion for production of the list of 3,000 jurors initially summoned, the list of 295 deemed qualified by the administrator and her staff, and copies of the 32 standard questionnaires of jurors who were not sent the second, more detailed questionnaire. (Dkt. 239).

On March 21, 2003, the parties submitted a joint stipulation to excuse 14 of the prospective jurors based on responses contained in the supplemental questionnaires. At a pretrial conference held March 26, the parties agreed to excuse 2 additional jurors, and the Court proposed excusing an additional 64 based on excuse requests, contained in the supplemental questionnaires, relating to age, English proficiency, mental or physical infirmity, undue hardship and extreme inconvenience. See District of Arizona's Revised Jury Selection Plan, General Order 99-14 at 5-7 (June 23, 1999). Defense counsel objected to summarily excusing 25 of the 64, and the Court heard oral argument. (Dkt. 253). Subsequently, the Court issued an order summarily excusing a total of 62 jurors: 16 by stipulation of the parties for cause; 39 with no objection of the parties for age, English proficiency, mental or physical infirmity, undue hardship or extreme inconvenience; and 7 over defense counsel's objection for mental or physical infirmity, undue hardship or extreme inconvenience. (Dkt. 254). In addition, the Court informed the parties that the list of qualified jurors called to sit on the venire panel would consist of those individuals not summarily excused who had completed and returned their questionnaires to the Jury Administrator by March 27, 2003, and that any additional questionnaires received thereafter would be placed on standby in the event there are insufficient venirepersons to impanel a jury. On March 28, the Jury Administrator provided to counsel and the Court a randomly-drawn venire list of 207 qualified potential jurors.

## DISCUSSION

Defendant Mitchell's motion alleges a violation of the fair cross-section requirement of the JSSA based on perceived underrepresentation of Native Americans in his jury pool. See 28 U.S.C. §§ 1861-1878. Specifically, he asserts that Native Americans are

1 underrepresented in both the initial pool of 3,000 names randomly selected from the Prescott
2 master jury wheel, and from the 295 jurors identified by the Jury Administrator as statutorily
3 qualified to sit as trial jurors in this case. In a sworn statement of facts accompanying the
4 motion, defense counsel avows that defendant Mitchell is an enrolled member of the Navajo
5 tribe; that according to records of the United States Census Department for the 2000 census,
6 the adult population of the five Arizona counties in the Prescott Division is 18.64% Native
7 American; that an analysis of the 3,000 names randomly selected from the Prescott master
8 jury wheel demonstrates that approximately 517, or 17.23%, reside in towns believed to be
9 on Indian reservations; that examination of the 295 "statutorily eligible" jurors culled from
10 the initial 3,000 shows that only 41 are potentially Native American, or 13.89%; and that the
11 final venire for this trial will "inevitably contain a disproportionately smaller number of
12 Native Americans as a percentage of the entire panel than Native Americans bear to the adult
13 population of the Prescott Division or to the Prescott master jury wheel." (Dkt. 244 at 3).
14 Mitchell argues that this statistical disparity constitutes a *prima facie* violation of the JSSA.
15 Mitchell also contends the instant challenge is timely because it was brought within seven
16 days of learning the identities of the individuals summoned to sit as jurors in this case. See
17 28 U.S.C. § 1867(a).
18     In response, the government contends that Mitchell's challenge cannot be premised
19 on proof of underrepresentation in a single jury and that the composition of a jury need not
20 mirror that of the community. (Dkt. 249 at 3-4). The government also asserts that even
21 accepting Mitchell's claim that 17.23% of the 3,000 individuals summoned are Native
22 American compared to an available population of 18.64%, an absolute disparity of 1.23% is
23 within acceptable limits. (Id. at 4). Finally, the government argues that regardless of the
24 percentage disparity, Mitchell has failed to show that any underrepresentation of Native
25 Americans is a result of systematic exclusion.
26     In his reply brief, Defendant Mitchell alleges for the first time that he "has already
27 presented evidence that the use of the mail and complicated written materials sent to Native
28 Americans, together with the concept of using voter registration lists to choose jurors who

live in a sovereign nation with its own separate government, led to systematic underrepresentation of Native Americans." (Reply at 4). He also contends that the relevant comparison for purpose of his challenge is the composition of the Prescott Division master jury wheel to the composition of the venire in this case, and that an actual sampling conducted by the Jury Administrator reflects that Native Americans comprise 16.7% of the Prescott master jury wheel.[4] (Id.).

## I.  Statutory Challenge

In federal courts, jury selection is governed by the JSSA, 28 U.S.C. §§ 1861-1878. The first section of the Act declares: "It is the policy of the United States that all litigants in federal courts entitled to trial by jury shall have the right to grand and petit juries *selected at random* from a *fair cross section of the community* in the district or division wherein the court convenes." 28 U.S.C. § 1861 (emphasis added). The JSSA directs each federal judicial district to devise a plan for the random selection of jurors and provides criminal defendants a vehicle for challenging a court's compliance with the Act:

> In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of *substantial failure* to comply with the provisions of this title in selecting the grand or petit jury.

28 U.S.C. § 1867(a) (emphasis added).

### A.  Timeliness

The Court notes at the outset that Mitchell's motion is arguably untimely. Defendants were indicted and appointed counsel in November 2001. One year later, in a motion to reconsider the Court's order transferring trial to Phoenix, defendant Mitchell stated:

> The AJIS (automated information jury system) was first implemented in the Prescott Division in March of 2000. It allows jurors access to the system by using an assigned juror number. Every two months, the jury commissioner mails out approximately 2000 summonses and questionnaires

---

[4] This information is reflected in the Jury Administrator's May 2001 Report on Operation of the Jury Selection Plan, completed pursuant to 28 U.S.C. § 1863(a) on Form JS-12.

- 5 -

> to persons randomly selected from a jury wheel. According to information provided by Ms. Ana Baca, Jury Commissioner, to the Office of the Federal Public Defender, there is a high percentage of mailings that are undeliverable. Out of the 2000 people that are contacted, approximately 300 are deemed qualified and from that number, approximately 50 are selected to report for jury duty.
> The Prescott Division consists of Apache, Navajo, Coconino, Mohave and Yavapai Counties. According to information obtained from the 2000 United States Census, the total population of these counties was 439,816. Of that number, only 18.64% are Native American over the age of 18. These individuals are located using voter registration lists and some of the areas concerned are clearly remote and far from not only Prescott but Phoenix itself.
> Of that low percentage, it is reasonable to assume that an even lower percentage will be available to serve as jurors in this lengthy trial. Not only will the usual qualification requirements reduce the number of potential jurors but the travel and distance from family and their normal life will magnify the inconvenience that the transfer to Phoenix will pose.

(Dkt. 117 at 2). It is evident from this pleading that Mitchell's counsel were aware and considering, as far back as November 2002, the issue of whether reliance on voter registration lists results in the systematic underrepresentation of Native Americans in Prescott Division jury pools. However, counsel did not seek production of venire records until March 12, 2003, and even then, sought information relating only to potential jurors in this case and not Prescott Division venires generally. The JSSA directs that any allegation of substantial failure to comply with Act's requirements be raised "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier . . . ." 28 U.S.C. § 1867(a). It appears to the Court that Mitchell's challenge is untimely.

    B.    *Substantial Violation*

Even if Mitchell's statutory challenge were timely, the Court finds he is not entitled to relief because his motion fails to assert a substantial violation of the JSSA. Section 1867(d) of Title 28 requires the Court to assess whether the sworn statement of facts accompanying a Jury Act challenge, if true, constitutes a "substantial failure" to comply with the Act. In this case, counsel's statement of facts alleges only that the final venire for his trial will likely contain a disproportionately smaller number of Native Americans as a percentage of the entire panel than Native Americans bear to the adult population of the Prescott Division (18.64 %) or to the Prescott master jury wheel (16.7%).

On its face, the sworn statement fails to allege that the *system or process* by which the jury venire was selected from the master wheel is flawed. Mitchell's motion and supporting affidavit fail to establish that underrepresentation occurs generally or in venires other than his own. As discussed more fully below, a violation of the fair cross-section requirement cannot be premised upon proof of underrepresentation in a single jury. United States v. Miller, 771 F.2d 1219, 1228 (9th Cir.1985). Mitchell asserts for the first time in his reply brief that he has "already presented evidence" regarding the use of mail and complicated written materials to Native Americans, as well as the use of voter registration lists for jurors who live in sovereign nations. However, no such evidence in fact has been presented, and counsel failed to include these allegations in his sworn statement of facts. Cf. United States v. Bushyhead, 270 F.3d 905, 910 (9th Cir. 2001) (finding no violation of the JSSA where the defendant failed to provide statistics regarding the percentage of Native American voters that would have been in the jury pool had tribal voting lists been used in addition to county voting lists). There being no evidence and no allegation that the Court committed a substantial violation of the JSSA, Mitchell's motion based on 28 U.S.C. § 1867 is without merit.

## II.     Constitutional Challenge

To establish a *prima facie* violation of the Sixth Amendment's fair cross-section requirement, a defendant must show that: (1) the group alleged to be excluded is distinctive in the community; (2) representation of this group in jury venires is not fair and reasonable in relation to the number of such persons in the community; and (3) such under-representation is due to *systematic exclusion* of the group in the jury-selection process. Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979) (emphasis added). If a defendant makes a *prima facie* showing under Duren, the burden shifts to the state to justify the infringement by demonstrating that attainment of a fair cross-section is incompatible with a significant state interest. Duren, 439 U.S. at 367-68.

### A.     Distinctive Group

The first prong of the Duren test has been met. There is no dispute that Native Americans are a distinctive group in the community. See United States v. Brady, 579 F.2d

1  1121, 1131 (9th Cir. 1978).

2      B.    *Fair Cross-Section*

3      To meet the second prong of <u>Duren</u>, Mitchell must show that the representation of
4  Native Americans in Prescott Division venires from which juries were selected was not fair
5  and reasonable in relation to the number of Native Americans in the community. <u>United
6  States v. Sanchez-Lopez</u>, 879 F.2d 541, 547 (9th Cir. 1989). The Ninth Circuit has held that
7  "[t]he second prong of the <u>Duren</u> test requires proof, typically statistical data, that the jury
8  pool does not adequately represent the distinctive group in relation to the number of such
9  persons in the community." <u>United States v. Esquivel</u>, 88 F.3d 722, 726 (9th Cir. 1996). In
10 determining the underrepresentation of a particular group in jury venires, the Ninth Circuit
11 has consistently favored an absolute disparity analysis, which is derived by "taking the
12 percentage of the group at issue in the total population and subtracting from it the percentage
13 of that group that is represented on the master jury wheel." <u>Sanchez-Lopez</u>, 879 F.2d at 547;
14 see also <u>Esquivel</u>, 88 F.3d at 726.

15     Mitchell fails in two ways to establish the second prong. First, the mere observation
16 that a particular group is underrepresented on a particular panel does not support a
17 constitutional challenge. <u>United States v. James</u>, 453 F.2d 27, 29 (9th Cir. 1971). While
18 juries must be drawn from a source fairly representative of the community, the composition
19 of each jury need not mirror that of the community. <u>Taylor v. Louisiana</u>, 419 U.S. 522, 538,
20 95 S. Ct. 692, 701 (1975). Indeed, defendants "are not entitled to a jury of any particular
21 composition," <u>id.</u>, and the "Constitution does not require that the jury duplicate precisely the
22 community's statistical composition. Some deviation is expected." <u>United States v. Nelson</u>,
23 718 F.2d 315, 319-20 (9th Cir. 1983). Rather, to establish a successful fair cross-section
24 challenge, a defendant must show unfair underrepresentation of the excluded group generally
25 or in venires other than his own. <u>Cf.</u> <u>Duren</u>, 439 U.S. at 366, 99 S. Ct. at 669 (petitioner
26 successfully demonstrated that discrepancies occurred not just occasionally, but in every
27 weekly venire for nearly a year).

28     Second, even accepting Mitchell's statistics as appropriate, he has not demonstrated

- 8 -

substantial underrepresentation. If 18.64% of the population of the Prescott Division is Native American, and, if the Jury Administrator's random sampling of the Prescott master jury wheel is relied upon, 16.7% of the jurors on Prescott Division venires are Native American, the absolute disparity is only 1.94%. The Ninth Circuit has found absolute disparities below 7.7% to be insubstantial and constitutionally permissible. See United States v. Suttiswad, 696 F.2d 645, 649 (9th Cir. 1982) (absolute disparity of 2.8% for Blacks, 7.7% for Spanish, and 4.7% for Asians not substantial); United States v. Armstrong, 621 F.2d 951, 955-56 (9th Cir. 1980) (absolute disparity of 2.83% for Blacks not substantial); United States v. Kleifgen, 557 F.2d 1293, 1297 (9th Cir. 1977) (absolute disparity of 2.9% for Blacks and 4.4% for males was substantial); United States v. Potter, 552 F.2d 901, 905-06 (9th Cir. 1977) (absolute disparity of 2.7% for Blacks not substantial).

Moreover, the actual percentage of Native Americans on the venire in Mitchell's case is well within the acceptable range. Of the 207 potential jurors comprising the venire, 36 (17.39%) identify themselves as Native American. This constitutes an absolute disparity of only 1.25% in comparison to the overall Native American population in the Prescott Division and exceeds that of the Jury Administrator's sampling of the Prescott Division master jury wheel. Furthermore, the impact of underrepresentation in terms of the numerical composition of the jury venire is not statistically significant. In an array of 207 jurors, using the figures calculated, Native Americans are "underrepresented" by approximately 2 jurors. Defendant has not demonstrated this to be substantial underrepresentation.

C. *Systematic Exclusion*

Even if a significant disparity in the percentage of Native Americans were to exist in defendants' venire, the constitutional challenge would still fail because, as already noted above, Mitchell has failed to allege that such disparity is the result of *systematic* exclusion. See Ballard v. United States, 329 U.S. 187, 67 S. Ct. 261 (1946) (successful challenge must address itself to the system by which the jury box is filled, rather than the particular composition of a panel drawn from that box or the particular composition of the box).

**CONCLUSION**

Defendant's motion and supporting affidavit establish neither a substantial violation of the JSSA nor a *prima facie* violation of the Sixth Amendment's fair cross-section requirement. In addition, the Court finds that the actual venire drawn in this case represents a fair cross-section of the community and that the process used by the Court to select jurors followed the criteria and methods recommended by the JSSA.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Mitchell's Motion to Dismiss the Indictment or to Stay the Proceedings (Dkt. 243) is **DENIED**.

DATED this 31st day of March, 2003.

_____
MARY H. MURGUIA
United States District Judge