MICHAEL BAILEY
United States Attorney
District of Arizona
WILLIAM G. VOIT
Arizona State Bar No. 025808
Email: William.Voit@usdoj.gov
SHARON K. SEXTON
Arizona State Bar No. 012359
Email: Sharon.Sexton@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Lezmond Charles Mitchell,<br><br>Defendant. | No. CR-01-1062-PCT-DGC<br><br>**RESPONSE TO MOTION TO STRIKE EXECUTION WARRANT AND VACATE EXECUTION DATE AND TO ENJOIN ANY FURTHER VIOLATION OF THIS COURT'S JANUARY 8, 2003 JUDGMENT AND COMMITMENT ORDER; STAY OF EXECUTION PENDING RESOLUTION OF THIS MOTION (CR 606)**<br><br>**(Capital Case)**<br><br>**Oral Argument Requested** |

Now more than one full calendar year after the United States adopted its current lethal injection protocol and noticed its intent to execute him, and less than three weeks before his rescheduled execution date, Defendant Mitchell has filed a motion claiming that the protocol is inconsistent with language from the Federal Death Penalty Act (FDPA) included in the judgment. This motion is meritless on multiple independent grounds.

*First*, it is untimely. Mitchell could easily have brought this motion a year ago, when the protocol was adopted and his execution was initially scheduled. Indeed, four other inmates whose executions were scheduled at the same time as Mitchell's brought claims last year seeking to enjoin their executions on the ground that Mitchell now asserts (an alleged conflict with the FDPA) as part of a consolidated case encompassing several

separate suits challenging the federal lethal injection regulation and protocol in the District Court for the District of Columbia. Mitchell had earlier intentionally withdrawn from one of those suits. The inmates' claims were ultimately found to be "without merit" by the D.C. Circuit. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020) (per curiam) ("*Protocol Cases*"), *cert. denied sub nom. Bourgeois v. Barr*, No. 19-1348, 2020 WL 3492763 (U.S. June 29, 2020).

But now, after those claims were rejected by the D.C. Circuit and the Supreme Court declined review, Mitchell refiles in this Court on the eve of his rescheduled execution in order to seek a serial stay. That purposeful delay alone forecloses the last-minute injunction that Mitchell seeks, which the Supreme Court reiterated just weeks ago "should be the extreme exception, not the norm." *Barr v. Lee*, No. 20A8, 2020 WL 3964985, at *2 (U.S. July 14, 2020) (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019)); *see Bucklew*, 139 S. Ct. at 1134 (explaining that "the last-minute nature of an application" that "could have been brought" earlier, or "an applicant's attempt at manipulation," "may be grounds for denial of a stay") (citation omitted).

*Second*, Mitchell's interpretation of the FDPA is unpersuasive. The relevant text of the FDPA, governing the "manner" of implementing the sentence, *see* 18 U.S.C. § 3596(a), traces its roots back to legislation adopted in 1790. In the 230-year history of the federal death penalty, the federal government has never been obligated to comply with the minute details of state execution protocols—and in all that time, no federal execution has ever been carried out under a court order to follow such granular state procedures. As noted, just this year, the D.C. Circuit vacated an injunction against several other federal executions that was based on Mitchell's theory, and the Supreme Court declined review. As one D.C. Circuit judge explained, and three Supreme Court Justices strongly suggested, the FDPA's reference to the "manner" of execution incorporates only the basic method of execution in the state of conviction. *Protocol Cases*, 955 F.3d at 114 (Katsas, J., concurring); *Barr v. Roane*, 140 S. Ct. 353, 353 (2019) (Statement of Alito, J.) (explaining that this position was "very likely to prevail"). At most, under the view of the D.C. Circuit judge whose

- 2 -

vote was controlling, the FDPA further incorporates those state procedures established in legally binding statutes and regulations that constitute the law of the state. In all events, under *any* of the D.C. Circuit judges' view of the FDPA, there is no inconsistency between pertinent Arizona law and the federal protocol that will be used to execute Mitchell.

*Third*, all those defects aside, Mitchell's motion does not justify the relief it seeks. At most, Mitchell's FDPA claim would support an order requiring the government to implement his sentence after altering minor details of the execution protocol to conform with what Mitchell contends are aspects of Arizona law. Indeed, Mitchell cannot here challenge the lawfulness of his conviction or capital sentence. The alleged harm at issue is thus not Mitchell's death, nor even the method of execution, which Mitchell agrees must be lethal injection. Particularly in light of his belated challenge, the nature of the execution procedures Mitchell seeks to alter cannot justify a last-minute reprieve from the long-affirmed sentence for his terrible crimes.

## DISCUSSION

**I. The Motion Should be Denied Because Mitchell Delayed Too Long**

Mitchell has known about the language of his Judgment since 2003, and he has known about the federal government's current execution protocol since July 25, 2019, when the Department of Justice adopted it, filed it in the District of Columbia litigation challenging the protocol's validity, and delivered him notice of the United States' intent to carry out his sentence pursuant to federal regulations. There is no excuse for Mitchell waiting *over a year*, until August 6, 2020, to bring the instant challenge.

For the express purpose of avoiding last-minute stay applications, this Court held a status conference on August 15, 2019, to discuss "issues in the case that are coming in, timing, and making sure that we are doing it on a schedule that works." (CR 606-6 at F-076.) The Court specifically raised the D.C. case "challenging the federal execution protocol," in which Mitchell's lawyers are counsel of record for another inmate, and where Mitchell himself was previously a party. (*Id.* at F-081-82.) Mitchell's counsel represented to the Court that "I anticipate that he will be a party in that case before much longer." (*Id.*

at F-081-82.) When asked "So you're going to be seeking to intervene again on his behalf?", he answered: "Yes. More or less, yes." (*Id.*)

Indeed, without opposition, Mitchell had previously intervened in one of the D.C. protocol cases in 2014, emphasizing that his intervention was timely precisely because "Mitchell is not making this motion as a last-minute attempt to stay his execution." *Robinson v. Mukasey*, No. 07-CV-02145 (D.D.C. June 6, 2014), Dkt. 11 at 1. Mitchell then filed an Amended Complaint that referenced the FDPA in the course of arguing that the federal lethal-injection regulation and protocol were promulgated without statutory authority. *See id.*, Dkt. 12 at 9, 35. He later filed two separate pro se requests to withdraw from the case, *see id.*, Dkt. 14, 18, which the district court granted only after assuring itself that "Mr. Mitchell is fully aware of the legal consequences attendant to his withdrawal from this lawsuit," *id.*, Dkt. 20. Thus, Mitchell has known for years about the protocol litigation, as well as the consequences of withdrawing and trying to raise such issues elsewhere as "a last-minute attempt to stay his execution."

Recognizing the same concern, at the August 15, 2019 status conference, this Court specifically raised whether "there at some point [is] going to be a suggestion if the execution is going to be planned for it that he be moved here for Arizona procedures" or a claim "that if it occurs elsewhere it conforms with Arizona procedures." (CR 606-6 at F-085.) The United States responded that "our plan would be to respond if that matter is raised by the petitioner," while Mitchell's counsel stated there was a "litigation strategy" regarding the issue. (*Id.* at F-084-85.)

That litigation strategy, it turns out, was *not* to re-intervene in the protocol litigation and seek an injunction, but instead to sit on the claim for a full year, watch from the sidelines as the argument failed in the D.C. Circuit (and the Supreme Court denied review), and now raise it here at the eleventh hour as part of a motion to halt his execution. Although Mitchell now asks this Court to stop his execution, this Court "must take into consideration" Mitchell's "obvious attempt at manipulation," just as it must consider "the last-minute nature of an application to stay execution in deciding whether to grant equitable

relief." *Gomez v. U.S. Dist. Ct. for N. Dist. of California*, 503 U.S. 653, 654 (1992) (citations omitted).

Indeed, courts considering requests to halt executions must "apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (quoting *Nelson v. Campbell*, 541 U.S. 637, 650 (2004)). As the Supreme Court emphasized again just last month, last-minute stays of execution "should be the *extreme exception*, not the norm." *Lee*, 2020 WL 3964985, at \*2 (emphasis added) (quoting *Bucklew*, 139 S. Ct. at 1134).

The prejudice here is manifest. Given the twenty years of litigation already, the public, the victims, and the victims' family all have an overwhelming interest in the execution proceeding as scheduled. *See Bucklew*, 139 at 1134. As Mitchell well knows, many members of the victims' family have long supported his capital sentence. One has already made travel arrangements to be in Terre Haute for the August 26 execution.

There is no reason Mitchell could not have raised this issue a year ago, when his execution was first scheduled, which would have allowed for fair briefing, court consideration, and reasonable appeals. Mitchell has had a stay of execution for over ten months to litigate the denial of a Rule 60(b) motion in his civil case, leaving him ample time to litigate this issue if he wanted. He is not entitled to litigate one issue, get a stay, lose, keep waiting until his execution is rescheduled, and only then raise a second issue that he's known about all along in order to seek another stay. *See Gomez*, 503 U.S. at 654.

His motion should be denied for that reason alone. *See, e.g.*, *Bucklew*, 139 S. Ct. at 1134 (stating that "federal courts 'can and should' protect settled . . . judgments from 'undue interference' by invoking their 'equitable powers' to dismiss or curtail suits that are pursued in a 'dilatory' fashion or based on 'speculative' theories") (citation omitted); *Hill*, 547 U.S. at 584 (noting with approval that "a number of federal courts have invoked their equitable powers to dismiss suits they saw as speculative or filed too late in the day").

## II. The Federal Execution Protocol Does Not Violate the FDPA or the Judgment

If the Court reaches the merits despite this untimeliness, the motion still fails. The FDPA provides that "[w]hen the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Mitchell's judgment incorporates this language with only minor changes, providing for "implementation of the sentence in the manner prescribed by the law of the State of Arizona." (CR 466 at 2.)

As the Court is aware, this issue has been extensively litigated in the District of Columbia protocol litigation. After the district court entered an injunction relying on Mitchell's theory, three Supreme Court Justices stated that the government "is very likely to prevail when this question is ultimately decided." *Roane*, 140 S. Ct. at 353 (Statement of Alito, J.). That prediction proved accurate when the D.C. Circuit issued a per curiam opinion rejecting Mitchell's theory as "without merit." *Protocol Cases*, 955 F.3d at 112. When those inmates sought further review, the Supreme Court (by a vote of 7-2) both denied certiorari and denied the inmates' stay application. *Bourgeois*, 2020 WL 3492763.

The three D.C. Circuit judges all took different views of the statute's language. Writing separately, Judges Katsas and Rao concurred in the judgment, finding the federal protocol consistent with the FDPA, while Judge Tatel dissented. Judge Katsas concluded that the FDPA requires only compliance with the top-line decision of execution method, while Judge Rao concluded that state statutes and formal regulations are also included. Dissenting, Judge Tatel concluded that the FDPA also requires compliance with informal state regulations, although only those that actually effectuate the inmate's death. This Court, however, need not resolve the issue. Although Judge Katsas' analysis is the most persuasive, under any of these readings, the federal protocol is consistent with state "law."

### A. As Judge Katsas Held, the Manner of Execution is Lethal Injection

"The FDPA's text, structure, and history show that 'manner' refers only to the method of execution," and thus "the FDPA regulates only the top-line choice among

execution methods such as hanging, electrocution, or lethal injection." *Protocol Cases*, 955 F.3d at 113 (Katsas, J., concurring). That is the interpretation three Justices indicated was "very likely to prevail." *Roane*, 140 S. Ct. at 353 (Statement of Alito, J.). As those Justices wrote, this view is supported by "the ordinary meaning of these two terms" as well as by "the use of the term 'manner' in prior federal death penalty statutes." *Id.*

Although Defendant begins his discussion of the statutory language in 1937, this ignores the first 147 years of the relevant textual history. The operative language originates not in 1937, but rather in the Crimes Act of 1790. In the 1790 Act, the First Congress provided that for federal capital crimes, "the manner of inflicting the punishment of death, shall be by hanging the person convicted by the neck until dead." Crimes Act of 1790, ch. 9, § 33, 1 Stat. 112, 119. (**Exhibit A**.) It is indisputable, then, that for most of our nation's history, the law prescribing the "manner" of carrying out a capital sentence meant only the choice among methods (hanging) and had nothing to do with granular procedures (like drop length, type of rope, or placement of the knot).[1]

In 1937, Congress amended the statute, transplanting into the new law this same language about "the manner of inflicting the punishment of death." Specifically, the 1937 Act updated the law to provide that "[t]he manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State within which the sentence is imposed." *See* Pub. L. No. 75-156, 50 Stat. 304. (**Exhibit B.**) Nothing in the statutory language or history suggests any intended change to the 150-year understanding of this law as regulating only the method of execution.

For instance, when the Supreme Court was called upon to interpret the 1937 Act to decide whether a murderer in the then-Territory of Hawaii could be hanged, as provided under territorial law, the Court used "manner" interchangeably with "method" and "mode," in all instances referring simply to the general method of execution: "the power to sentence him to death by hanging." *See Andres v. United States*, 333 U.S. 740, 745 & n.6 (1948)

---

[1] This followed the common meaning under English law, where Blackstone equated "the manner of the execution" with its general method—e.g., "hanging," "burning," or "beheading." 4 W. Blackstone, *Commentaries on the Laws of England* 397-98 (1769).

(rejecting argument that "the phrase 'laws of the State' limits the [1937 Act] to the forty-eight states and, consequently, provides for no *method* of inflicting the death penalty" in territories, and further noting that "[t]he purpose of [the 1937 Act] was remedial: the adoption of the local *mode* of execution") (emphases added).

Indeed, the 1937 update had nothing to do with incorporating granular state procedures into federal law. Rather, as the Supreme Court recognized, "[t]he changes in the statute from [the 1790] language to the present [1937] language were prompted by the fact that 'Many States . . . use(d) more humane *methods* of execution, *such as electrocution, or gas*" and "it appear(ed) desirable for the Federal Government likewise to change its law *in this respect*." *Id.* at n.6 (quoting H.Rep. No. 164, 75th Cong., 1st Sess., 1 (1937)) (emphases added). (*See* **Exhibit C**.) Mitchell identifies nothing to suggest that Congress changed the law in *other* respects—e.g., by discarding the understanding that the statute refers to the method of execution and purporting to obligate the federal government, for the first time in history, to follow the subsidiary details of every state's execution protocol.

In 1984, as part of sentencing reforms, Congress repealed the 1937 Act, *see* Pub. L. No. 98-473, § 212, 98 Stat. 1987, eventually replacing it with the FDPA of 1994, *see* Pub. L. 103-322, Title VI, §§ 60001-26, 108 Stat. 1959. As Mitchell notes, the FDPA "included an implementation provision that closely tracked" the language of the 1937 Act. (CR 606 at 4.) Indeed, using virtually identical language, the FDPA again pointed to "the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a).

"[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018). As the statutory history shows, the FDPA traces back to Section 33 of the 1790 Act, which, in the specific context of federal executions, used "manner" to refer only to the top-line choice of method. Congress transplanted the same operative language into the 1937 Act and then the FDPA, thereby retaining its original meaning.

Mitchell argues that the FDPA "broadened the scope of state procedures invoked" from the 1937 Act. (CR 606 at 8.) He points to the FDPA's reference to "implementation"

- 8 -

of the sentence, rather than, as stated in the 1790 and 1937 Acts, "inflicting" the sentence. This is a weak prop upon which to support so weighty a supposed change to 200 years of statutory history. "Generally speaking, an amendatory act is not to be construed to change the original act or section further than expressly declared or necessarily implied." *Societe Civile v. Int'l Found. for Anticancer Drug Discovery*, 460 F. Supp. 2d 1105, 1110 (D. Ariz. 2006) (quotation omitted). Courts do not infer substantial statutory changes based on mere inference or ambiguous language. *See United States v. Ryder*, 110 U.S. 729, 739-40 (1884) ("The revisers would not have proposed, nor would congress have made, such a fundamental change in the law . . . without employing more appropriate terms for that purpose than those which the section contains. It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed."); *Schmidt v. United States*, 133 F. 257, 259-60 (9th Cir. 1904) ("It is not to be inferred that Congress by the revision intended to change the existing statute . . . unless the intention so to do has been clearly expressed.").

Here, Mitchell is asserting that the U.S. Congress and President acceded to a total transfer to state authorities of control over the minute details of all federal executions—including for quintessentially federal crimes such as espionage or treason—while at the same time imposing upon the federal government the substantial burden of complying with dozens and dozens of different state protocols, including those in states whose officials might be actively trying to frustrate death sentences. *See Roane*, 140 S. Ct. at 353 (Statement of Alito, J.) (noting that the position endorsed by Mitchell "would demand that the BOP pointlessly copy minor details of a State's protocol" and "could well make it impossible to carry out executions of prisoners sentenced in some States"). Mitchell does not succeed in shouldering the heavy burden necessary to establish this proposition.

For instance, in arguing that "'[i]mplementation' means more than a single act," Mitchell cites Merriam-Webster.com, which he says defines "implementation" as "the process of making something active or effective." (CR 606 at 5.) But contrary to his argument, the definition also includes "*an act or instance* of implementing something."

https://www.merriam-webster.com/dictionary/implementation (emphasis added). Mitchell next cites Black's Law Dictionary's definition of "Implementation *Plan*," but that is not the language of the statute. Indeed, this citation supports the government's view that the issue is not what "implementation" means in the abstract, but rather what term it modifies. The only implementing detail that must follow state law under the FDPA is the "manner" of carrying out the sentence of death.

Mitchell claims that "manner" itself means more than "method." (CR 606 at 5.) Again, that is hard to square with the fact that the term comes from the 1790 Act, where the term indisputably referred only to the general method of execution (hanging). And many dictionaries, including those contemporaneous to both the 1790 Act and the FDPA, confirm that "manner" is synonymous with "method." *See Protocol Cases*, 955 F.3d at 114-15 (Katsas, J., concurring) ("dictionaries indicate that 'manner' is synonymous with 'method' as well as 'mode'") (quoting *Manner*, Black's Law Dictionary (6th ed. 1990) ("A way, mode, method of doing anything, or mode of proceeding in any case or situation."); 1 J. Ash, *The New and Complete Dictionary of the English Language* (2d ed. 1795) (defining "manner" as "[a] form, a method"); 2 S. Johnson, *A Dictionary of the English Language* (1755) ("Form; method").).[2]

Mitchell also points to the word "prescribed" (CR 606 at 5), but none of the dictionaries he cites is at all inconsistent with (or even relevant to) the longstanding understanding of the statute's scope. Indeed, that word comes from the 1937 Act, which as discussed was enacted to permit use of "more humane *methods* of execution, *such as electrocution, or gas*." *Andres*, 333 U.S. at 745 n.6 (quoting the House Report).

Historical practice bears out the government's view. Defendant fails to point to a single execution in U.S. history in which the federal government was obligated to conform its execution procedures to subsidiary state protocols. While the federal government often

---

[2] Judge Katsas ably explains why, like most words, "manner" in different statutes can mean different things. For instance, the word's use in 18 U.S.C. § 3592(c)(6), cited by Mitchell, arose from a separate context, the Anti-Drug Abuse Act of 1988, enacted almost two centuries after the federal manner of execution statute, which is the relevant context here. *See Protocol Cases*, 955 F.3d at 122 (Katsas, J., concurring).

chose to carry out executions under the 1937 Act in state facilities in cooperation with state personnel, Congress permitted that as an option ("may use"), not a mandate. Pub. L. No. 75-156, 50 Stat. 304. The FDPA continues to permit the federal government to use state facilities and personnel, and it remains framed as an *option*, not an exception allowing the use of federal facilities and personnel despite state law. 18 U.S.C. § 3597; *see also Protocol Cases*, 955 F.3d at 119 (Katsas, J., concurring) ("[P]roviding that the federal government 'may' use 'State' facilities would be a remarkably clumsy way of permitting the federal government to use federal facilities."). Mitchell's contrary interpretation of the statute—mandating that the federal government follow state protocols that commonly require the use of state facilities, personnel, and resources—would render Section 3597 at best superfluous, and at worst contradictory.

Rather than submitting itself to state protocols, when the federal government announced the first executions under the 1937 Act, it was understood that the inmates would "be executed by whatever *method* is prescribed by the law of the State," while the Department of Justice would provide "all U.S. Marshals instructions for carrying out executions" that would govern "[u]nless [a] court specifies otherwise." (**Exhibit D** (Associated Press, *U.S. Arranging To Execute Five*, June 17, 1938 (emphasis added) (also citing federal instructions regarding execution time and number of witnesses).) True to form, for the first federal execution in a state facility under the 1937 Act, the federal "government's supervision over the execution" was "so strict" that the local sheriff "was forced to obtain special permission from Washington to be present." (**Exhibit E** (United Press, *Seadlund Will Die Tonight*, July 13, 1938).)

The Bureau of Prisons confirmed this understanding of the statute in its 1942 Manual of Policies and Procedures, pursuant to which federal executions were carried out under the 1937 Act. The manual explains that the 1937 Act's "manner" provision "refers to the *method* of imposing death, whether by hanging, electrocution, or otherwise, and *not to other procedures* incident to the execution prescribed by the State law." (*See* **Exhibit F** (emphases added).) The Supreme Court has long placed "weight" on agency "practice" in

interpreting statutes, particularly when the practice "involves a contemporaneous construction of a statute by [those] charged with the responsibility of setting its machinery in motion." *Norwegian Nitrogen Prods. Co.* v. *United States*, 288 U.S. 294, 315 (1933).

This agency practice has continued through the present. The federal government has executed six inmates since 1994: Timothy McVeigh and Juan Garza in 2001; Louis Jones in 2003; and Daniel Lee, Wesley Purkey, and Dustin Honken in 2020. All of those executions occurred in the federal execution chamber at the U.S. Penitentiary in Terre Haute, Indiana, and each was conducted under federal procedures, not state protocols.[3]

Finally, "[a]dherence to the minutiae of state execution protocols is not only pointless, but practically impossible." *Protocol Cases*, 955 F.3d at 120 (Katsas, J., concurring). Mitchell's interpretation of the Arizona protocol, ostensibly, would require the federal government to make use of "green" and "black" syringe labels, generate things like a "designated syringe number," and complete specified state log forms. (CR 606-3 at C-034-35.) The notion that the federal statute has any interest in such tangential procedural details is entirely without foundation. Moreover, Mitchell's argument would empower state governors or even mid-level state prison officials to decide whether the federal government can actually execute federal criminals by generating state protocols that are unmanageable, or by simply refusing to disclose them. Indeed, some state statutes *prohibit* disclosure of state execution protocols. *See, e.g.*, Ark. Code Ann. § 5-4-617(i)(1) (2019).

Especially in the death penalty context, the Supreme Court is sensitive to such practical concerns. *See Baze* v. *Rees*, 553 U.S. 35, 47 (2008) (plurality op. of Roberts, C.J.) ("[Given] that capital punishment is constitutional . . . [i]t necessarily follows that there must be a means of carrying it out."). The interpretation Mitchell suggests is not the law Congress could have intended. Under the proper interpretation, application of the federal

---

[3] Mitchell points to failed legislative proposals to amend the FDPA (CR 606 at 8-9), but "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 187 (1994) (quotation omitted). Judge Katsas' concurrence ably dispatches this argument. *See Protocol Cases*, 955 F.3d at 122 (Katsas, J., concurring).

protocol to Mitchell complies with the FDPA because it applies the same method of execution as provided by Arizona law—namely, lethal injection.

### B. Under Judge Rao's View, There is No Conflict With State Law

Judge Rao also agreed that the federal protocol "did not exceed the government's authority" under the FDPA. *Protocol Cases*, 955 F.3d at 142 (Rao, J., concurring). Unlike Judge Katsas, however, Judge Rao reasoned that the FDPA "requires the federal government to apply only those execution procedures prescribed by a state's statutes and formal regulations, but leaves the federal government free to specify other procedures or protocols not inconsistent with state law." *Id.* at 129. Critically, though, the "law of the State," in her view, only "refers to binding law prescribed through formal lawmaking procedures," meaning "only statutes and regulations carrying the force of law." *Id.* at 132.

Even under Judge Rao's view, the federal protocol is consistent with Arizona "law." Arizona's statute on the "[m]ethod of infliction of sentence of death," A.R.S. § 13-757(A), includes no procedures. Rather, it simply provides that "[t]he penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections." *Id.* Rather than appearing in a statute or formal regulation, Arizona's execution protocol appears in a "department order" issued by the Director of the Arizona Department of Corrections (ADOC). (*See* CR 606-3 (Order 710).) That order bears none of the hallmarks of "binding law prescribed through formal lawmaking procedures" that Judge Rao envisioned. *Protocol Cases*, 955 F.3d at 132 (Rao, J., concurring).

Indeed, "[r]ules made by the state department of corrections" are expressly exempted from Arizona's Administrative Procedure Act, *see* A.R.S. § 41-1005(22), and courts have long recognized that "Arizona leaves the precise protocol for carrying out executions by lethal injection to the discretion of the state's department of corrections," *Towery v. Brewer*, No. CV-12-245-PHX-NVW, 2012 WL 592749, at *12 (D. Ariz. Feb. 23, 2012). Mitchell claims that Order 710 is "part of Arizona law" because ADOC's authority to promulgate it derives from statutory authority. But Judge Rao rejected that

- 13 -

reasoning. *Protocol Cases*, 955 F.3d at 132 n.4 (Rao, J., concurring). As her analysis points out, agencies invariably "issue interpretive rules pursuant to their statutory authority, yet interpretive rules emphatically do not carry the force of law." *Id.*

Mitchell also claims that Order 710 is Arizona "law" because ADOC "entered an agreement" to settle certain claims in the *First Amendment Coalition* lawsuit. (CR 606 at 9.) But the ADOC Director's settlement does not turn his power to order state protocols outside of formal rulemaking into "binding law prescribed through formal lawmaking procedures." *Protocol Cases*, 955 F.3d at 132 (Rao, J., concurring). The Settlement Agreement is a contract, and there is no evidence that any formal rulemaking process went into it. Indeed, ADOC was able to enter into this Settlement Agreement at its discretion precisely because it has the authority to revise the protocol *without* formal lawmaking procedures. If the parties to that case wanted, a different settlement agreement could be entered tomorrow, again without formal lawmaking procedures.

Thus, Mitchell misses the mark in invoking ADOC's voluntary agreement to omit language stating that the state protocols "do[] not create any legally enforceable rights or obligations." Many things impose "legally enforceable rights or obligations" but still are not "law." Every contract imposes the former but is not the latter. Indeed, the notion that the Director of ADOC could unilaterally create the "law" of the state through a settlement agreement is particularly dubious in Arizona, which is governed by one of the strongest separation-of-powers provisions of any state constitution. *See* Ariz. Const. art. III. Under that provision, "[t]he legislature has the exclusive power to declare what the law shall be." *State ex rel. Woods v. Block*, 189 Ariz. 269, 275, 942 P.2d 428, 434 (1997) (quoting *State v. Prentiss*, 163 Ariz. 81, 85, 786 P.2d 932, 936 (1990)). "In contrast, the executive branch's duty is to carry out the policies and purposes declared by the Legislature," and the Arizona Supreme Court has "emphasized that separation of power between the branches of government requires that 'those who make the law be different from those who execute and apply it.'" *Id.* (quoting *Matter of Walker*, 153 Ariz. 307, 310, 736 P.2d 790, 793 (1987)).

In short, there is nothing about the ADOC-promulgated protocol that would qualify as "the law of the State of Arizona." (CR 466 at 2.) The only state law governing the manner of executing a death sentence is limited to prescribing lethal injection, which is just what the federal protocol provides. As such, the federal protocol is entirely consistent with the FDPA and the Judgment under Judge Rao's view as well.

### C. Even under Judge Tatel's View, Mitchell is Not Entitled to Relief

Dissenting in the *Protocol Cases*, Judge Tatel's view was that the FDPA "requires federal executions to be carried out using the same procedures that states use to execute their own prisoners," including procedures "in protocols issued by state prison officials pursuant to state law." 955 F.3d at 146 (Tatel, J., dissenting). However, even this dissent recognized that does not mean wholesale importation of every state procedure. Rather, the dissent explained that the only components of a state protocol that could bind the federal government would be those that actually "effectuate the death" of the inmate:

> Plaintiffs, however, do not contend that the government must follow every nuance. Quite to the contrary, they argue, and I agree, that section 3596(a) requires the federal government to follow only implementation procedures, which plaintiffs define as those procedures that effectuate the death, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements.

*Id.* at 151 (internal quotations, citations, and brackets omitted). *See also Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020) ("even the dissenting judge accepted that § 3596(a) does not require the BOP to follow 'every nuance' of state execution procedure, but rather only 'those procedures that effectuate the death'").

Of the ten items Mitchell identifies as supposedly being in conflict with the federal protocol, the majority have nothing to do with "implementation procedures . . . that effectuate the death" on the order of "choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements." *Protocol Cases*, 955 F.3d at 151 (Tatel, J., dissenting). Rather, Mitchell focuses on pre-execution notices and disclosures, facilities for counsel, the number defense lay witnesses who may attend, and the availability of "delay" or "discretion" generally. (CR 606 at 10-12.) These are not "implementation

procedures . . . that effectuate the death." *Protocol Cases*, 955 F.3d at 151 (Tatel, J., dissenting). As the Seventh Circuit unanimously held in rejecting the claim that the FDPA incorporated state execution procedures related to witnesses, "Section 3596(a) cannot be reasonably read to incorporate every aspect of the forum state's law regarding execution procedure." *Peterson*, 965 F.3d at 554 ("We do not understand the word 'manner' as used in § 3596(a) to refer to details such as witnesses."). There is no precedent for Mitchell's vast argument that every procedure, starting with the initial notice, falls under the FDPA.

In fact, some of Mitchell's arguments affirmatively undermine his interpretation of the FDPA. Consider his claim that the federal government must comply with an "Arizona statute [that] requires at least 35 days' notice of an execution date." (CR 606 at 12.) In fact, the statute he cites governs when Arizona's "supreme court shall issue a warrant of execution." A.R.S. § 13-759(A). Likewise, he refers to the power of the "state supreme court" to delay execution warrants under a state court rule. (CR 606 at 12.) If such things were part of the "manner" of "implementation of the sentence" of death, 18 U.S.C. § 3596(a), then the law would be nonsensical. It would mean that Congress intended federal officials to seek execution warrants from separate sovereigns with no role in the federal case and no power to issue them.

The only items in Mitchell's list that could arguably fall under Judge Tatel's reading of the statute are "Qualifications for placing IVs," "IV access," and "Expiration of lethal-injection drugs." (CR 606 at 10.) But there is no conflict between the federal and state protocols on these points. The federal protocol does not prohibit what the Arizona protocol requires, and Mitchell offers no evidence that his execution will offend state procedures. To the contrary, BOP will use qualified personnel for its execution team. *See In re BOP Execution Protocol Cases*, 19-MC-145, Dkt. 39-1, A.R. 874, ¶ D ("qualified personnel" include, among others, currently licensed physicians, nurses, EMTs, Paramedics, Phlebotomists, and other medically trained personnel). BOP has tested its compounded pentobarbital for quality assurance. *Id.*, Dkt. 39-1, A.R. 970-1015; Dkt. 97, A.R. 1075-1083. And BOP's "Guidelines for Compounding and Testing Pentobarbital Sodium for

Use in Executions" specifically require, among other things, that the pentobarbital solution be unexpired and that it must have passed quality assurance testing conducted by at least one independent laboratory. *Id.*, Dkt. 97, A.R. 1085.

In short, with few exceptions, Mitchell's claimed inconsistencies have nothing to do with the "procedures that effectuate the death" that Judge Tatel's dissent would require, and for the small minority that arguably do, his arguments are entirely speculative and involve no actual conflict. Thus, under any construction of the law, Mitchell's motion fails.

### III. Mitchell Does Not Justify the Relief He Seeks

Although Mitchell refers to a "stay" in the caption of his motion, and in a separate motion (CR 609), the relief he seeks here is actually an injunction. *See Nken v. Holder*, 556 U.S. 418, 428 (2009) (discussing the difference). An "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. NRDC*, 555 U.S. 7, 32 (2008) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.").

Here, Mitchell's challenge involves only alleged procedural violations, not that he cannot be executed, and he fails to make any showing that real-world harm is likely to be caused by the federal protocol. On the other hand, the United States, the victims, and their families all have a powerful and legitimate interest in carrying out this capital sentence for a brutal crime committed almost twenty years ago. The Supreme Court in *Winter* vacated an injunction in similar posture. *See id.* at 32-33 ("Given that the ultimate legal claim is that the Navy must prepare an EIS, not that it must cease sonar training, there is no basis for enjoining such training in a manner credibly alleged to pose a serious threat to national security."). *See also Protocol Cases*, 955 F.3d at 126-29 (Katsas, J., concurring) (in light of strong countervailing interests, injunctive relief not proper where "the plaintiffs contend only that their executions cannot occur until the federal government replicates every jot-and-tittle of the relevant state execution protocols"). Particularly in light of his belated challenge to such procedures, Mitchell fails to justify a last-minute injunction.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion should be denied.

RESPECTFULLY SUBMITTED this 10th day of August, 2020.

          MICHAEL BAILEY
          United States Attorney
          District of Arizona

          */s William G. Voit*
          WILLIAM G. VOIT
          SHARON K. SEXTON
          Assistant U.S. Attorneys

# **CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of August, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Jonathan C. Aminoff
  Email: Jonathan.Aminoff@fd.org
Celeste Bacchi
  Email: Celeste_Bacchi@fd.org
Federal Public Defender's Office
Central District of California
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-5374
Facsimile: (213) 894-0310

Attorneys for Defendant Lezmond Charles Mitchell

/s     William G. Voit
U.S. Attorney's Office