MICHAEL BAILEY
United States Attorney
District of Arizona
WILLIAM G. VOIT
Arizona State Bar No. 025808
Email: William.Voit@usdoj.gov
SHARON K. SEXTON
Arizona State Bar No. 012359
Email: Sharon.Sexton@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-01-1062-PCT-DGC |
|---|---|
| Plaintiff, | **RESPONSE TO MOTION FOR STAY OF EXECUTION (CR 609)** |
| v. | **(Capital Case)** |
| Lezmond Charles Mitchell, | **Oral Argument Requested** |
| Defendant. | |

Defendant Mitchell is before this Court after having been convicted and sentenced to death for the 2001 carjacking, torture, murder, and dismemberment of a grandmother and her nine-year-old granddaughter. In the nearly two decades of ensuing litigation, his conviction and sentence have been consistently upheld by every court to review them.

On July 25, 2019, the United States adopted its current lethal injection protocol and noticed its intent to execute Mitchell. Yet one full calendar year passed before Mitchell brought any claim that the federal protocol is inconsistent with language from the Federal Death Penalty Act included in his judgment. (CR 606.) It was not until August 7, 2020, nineteen days before his rescheduled execution, that he filed the instant motion to halt that execution. (CR 609.) That motion should be denied.

Courts should apply a strong equitable presumption against enjoining an execution when the prisoner's argument could have been raised earlier without requiring such relief.[1] Here, at a status conference on August 15, 2019, Mitchell acknowledged the issue he now raises and announced an intention to pursue it. But he chose not to do so, instead holding the issue in reserve until his execution was rescheduled in order to seek serial stays through piecemeal litigation. The strong equitable presumption against a stay under these circumstances calls for the denial of his motion.

Additionally, a court cannot halt an execution absent a showing of likely success on the merits. The key statutory language underlying Mitchell's claim—the provision governing the "manner" of execution—traces its roots back to a statute adopted in 1790. Yet in the 230 years since then, no federal execution has ever been carried out under a court order requiring the federal government to follow granular details of state execution protocols. Just this year, the D.C. Circuit declined to invalidate any of the four other federal executions challenged under this theory, and the Supreme Court declined review. Indeed, every single federal execution to take place after enactment of the FDPA has been carried out under federal procedures. In the face of that history, Mitchell does not show the kind of probable success necessary to enjoin his execution.

Lastly, the equities cut substantially against Mitchell, who perpetrated gruesome crimes against vulnerable victims and who has enjoyed nearly two decades in which to

---

[1] Although Mitchell requests a "stay," the underlying relief he seeks is actually an injunction, which is "a means by which a court tells someone what to do or not to do"—an "in personam" order "directed at someone, and govern[ing] that party's conduct." *Nken v. Holder*, 556 U.S. 418, 428 (2009). Mitchell argues that federal officials will carry out the terms of his sentence in violation of the FDPA, a claim that would at most support an order precluding those officials from implementing his sentence absent use of what Mitchell contends are the required procedures. In contrast, "instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself . . . by temporarily divesting an order of enforceability." *Id.* "The whole idea [of a stay] is to hold *the matter under review* in abeyance" given lack of time "to decide the merits." *Id.* at 432 (emphasis added). But here, the "matter under review" is not Mitchell's sentence, and an order temporarily setting it aside—as a stay would do—is beyond this court's jurisdiction in this non-habeas challenge. *See Hill v. McDonough*, 547 U.S. 573, 580 (2006) (permitting challenge to execution method outside habeas only where there was no "challenge to the fact of the sentence itself"). Mitchell thus cannot use this challenge to the method of his execution to "temporarily suspend[] the source of authority to act—the order or judgment in question," *i.e.*, his capital sentence. *Nken*, 556 U.S. at 428-29.

- 2 -

litigate, including over a year since the government announced its intention to execute him using the federal protocol. And he seeks injunctive relief to litigate not asserted innocence or any risk of unconstitutional pain, but rather technical details. The strong interests of the United States, the public, the victims, and victim family members substantially outweigh whatever interest Mitchell has in such speculative arguments.

For these and the following reasons, the motion should be denied.

## DISCUSSION

Standard injunctive principles "apply even in the context of an impending execution." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citing *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012)). "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To halt an impending execution, then, an inmate "must demonstrate (1) that he is likely to succeed on the merits of [his] claim, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Alternatively, injunctive relief could be granted if he demonstrated either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Beardslee v. Woodford*, 395 F.3d 1064, 1067 (9th Cir. 2005) (internal quotation and brackets omitted). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Id.* (quotation omitted).

Mitchell fails to meet any part of the standard necessary to halt his execution.

**I.     Mitchell's Year of Delay Requires Denial of his Motion**

Because "a stay of execution is an equitable remedy," any "court considering a stay must . . . apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without

requiring entry of a stay.'" *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (quoting *Nelson v. Campbell*, 541 U.S. 637, 650 (2004)). Indeed, "before granting a stay [of execution], a district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson*, 541 U.S. at 649-50.

The Supreme Court has specifically criticized suits that are "dilatory or speculative" or that seek to employ "[r]epetitive or piecemeal litigation" to delay the carrying out of capital sentences. *Hill*, 547 U.S. at 584-85. Thus, courts also "must take into consideration" an inmate's "attempt at manipulation" and "the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." *Gomez v. U.S. Dist. Ct. for N. Dist. of California*, 503 U.S. 653, 654 (1992). As the Supreme Court emphasized again just last month, last-minute stays "should be the *extreme exception*, not the norm." *Barr v. Lee*, No. 20A8, 2020 WL 3964985, at *2 (U.S. July 14, 2020) (emphasis added) (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019)).

Here, there is no reason Mitchell could not have raised this issue a year ago, when his execution was first scheduled. On July 25, 2019, the Department of Justice adopted and publicly filed the lethal injection protocol that he now challenges. (CR 606-1.) On that same date, the United States delivered notice of its intent to carry out his sentence pursuant to federal regulations. *See* Dkt. 84-1, *Lezmond Mitchell v. United States*, No. 09-cv-08089-DGC (D. Ariz.). His original execution date was scheduled for December 11, 2019. (*Id.*) The December execution was eventually stayed by the Ninth Circuit on October 4, 2019, pending resolution of an appeal of the denial of a Rule 60(b) motion. To date, that stay has given Mitchell more than ten months to raise this argument for litigation in the ordinary course. Yet Mitchell chose not to raise his argument, despite losing on the merits of his Rule 60(b) appeal, losing a petition for rehearing en banc, and losing on a motion to stay the mandate. Only now, after his execution has been rescheduled for just a few weeks in the future, does he do so.

The issue Mitchell seeks to litigate was well known to him a year ago. At the August 15, 2019, status conference, this Court itself raised the question of the FDPA language in the judgment. (CR 606-6 at F-085.) The United States opined that "our plan would be to respond if that matter is raised by the petitioner," while Mitchell stated he had a "litigation strategy" regarding the issue. (*Id.* at F-084-85.) Further, the Court also specifically identified the ongoing District of Columbia litigation "challenging the federal execution protocol," in which Mitchell's lawyers are counsel for another inmate. (*Id.* at F-081-82.) Mitchell updated the Court on that litigation and forecast that he would re-intervene and "be a party in that case before much longer." (*Id.*)

Indeed, Mitchell's knowledge of the underlying legal issues and the risks of untimeliness dates back even further. In 2014, Mitchell intervened in one of the D.C. protocol cases, emphasizing that his intervention was timely precisely because "Mitchell is not making this motion as a last-minute attempt to stay his execution." *Robinson v. Mukasey*, No. 07-CV-02145 (D.D.C. June 6, 2014), Dkt. 11 at 1. Mitchell then filed an Amended Complaint that referenced the FDPA in the course of arguing that the federal lethal-injection regulation and protocol were promulgated without statutory authority. *See id.*, Dkt. 12 at 9, 35. But Mitchell intentionally chose to forgo participating further in that litigation, filing two separate pro se requests to withdraw in 2017. *Id.*, Dkt. 14, 18. The district court granted these requests only after assuring itself that "Mr. Mitchell is fully aware of the legal consequences attendant to his withdrawal from this lawsuit." *Id.*, Dkt. 20.

Mitchell's only defense for waiting until the eve of his rescheduled execution is to claim the motion is "timely" because it was filed after "notice of the Government's intention to execute him in [purported] contravention of the terms of this Court's judgment and the FDPA." (CR 609 at 10.) But as laid out, Mitchell today stands in exactly the same shoes in which he stood a year ago. The language in his execution notices is functionally identical. (*Compare* CR 606-2, with Dkt. 84-1, *Lezmond Mitchell v. United States*, No. 09-cv-08089-DGC (D. Ariz.).) He indisputably has known about the language of the

Judgment, the FDPA, and the federal protocol since July 25, 2019, and if he had a challenge to bring, he had to bring it promptly. He did not do so.

Holding back on pursuing a claim in order to seek serial stays of execution is a classic example of "piecemeal litigation" that the Supreme Court does not countenance. *Hill*, 547 U.S. at 584-85. If parties could do what Mitchell has done here—obtain a stay to litigate one issue, lose, wait for the execution to be rescheduled, and only then raise the next issue and seek a further stay—then last-minute stays would be the "norm," not the "extreme exception" the Supreme Court requires. *Lee*, 2020 WL 3964985, at *2; *Bucklew*, 139 S. Ct. at 1134. Because Mitchell has "delayed unnecessarily in bringing the claim," *Nelson*, 541 U.S. at 649-50, which "could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay," *Hill*, 547 U.S. at 584, his motion should be denied.

## II. Mitchell Fails to Show a Likelihood of Success on the Merits

"A federal court will only grant a stay of execution where the inmate seeking the stay can show a significant possibility of success on the merits." *Moormann v. Schriro*, 672 F.3d 644, 647 (9th Cir. 2012). A stay of execution must be denied where the inmate fails to meet this burden. *See, e.g.*, *Cook*, 688 F.3d at 613 ("Because Cook . . . fails to show a significant possibility of success on the merits, we must deny his request for a stay [of execution].") (internal quotation omitted).

Mitchell fails to make any substantial showing that his argument will succeed. The United States discusses the merits issue extensively in Part II of its contemporaneously-filed response to Mitchell's underlying motion. In the interests of furthering the Court's expedited review of the matter, the government incorporates those arguments by reference and offers only a summary here.

Under any view of the FDPA articulated by the three judges in *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020) ("*Protocol Cases*"), the federal protocol is entirely consistent with Arizona law. Judge Katsas' concurrence persuasively traces the text, structure, and history of the FDPA back to the Crimes Act of

1790, where the operative language about the "manner" of carrying out the sentence originates, and rightly concludes that "the FDPA regulates only the top-line choice among execution methods such as hanging, electrocution, or lethal injection." *Protocol Cases*, 955 F.3d at 113 (Katsas, J., concurring).

That is consistent with the undeniable meaning of the 1790 Act, which only regulated the execution method ("hanging"), not procedural details. The 1937 Act's substitution of the state's manner of inflicting death had nothing to do with incorporating granular state procedures beyond the execution method. Rather, the 1937 Act was "prompted by the fact that 'Many States . . . use(d) more humane *methods* of execution, *such as electrocution, or gas*" and "it appear(ed) desirable for the Federal Government likewise to change its law *in this respect*." *Andres v. United States*, 333 U.S. 740, 745 n.6 (1948) (quoting H. Rep. No. 164, 75th Cong., 1st Sess., 1 (1937)) (emphases added). The FDPA's re-use of the same term carries forward its same original meaning. *See Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018).

There is no persuasive evidence that subsequent statutory changes were meant to change this original meaning of the "manner" of execution. "Generally speaking, an amendatory act is not to be construed to change the original act or section further than expressly declared or necessarily implied." *Societe Civile v. Int'l Found. for Anticancer Drug Discovery*, 460 F. Supp. 2d 1105, 1110 (D. Ariz. 2006). If Congress intended to change the original meaning of the federal manner of execution statute to require federal incorporation of the minute details of dozens of different state execution protocols, it would have been express. Courts will not merely infer such substantial statutory changes.

Further, the Supreme Court has long placed "weight" on agency "practice" in interpreting statutes, particularly when the practice "involves a contemporaneous construction of a statute by [those] charged with the responsibility of setting its machinery in motion." *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933). As laid out, the contemporaneous understanding by BOP in its 1942 Manual of Policies and Procedures was that the 1937 Act's "manner" provision "refers to the method of

imposing death, whether by hanging, electrocution, or otherwise, and not to other procedures incident to the execution prescribed by the State law." And there is not a single example of the federal government ever being bound to use the minutiae of state protocols, even when it availed itself of the option to coordinate with state facilities.

Further, even under Judge Rao's concurrence, there is no conflict between the federal protocol and Arizona "law," meaning in her view "only statutes and regulations carrying the force of law." *Protocol Cases*, 955 F.3d at 132 (Rao, J., concurring). Arizona's statute on the "[m]ethod of infliction of sentence of death," only requires lethal injection. A.R.S. § 13-757(A). The ADOC's use of a Director's Order for state execution protocols is not formal lawmaking, from which the agency's rules are statutorily exempt. A.R.S. § 41-1005(22).

Finally, even Judge Tatel would not embrace Mitchell's vast argument. In his view, "section 3596(a) requires the federal government to follow only implementation procedures," meaning only "those procedures that effectuate the death," on the order of the "choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements." *Protocol Cases*, 955 F.3d at 151 (Tatel, J., dissenting). *See also Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020) ("even the dissenting judge accepted that § 3596(a) does not require the BOP to follow 'every nuance' of state execution procedure, but rather only 'those procedures that effectuate the death'"). Mitchell's motion refers overwhelmingly to state procedures well beyond that scope.

All six of the federal inmates executed since 1994 have been executed under federal, not state protocols. Against that sort of a backdrop—where no federal execution has been carried out under a court order requiring use of a state protocol—Mitchell's burden to show likely success on the merits faces a high bar, which he fails to surmount. *See Lee*, 2020 WL 3964985, at *1 (improper for district court to enter a last-minute stay for inmates to litigate a challenge to the federal protocol's use of pentobarbital, reasoning that the inmates "face[d] an exceedingly high bar" to show likely success on the merits given the drug's history in executions and the lack of precedent holding it unconstitutional). Thus, Mitchell

1  fails to show he is likely to succeed on the merits, and his motion must be denied for that
2  reason alone.

3  **III.     Mitchell Does Not Show Irreparable Injury**

4  The Supreme Court has held there is no right to a stay "even if irreparable injury
5  might otherwise result," *Nken v. Holder*, 556 U.S. 418, 433 (2009), but it bears noting that
6  Mitchell does not show irreparable injury. While being executed is certainly "irreparable,"
7  that is not the relevant "injury" at issue in Mitchell's motion, which does not challenge the
8  lawfulness of his conviction or sentence. Rather, his asserted injury is that he "could be
9  executed by means of an illegal protocol." (CR 609 at 7.) As discussed extensively,
10 Mitchell fails to show the federal protocol is "illegal." It has already been used to execute
11 three other federal inmates, with the Supreme Court repeatedly vacating further stays of
12 those executions. *See, e.g.*, *Barr v. Lee*, No. 20A8, 2020 WL 3964985 (U.S. July 14, 2020);
13 *Barr v. Purkey*, No. 20A10, 2020 WL 4006821 (U.S. July 16, 2020). The Supreme Court,
14 moreover, denied those inmates' request for a stay pending further review of the FDPA
15 claim that Mitchell now asserts, notwithstanding arguments very similar to those Mitchell
16 makes here. *Bourgeois v. Barr*, No. 19A1050, 2020 WL 3492763 (U.S. June 29, 2020).

17 But in any event, to obtain the extraordinary remedy of a stay of execution, Mitchell
18 must do much more than allege that he will be executed under a federal protocol that would
19 allow, say, for the use of red syringe labels when Arizona's protocol calls for green ones.
20 Mitchell offers neither proof, nor even argument, that the asserted differences between the
21 federal and Arizona protocols are likely to inflict actual, non-speculative harm during his
22 execution. *See Beaty*, 649 F.3d at 1072 (denying stay of execution because although inmate
23 had "a strong interest in being executed in a constitutional manner, . . . he has not shown
24 that this interest is threatened in this case").

25 For example, none of Mitchell's arguments about qualifications for placing IVs, IV
26 access, the use of unexpired drugs, and disclosure of using a compounded drug and quality
27 assurance testing involves any inherent conflict between the state and federal protocols,
28 much less proof of actual harm. To the contrary, BOP will use qualified personnel for its

execution team. *See In re BOP Execution Protocol Cases*, 19-MC-145, Dkt. 39-1, A.R. 874, ¶ D ("qualified personnel" include, among others, currently licensed physicians, nurses, EMTs, Paramedics, Phlebotomists, and other medically trained personnel). BOP has tested its compounded pentobarbital for quality assurance. *Id.*, Dkt. 39-1, A.R. 970-1015; Dkt. 97, A.R. 1075-1083. And BOP's "Guidelines for Compounding and Testing Pentobarbital Sodium for Use in Executions" specifically require, among other things, that the pentobarbital solution be unexpired and that it must have passed quality assurance testing conducted by at least one independent laboratory. *Id.*, Dkt. 97, A.R. 1085. In neither of Mitchell's motions is the testing of the pentobarbital, the qualifications of personnel, or the reasonableness of other procedures ever attacked substantively.[2]

Similarly, Mitchell claims that the Arizona protocol provides "better access to counsel" (CR 609 at 7), presumably referring to its provision that, "[i]n the event the inmate has designated one of his attorneys to witness the execution, temporary office space will be provided for the inmate's counsel . . . during the scheduled day of execution," along with the ability to bring in a phone, tablet, and laptop (CR 606-3 at C-024). But Mitchell does not say that he *has* designated his lawyers to witness the execution; or that his lawyers would attend if he does; or that they would be denied access to office space, a phone, or a laptop by BOP. In the same way, although Mitchell points to different numbers of lay defense witnesses who may attend under the two protocols, he fails to allege that he wishes to designate more than three witnesses; if he did, that more than three would attend; or if they would, how he would suffer substantial and irreparable harm from such a limitation that could possibly justify a stay.

Finally, Mitchell refers to limitations in the Arizona protocol on deviating from its terms, but his argument again is untethered to any specific allegation of concrete harm. In the Arizona protocol, the limitations on deviation apply to "material aspects of the

---

[2] Mitchell's argument about the "availability of delay" by state supreme court order, incongruous as it may be in the context of a federal execution, still fails to show an inconsistency with federal regulations. As Mitchell elsewhere concedes, federal regulations permit court-ordered delays. (CR 606 at 12.)

execution process," which is defined as things like "execution chemicals or dosages, consciousness checks, the access of the press and the inmate's counsel to the execution, and the timeframes established by this Department Order." (CR 606-3 at C-008.) Mitchell has no evidence that BOP plans to switch execution chemicals or dosages, prohibit access of the press or counsel, or otherwise engage in material deviations that would be likely to cause irreparable harm.

In short, any deviations on technical details postulated by Mitchell will not cause irreparable harm, or any harm. This factor does not support staying his execution.

### IV. The Balance of the Equities and the Public Interest Weigh Against a Stay

While Mitchell's claims to harm are abstract and speculative, the interests of the United States, the public, the victims, and their family members are not. In claiming that the United States lacks a strong interest in enforcing its judgment after 19 years of litigation—in which it has uniformly prevailed—Mitchell asks this Court to ignore binding precedent. "Equity *must* take into consideration the State's strong interest in proceeding with its judgment." *Gomez*, 503 U.S. at 654 (emphasis added). *See also Hill*, 547 U.S. at 584 (recognizing the government's "strong interest in enforcing its criminal judgments"); *Cook v. Ryan*, 688 F.3d 598, 613 (9th Cir. 2012) (recognizing the government's "compelling interest" in seeing a lawful judgment enforced).

The fact that Mitchell's conviction and sentence have been repeatedly upheld, in both direct and collateral appeals, provides the United States with a strong interest in finality. *See Calderon v. Thompson*, 523 U.S. 538, 556 (1998) ("A State's interests in finality are compelling when a federal court of appeals issues a mandate denying federal habeas relief."). Indeed, Mitchell's own case law makes clear that stays of execution should be denied in circumstances like this. (CR 609 at 7.)

Mitchell cites Justice Powell's concurrence in *Wainwright v. Booker*, 473 U.S. 935, 937 (1985), which was a concurrence in *vacating* a stay of execution. That concurrence, recognizing the state's strong interest in carrying out the sentence "for a particularly brutal murder" after more than a decade of repeated appeals, seems tailor-made for Mitchell's

own case. *Id.* "None of the many opinions that have been filed in this protracted litigation suggests that respondent is innocent or that his conviction raises any serious constitutional issues," and "[f]or our system of justice to function effectively, litigation in cases such as this one must cease when there is no reasonable ground for questioning either the guilt of the defendant or the constitutional sufficiency of the procedures employed to convict and sentence him." *Id.*

Finality is not just a strong interest of the United States as a litigant. "Finality is essential to both the retributive and the deterrent functions of criminal law," and "[w]ithout finality, the criminal law is deprived of much of its deterrent effect." *Calderon*, 523 U.S. at 554 (quotation omitted). "Only with an assurance of real finality can the State execute its moral judgment in a case" and vindicate the public's "'powerful and legitimate interest in punishing the guilty.'" *Id.* at 556 (quoting *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring)). Petitioner's crimes were heinous, cruel, and depraved. The public has a strong interest in executing the moral judgment and just punishment of a penalty imposed in 2003 and repeatedly affirmed since.

And the "balance" of the equities tilts decidedly in the government's favor. Nearly two decades after his crime, Mitchell seeks to again stay his execution for an indefinite period by advancing a novel claim, one he has sat on for a full calendar year and that in the end involves no allegation of real-world harm. The severe logistical costs of constantly re-mobilizing for a federal execution every time an inmate brings a serial stay motion—costs Mitchell minimizes, but does not deny (*see* CR 609 at 8 (citing application))—would alone justify denial of a stay.

But this isn't just a question of logistics. Weighing against Mitchell is the "'powerful and legitimate interest in punishing" him for his heinous crime—killing a grandmother and a child—an interest "shared by the State and crime victims alike." *Calderon*, 523 U.S. at 555-56 (quotation omitted). As in any capital case, relatives of the victims have a range of opinions, but numerous members of the victims' family here have long supported a capital sentence for what Mitchell did to their loved ones. (*See, e.g.*, PSR

1  & Attach., Statements of K.H. ("I [am] requesting that the defendant Lezmond Mitchell pay for what he has done to my mother and niece and how he has hurt our family/families. I'm for the death penalty. He knew right from wrong."), B.H. ("He had no respect for life and no remorse for what he did to my grandma and cousin. I want the death penalty for him."), D.H. ("I want Justice which is the death penalty.").) Indeed, Jane Doe's father has already made plans to travel to Terre Haute to observe Mitchell's execution, in an effort to attain a measure of peace and finality for crimes committed long ago.

Equity would abhor the notion that Mitchell could, at this late hour, stop his execution once again in order to dictate the minute details of his death—something he denied Alyce Slim and Jane Doe when he tortured them to death. The United States, the public, the victims, and their families "deserve better" than further delays of this lawful, repeatedly-affirmed sentence. *Bucklew*, 139 S. Ct. at 1134.

### **CONCLUSION**

For the foregoing reasons, Mitchell's motion should be denied.

RESPECTFULLY SUBMITTED this 10th day of August, 2020.

>MICHAEL BAILEY
>United States Attorney
>District of Arizona
>
>*/s William G. Voit*
>WILLIAM G. VOIT
>SHARON K. SEXTON
>Assistant U.S. Attorneys

# CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of August, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

>Jonathan C. Aminoff
>  Email: Jonathan.Aminoff@fd.org
>Celeste Bacchi
>  Email: Celeste_Bacchi@fd.org
>Federal Public Defender's Office
>Central District of California
>321 East 2nd Street
>Los Angeles, California 90012-4202
>Telephone: (213) 894-5374
>Facsimile: (213) 894-0310

Attorneys for Defendant Lezmond Charles Mitchell

/s    William G. Voit
U.S. Attorney's Office