**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Lezmond Mitchell,<br><br>　　　　Defendant. | No. CR-01-01062-001-PCT-DGC<br><br>**ORDER** |

Defendant Lezmond Mitchell has filed a motion to strike his execution warrant, vacate his execution date, and enjoin violation of this Court's January 8, 2004 Judgment (Doc. 606), and a motion to stay his execution pending resolution of the first motion (Doc. 609). The United States has filed responses opposing both motions (Docs. 611, 612), and Mr. Mitchell has filed a reply (Doc. 613). A hearing on the motions was held on August 12, 2020. The Court will deny both motions.

**I.    Procedural History.**

In 2003, a jury convicted Mr. Mitchell of first-degree murder, felony murder, carjacking resulting in death, and related federal crimes arising out of the 2001 kidnapping and murder of a 63-year-old grandmother and her 9-year-old granddaughter.[1] The jury unanimously recommended a sentence of death on the federal carjacking count.

On September 15, 2003, Judge Mary Murguia sentenced Mr. Mitchell to death and issued a Judgment that included the following provision:

---

[1] A detailed discussion of the facts surrounding the crimes and Mr. Mitchell's trial can be found at *United States v. Mitchell*, 502 F.3d 931, 942 (9th Cir. 2007).

> Pursuant to the Federal Death Penalty Act of 1994, specifically, Section 3594 of Title 18 of the United States Code, pursuant to the jury's special findings returned on May 20, 2003, and pursuant to the jury's unanimous vote recommending that the defendant be sentenced to death, IT IS THE JUDGMENT OF THIS COURT THAT the defendant, Lezmond Charles Mitchell, be sentenced to death on Count Two of the Second Superseding Indictment. The judgment and death sentence on Count Two is supported by independent verdicts with regard to each victim. Furthermore, pursuant to Title 18, Section 3596 of the United States Code, the defendant is hereby committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment and conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the defendant to the custody of the United States Marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State of Arizona.

Doc. 425. The Court subsequently amended its Judgment on January 8, 2004, but left the above portion of the order unchanged. Doc. 466. The Judgment was affirmed on appeal and has not been altered as a result of Mr. Mitchell's subsequent habeas petitions.[2]

On July 25, 2019, T.J. Watson, the warden of the Federal Correctional Complex at Terre Haute, Indiana, served Mr. Mitchell with a letter indicating that, pursuant to 28 C.F.R. § 26.3(a)(1), the Director of the Bureau of Prisons ("BOP") had set December 11, 2019, as Mr. Mitchell's execution date ("2019 Letter"). The same day, in four pending federal lethal injection lawsuits in the District Court for the District of Columbia, the Government filed a notice indicating that it had adopted a revised lethal injection protocol for federal death penalty sentences. Doc. 606-1, BOP Addendum.

On October 4, 2019, Mr. Mitchell's execution was stayed by the Ninth Circuit pending its consideration of his appeal from this Court's denial of a Rule 60(b) motion. *Mitchell v. United States*, No. 18-17031 (9th Cir. Oct. 4, 2019), ECF No. 26. The Ninth Circuit ultimately affirmed the Court's denial. *Id.* (Apr. 3, 2020), ECF No. 37.

On July 29, 2020, Warden Watson served Mr. Mitchell with a letter stating that the BOP had set a new execution date of August 26, 2020 ("2020 Letter"). Doc. 606-2. Eight

---

[2] Throughout his motion, Mr. Mitchell refers to the Judgment date as January 8, 2003. *See* Doc. 606. The amended Judgment was entered on January 8, 2004. Doc. 466.

days later, Mr. Mitchell filed his motion to strike the execution warrant and vacate his execution date. Doc. 606.

## II. Motion to Stay.

Mr. Mitchell asks the Court to stay his execution "until the resolution of his motion" to vacate the execution date. Doc. 609 at 15.[3] Because the Court resolves that motion in this order, it will deny the motion to stay as moot.[4]

## III. Motion to Strike, Vacate, and Enjoin.

Mr. Mitchell asks this Court to vacate the August 26, 2020 execution date and enjoin the government from attempting to execute him "in a manner that violates this Court's judgment." Doc. 606 at 6.

### A. Timeliness.

The government asserts that Mr. Mitchell's motion is untimely. It argues that he "has known about the federal government's current execution protocol since July 25, 2019, when the Department of Justice adopted it, filed it in the District of Columbia litigation challenging the protocol's validity, and delivered him notice of the United States' intent to carry out his sentence pursuant to federal regulations." Doc. 611 at 3. The government asserts "[t]here is no reason Mitchell could not have raised this issue a year ago, when his execution was first scheduled, which would have allowed for fair briefing, court consideration, and reasonable appeals." *Id.* at 5.

Mr. Mitchell received notice of his December 2019 execution date on July 25, 2019, while he had an appeal pending before the Ninth Circuit related to this Court's denial of his Rule 60(b) motion. Shortly thereafter, on August 5, 2019, he asked this Court to stay his execution pending resolution of the appeal. Motion to Stay Execution, *Mitchell v.*

---

[3] This order cites to page numbers placed at the top of each page by the Court's electronic case filing system, not to page numbers in the original documents.

[4] During the hearing, counsel for Mr. Mitchell asked the Court to stay his execution pending appeal of the Court's decision. That request was not made in Mr. Mitchell's motion (Doc. 609), and the standard for such a stay has not been briefed by the parties. The Court accordingly will not address the request. Mr. Mitchell can take up the stay question with the Ninth Circuit, as he did in his previous appeal from this Court.

*United States*, No. 3:09-cv-8089-DGC (D. Ariz. Aug. 5, 2019), ECF. No. 84.  The Court denied the motion on jurisdictional grounds, *id.* (Aug. 30, 2019), ECF. No. 92, and Mr. Mitchell filed a motion to stay his execution in the Ninth Circuit on September 9, 2019.  That motion was granted on October 4, 2019.  *Mitchell v. United States*, No. 18-17031 (9th Cir. Oct. 4, 2019), ECF No. 26.  The Court cannot conclude that Mr. Mitchell was required to proceed with additional challenges to his execution when it was stayed.  Mr. Mitchell received notice of his new execution date on July 29, 2020, and filed this motion days later.

Additionally, at a status conference on August 15, 2019, after issuance of the 2019 Letter, the government acknowledged to the Court that its intent was to conduct the execution in Indiana, but stated that it was "not prepared to respond" to the Court's query about whether the execution would follow Arizona state procedures.  Doc. 606-6 at 084–85; RT 08/15/19 at 10–11.  Thus, the issue raised in this motion – whether the government can legally conduct Mr. Mitchell's execution without following Arizona procedures – was not ripe until Mr. Mitchell was served with the 2020 Letter.

**B.     Meaning of the Federal Death Penalty Act ("FDPA").**

Congress enacted the FDPA in 1994.  The statute looks to state law for the "manner" of implementing federal death sentences:

> When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, *who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed.*  If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a) (emphasis added).

The Judgment in this case uses essentially the same language.  It provides that the execution shall be conducted "in the manner prescribed by the law of the State of Arizona."  Doc. 466.

The parties dispute the meaning of these phrases. The government maintains that by requiring it to implement Mr. Mitchell's execution "in the manner prescribed" by Arizona law, the FDPA merely requires it to use Arizona's "top-line" choice of execution method – lethal injection. Doc. 611 at 6–13. Mr. Mitchell argues that "implementation . . . in the manner prescribed" by Arizona law incorporates all of Arizona's detailed execution procedures. Doc. 606 at 9. And because the execution protocol issued by the federal government in 2019 ("2019 Protocol") does not follow those procedures, Mr. Mitchell contends that his execution under the 2019 Protocol would violate the FDPA. *Id.*[5]

Both parties rely heavily on a recent decision of the D.C. Circuit, *In re Fed. Bureau of Prisons' Execution Protocol Cases* (*Execution Protocol Cases*), 955 F.3d 106 (D.C. Cir. 2020), *cert. denied sub nom. Bourgeois v. Barr*, No. (19A1050), 2020 WL 3492763 (U.S. June 29, 2020). The plaintiffs in that case were four federal death row inmates who challenged the 2019 Protocol. The district court preliminarily enjoined their executions, holding that "the FDPA gives decision-making authority regarding 'implementation'" of federal death sentences to states, and, therefore, the 2019 Protocol's uniform federal implementation procedure is "not authorized by the FDPA." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145, 2019 WL 6691814, at *4, *7 (D.D.C. Nov. 20, 2019). The court found that the FDPA language requiring executions to be conducted "in the manner prescribed" by state law applied not just to the general execution method, but also to "procedural details" like how the "catheter is to be inserted." *Id.* at *4, *6.

The D.C. Circuit reversed, with two members of the panel finding that the district court misconstrued the FDPA. *Execution Protocol Cases*, 955 F.3d at 108. The circuit court summarized its core holding as follows:

> Judge Katsas concludes that the FDPA regulates only the top-line choice among execution methods, such as the choice to use lethal injection instead of hanging or electrocution. Judge Rao concludes that the FDPA also requires the federal government to follow execution procedures set forth in

---

[5] Although Mr. Mitchell asserts that his execution would violate both the FDPA and the Court's Judgment, his legal analysis relies entirely on the meaning of the FDPA. Neither he nor the government argues that the Judgment has a different meaning. This order accordingly focuses entirely on the FDPA.

- 5 -

> state statutes and regulations, but not execution procedures set forth in less formal state execution protocols. Judge Rao further concludes that the federal protocol allows the federal government to depart from its procedures as necessary to conform to state statutes and regulations. On either of their views, the plaintiffs' primary FDPA claim is without merit.

*Execution Protocol Cases*, 955 F.3d at 112.

Judge Tatel dissented. He agreed with Judge Rao "that the term 'manner' refers to more than just general execution method," but concluded that the statute also incorporates informal execution protocols if "issued by state prison officials pursuant to state law." *Id.* at 146 (Tatel, J., dissenting).

Mr. Mitchell cites the opinions of Judges Rao and Tatel to support his view that "manner" in the FDPA means more than the top-line method of execution. Doc. 606 at 11. On this issue, the Court agrees with Mr. Mitchell.

The starting point is the Crimes Act of 1790, which specified that "the manner of inflicting the punishment of death, shall be by hanging the person convicted by the neck until dead." Crimes Act of 1790, ch. 9, § 33, 1 Stat. 112, 119. "Manner" as used in this phrase clearly means only the general method of execution – hanging. Judge Katsas tracked the word "manner" from the 1790 Act to the 1937 statute that replaced it. 955 F.3d at 115–18 (Katsas, J., concurring). The 1937 statute continued to use the word "manner," but did not specify a single method of execution. Instead, it provided that "[t]he manner of inflicting the punishment of death shall be the manner prescribed by the laws of the State within which the sentence is imposed." *See* An Act To Provide for the Manner of Inflicting the Punishment of Death, Pub. L. No. 75-156, 50 Stat. 304 (1937). Judge Katsas reasoned that because "manner" meant the general method of execution in the 1790 statute, it must also have meant the general method of execution in the 1937 statute, particularly because both statutes refer to "the manner of inflicting the punishment of death." 955 F.3d at 116. The government and Judge Katsas also note that the Supreme Court in *Andres v. United States*, 333 U.S. 740, 745 & n.6 (1948), stated that the 1937 statute was "prompted by the fact that 'Many States . . . use(d) more humane *methods* of execution, *such as electrocution,*

- 6 -

*or gas*'" and "it appear(ed) desirable for the Federal Government likewise to change its law *in this respect*." *Id.* (quoting H.Rep. No. 164, 75th Cong., 1st Sess., 1 (1937)) (emphases added).

Although this view has some merit, the Court ultimately finds it unpersuasive because the 1937 statute fundamentally changed the way in which federal death penalty sentences were carried out. It shifted the focus from a single federal method – hanging – to a range of approaches used by the States. And Congress's intent to adopt more humane methods of execution certainly does not exclude the possibility that Congress intended to incorporate details of state executions that made them more humane. The 1937 Act further stated that the "marshal charged with the execution of the sentence may use available State or local facilities and the services of an appropriate State or local official" to perform the execution. An Act To Provide for the Manner of Inflicting the Punishment of Death, Pub. L. No. 75-156, 50 Stat. 304 (1937). This contemplated at least the possibility of a wholesale use of state execution procedures.

In fact, that is what happened. As Judge Rao explained:

> In practice, . . . the federal government incorporated more than the state's method of execution when it carried out executions under the 1937 statute. The government concedes that nearly all executions conducted under the 1937 statute took place in state facilities. Presumably, those executions were carried out in accordance with state law and possibly with other state procedures. DOJ notes that three executions under the 1937 statute took place in federal facilities, but DOJ is unable to identify a single way in which the executions were otherwise inconsistent with state law.

955 F.3d at 137 (Rao, J., concurring) (citation omitted).

To further support Judge Katsas's view, the government cites two newspaper articles to suggest that federal procedures were in fact used in executions under the 1937 Act. One article stated that inmates were to "be executed by whatever method is prescribed by the law of the State," but that the Department of Justice ("DOJ") would provide "all U.S. Marshals instructions for carrying out executions" and those procedures would govern "[u]nless [a] court specifies otherwise." Doc. 611-4 (Associated Press, U.S. Arranging To

- 7 -

Execute Five, June 17, 1938). Another article noted that the government's supervision over an execution was "so strict" that the local sheriff "was forced to obtain special permission from Washington to be present." Doc. 611-5 (United Press, Seadlund Will Die Tonight, July 13, 1938).

These brief accounts are not only hearsay, they lack the detail necessary to determine what procedures were actually used in the executions. The government relies on *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933), for the proposition that agency "practice" has "peculiar weight when it involves a contemporaneous construction of a statute by [those] charged with the responsibility of setting its machinery in motion." *Id.*; Doc. 611 at 11–12. But the Court is not persuaded that two short newspaper articles can be relied upon to establish the execution practice under the 1937 statute, particularly in light of the government concessions cited by Judge Rao above and a 1994 letter from Attorney General Janet Reno described below.

The government also cites a Federal Bureau of Prisons' 1942 Manual of Policies and Procedures which stated that the 1937 Act's "manner" provision "refers to the method of imposing death, whether by hanging, electrocution, or otherwise, and not to other procedures incident to the execution prescribed by the State law." *See* Doc. 611-6. But this statement is not "practice" as required by *Norwegian Nitrogen*, and the record before the D.C. Circuit suggested that virtually all executions under the 1937 Act were held in state facilities. 955 F.3d at 137 (Rao, J., concurring); *id.* at 148 (Tatel, J., dissenting).

The continuing history provides additional insight. The 1937 statute was repealed by the Sentencing Reform Act of 1984, Pub. L. No. 98-473, § 212, 98 Stat. 1987, and for the next several years the United States had no statute that specified a method for federal death sentences. DOJ promulgated regulations in 1993 that adopted lethal injection as the uniform federal execution method with specific federal procedures. 58 Fed. Reg. 4898, 4901–02 (1993) (codified at 28 C.F.R. § 26.3). At the time, DOJ hypothesized "that Congress might have repealed the 1937 statute because it 'no longer wanted the federal method of execution dependent on procedures in the states, some of which were

- 8 -

increasingly under constitutional challenge.'" 58 Fed. Reg. at 4,899. This statement again suggests that state procedures were used under the 1937 Act.

Significantly, when Congress passed the FDPA in 1994, it did not choose to retain the single-method approach of the existing DOJ regulations. Congress chose instead to return to the 1937 model, providing that the "United States marshal . . . shall supervise implementation of the [death] sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Attorney General Janet Reno wrote to Congress shortly before the FDPA was passed and noted that it "contemplate[d] a return to an earlier system in which the Federal Government does not directly carry out executions, but makes arrangements with states to carry out capital sentences in Federal cases." *See* H.R. Rep. No. 104-23, at 22 (1995) (quoting Letter from Attorney General Janet Reno to Hon. Joseph R. Biden, Jr., at 3–4 (June 13, 1994)). Her statement confirms that the federal government's practice under the 1937 Act was to use state procedures for federal executions. She then "recommend[ed] amendment of the legislation to perpetuate the current approach, under which the execution of capital sentences in Federal cases is carried out by Federal officials pursuant to uniform regulations issued by the Attorney General." *Id.* Congress disregarded her request and returned to the 1937 model.

In light of this history, the Court cannot conclude that the 1790 use of the word "manner" remained intact until it found its way into the FDPA. Congress deliberately chose in 1994 to revert from a single-method execution approach, like that adopted in 1790 and in the 1993 DOJ regulations, to the state-focused approach of the 1937 statute. And it did so in the face of Attorney General Reno's assertion that federal executions under the 1937 statute had occurred in state facilities. This history suggests that Congress knowingly adopted an approach in the FDPA that looked to state law and procedures for the means of execution. It does not support the government's contention that the FDPA entrusted all execution details to federal officers and looked to state law solely for the general method of execution.

/ / /

### C. To What State Law Does the FDPA Look?

The Court must next decide what level of state procedures Congress intended to embrace in the FDPA. Judges Rao and Tatel differ on what constitutes the "law of the State" for purposes § 3596(a). Judge Rao would limit it to execution procedures set forth in state "statutes and formal regulations." 955 F.3d at 129 (Rao, J. concurring). In her opinion, by directing the federal government to look to the *law* of the State, the FDPA requires the government to "follow all procedures prescribed by state statutes and formal regulations, but no more." *Id.* at 134 (Rao, J., concurring). Judge Tatel takes a more expansive view, finding that the "law of the State" also includes "protocols issued by state prison officials pursuant to state law." *Id.* at 146 (Tatel, J., dissenting). The Court agrees with Judge Rao.

Judge Tatel writes:

> The "law" of each state, then, requires executions to be implemented according to procedures determined by state corrections officials, who, in turn, have set forth such procedures in execution protocols. In other words, "by law," each state directed its prison officials to develop execution procedures, and "by law," those officials established such procedures and set them forth in execution protocols. Accordingly, the protocols have been "prescribed by . . . law."

955 F.3d at 147 (Tatel, J., dissenting).

This analysis places too little weight on the key word "prescribed." Under the FDPA, the state law must not just authorize or direct that the manner of death be set forth by correction officials in a state protocol, the state law must "prescribe[]" the manner of death to be followed in federal executions: "[the marshal] shall supervise implementation of the sentence in the *manner prescribed by the law of the State* in which the sentence is imposed." 18 U.S.C. § 3956(a) (emphasis added).

"Prescribe" means "to lay down a rule," to "dictate." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/prescribe (last visited Aug. 12, 2020). It means "to tell someone what they must have or do." *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/prescribe

(last visited Aug 12, 2020). A state statute that, in the words of Judge Tatel, merely "direct[s] its prison officials to develop execution procedures" does not "prescribe," "lay down," or "dictate" those procedures. 955 F.3d at 147 (Tatel, J., dissenting).

To support his interpretation, Judge Tatel looks to the purpose of the FDPA – which he equates to the purpose of the 1937 Act from which its language was taken – which is to make executions more humane by adopting the more advanced procedures used by the States. 955 F.3d at 148 (Tatel, J., dissenting). Judge Rao correctly responds, however, that courts cannot depart from the plain meaning of a statute (in this case, the word "prescribed") in the interest of more fully promoting the statute's purpose. *Id.* at 140–41 (Rao, J., concurring). "[O]ur function [is] to give the statute the effect its language suggests," not to further whatever "admirable purposes it might be used to achieve." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 270 (2010). "[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646–47 (1990) (emphasis in original).

In concluding that state "law" does not include informal execution protocols, Judge Rao relies on *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979). In that case the Supreme Court considered a provision of the Trade Secrets Act that protected confidential information by prohibiting its disclosure unless "'authorized by law.'" *Id.* at 294 (quoting 18 U.S.C. § 1905). The Supreme Court held that a regulation issued pursuant to an agency's "housekeeping" statute and without notice-and-comment procedures did not qualify as "law" under the Act. *Id.* at 309–16. From this, Judge Rao concludes that the word "law" in § 3596(a) does not include informal state protocols, but is limited to "binding law prescribed through formal lawmaking procedures." 955 F.3d at 132 (Rao, J., concurring).

Judge Tatel responds that "prescribed by law" and similar phrases appear more than 1,200 times in the United States Code and have no single meaning, but must instead be interpreted in context. 955 F.3d at 149 (Tatel, J., dissenting). He then turns again to the

overall purpose of the FDPA – to adopt more humane state execution procedures – and concludes that excluding state protocols from the requirement of the FDPA would defeat the statute's purpose. But this analysis glosses over the actual language at issue – "prescribed by law." Judge Tatel does not assert that informal state protocols constitute "law," and, as Judge Rao notes, Judge Tatel cites no case where such informal procedures have been held to have the force of law. 955 F.3d at 143 n.15 (Rao, J., concurring).

Because the FDPA directs the federal government to impose the death penalty "in the manner *prescribed by the law of the State*," only those execution procedures actually prescribed by state law – state statutes and regulations that have the force and effect of law – must be applied in a federal execution. Procedures contained in less formal state protocols simply are not "the law of the State." 18 U.S.C. § 3596(a).

**D. What is Arizona "Law" for Purposes of the FDPA?**

Mr. Mitchell asserts that Arizona's execution protocol, found in Arizona Department of Corrections, Rehabilitation and Reentry ("ADC") Department Order 710 ("DO 710"), constitutes Arizona "law" within the meaning of the FDPA, and that the government therefore is required to comply with it fully during his execution. He makes two arguments in support.

First, Mr. Mitchell's motion notes briefly that an "Arizona statute provides that the method of execution is lethal injection to occur 'under the supervision of the state department of corrections.'" Doc. 606 at 14 (quoting A.R.S. § 13-757). Mr. Mitchell asserts that ADC drafted DO 710 "[p]ursuant to that authority," and, "[a]ccordingly, these protocols are part of Arizona law." *Id.* But state statutes frequently direct state agencies to take action, and Mr. Mitchell cites no authority for the proposition that a protocol issued in response to such a legislative direction automatically constitutes state law. Certainly A.R.S. § 13-757, which states only that executions are to occur "under the direction" of ADC, does not say that all procedures adopted by ADC therefore have the force of law.

Mr. Mitchell also notes that DO 710 cites various statutes. *Id.* (citing Doc. 606-3 at 25). But the statutes cited in DO 710 do not concern the legal effect of the department

order.  Instead, they include provisions defining the word "person" (A.R.S. §§ 1-215(28), 13-105(30)); stating that a person sentenced before November 23, 1992, may choose either lethal injection or lethal gas as the means of execution (A.R.S. § 13-757(B)); providing that the identities of executioners are kept confidential (A.R.S. § 13-757(C)); stating who may be present at executions (A.R.S. § 13-758); requiring that the ADC director provide a return of warrant to the courts after an execution (A.R.S. § 13-759); and addressing the competency of persons to be executed (A.R.S. §§ 13-4021 through 13-4026).[6]  Doc. 606-3 at 25.  None of these statutes states that department orders issued by ADC have the force and effect of law; indeed, none directly concerns ADC's issuance of orders.  They instead are statutes that touch on topics addressed in DO 710.  Mr. Mitchell cites no authority suggesting that mere citation of these statutes somehow makes DO 710 part of Arizona law.[7]

Second, Mr. Mitchell notes that prior versions of DO 710 contained language stating that they did not "create any enforceable legal rights or obligations."  In 2017, in a lawsuit pending in this Court, ADC entered into a settlement agreement with the plaintiffs, including several death row inmates, and agreed to exclude such language from future protocols.  Doc. 606-4, Stipulation and Order from *First Amendment Coalition of Arizona, Inc. v. Ryan*, D. Ariz. Case No. 2:14-cv-01447-NVW.  Mr. Mitchell contends that this stipulation distinguishes DO 710 from the protocols litigated in the D.C. Circuit, which,

---

[6] The list also includes a citation to Ariz. R. Crim. P. 31.17(c)(3), which at the time DC 710 was issued apparently concerned notifications to the Arizona Supreme Court about the date and time of execution.  That provision now appears to be in Rule 31.23.

[7] Mr. Mitchell never addresses Arizona administrative law concerning agency rulemaking, such as the Arizona Administrative Procedures Act, A.R.S. § 41-1001, *et seq*., to show that DO 710 is an agency regulation with the force and effect of law.  His motion and reply brief are entirely silent on this subject.  *See* Docs. 606, 613.  The Court also notes that DO 710 is one of more than 125 Department Orders issued by ADC.  *See* https://corrections.az.gov/reports-documents/adcrr-policies/department-orders-index (last visited August 11, 2020).  These orders cover a wide variety of prison-related topics, from housing to visitation to medical care.  *Id.*  Department Order 101 sets the procedures for drafting and reviewing Department Orders, and suggests that the process is entirely internal.  *See* https://corrections.az.gov/sites/default/files/policies/100/0101071320.pdf  (last visited August 11, 2020).  The Court further notes that the ADC Department Orders are not included in the Arizona Administrative Code.  *See* https://apps.azsos.gov/publicservices/Title_05/5-01.pdf (last visited August 11, 2020).  Mr. Mitchell addresses none of this.

because they "do not appear to have the binding force of law, cannot be deemed part of the 'law of the State.'"  955 F.3d at 143 n.15 (Rao, J., concurring.)  Mr. Mitchell argues, therefore, that the "Arizona law" governing the manner of state executions includes DO 710.  Doc. 606 at 14.

The Court is not persuaded.  The *First Amendment Coalition* case was resolved by a Settlement Agreement – a contract – which the parties agreed could be enforced by other persons sentenced to death in Arizona.  The Settlement Agreement provided:

> [T]he parties intend this Stipulated Settlement Agreement to be enforceable by, and for the benefit of, not only Plaintiffs but also all current and future prisoners sentenced to death in the State of Arizona ("Condemned Prisoner Beneficiaries"), who are express and intended third-party beneficiaries of this Stipulated Settlement Agreement[.]

Doc. 606-4 at 7.

The remaining provisions of the stipulation make clear that the parties viewed the Settlement Agreement as a binding contract between ADC and death row inmates.  It identifies seven specific "covenants" by ADC that are enforceable (*id.* at 4–8), provides that the court may take action upon "breach" of the Settlement Agreement (*id.* at 8), provides that the case can be reopened at the request of a third-party beneficiary (*id.* at 7–8), and provides that "an injunction shall immediately issue in this action or in a separate action for breach of this Stipulated Settlement Agreement" (*id.* at 10).  In short, the *First Amendment Coalition* case was resolved in the same manner as many other lawsuits – by a binding contract that could be enforced in court by specific parties and third-party beneficiaries.

The stipulation says nothing about creating Arizona law, and Mr. Mitchell cites no authority for the proposition that a settlement agreement between litigants creates Arizona law.  True, the Settlement Agreement includes a covenant that present and future versions of DO 710 would not say that they do not "create any legally enforceable rights or obligations" (*id.* at 3), but the reason for this covenant is readily apparent – the parties

intended to establish legally enforceable contract rights and such language would be inconsistent with their agreement.

The Court cannot conclude that the Settlement Agreement makes DO 710 the "law" of Arizona within the meaning of the FDPA. The settlement is a contract, not a statute or formal regulation. Mr. Mitchell cites nothing to suggest that Congress intended "the law of the State" to include contracts. The Court accordingly holds, for purposes of the FDPA, that the "law" of Arizona includes Arizona's death penalty statutes and criminal rules, but that Mr. Mitchell has failed to show that it also includes DO 710.[8]

### E.  What Does Arizona Law Require in this Case?

To resolve the merits of Mr. Mitchell's motion, the Court must compare the requirement of the BOP's 2019 Protocol to Arizona's death penalty statutes and criminal rules to see if there is inconsistency. Mr. Mitchell cites three differences. Doc. 606 at 17. First, under Arizona law, a prisoner is entitled to 35 days' notice of his execution date, A.R.S. § 13-759, while the BOP protocol provides only 20 days' notice, 28 C.F.R. § 26.4(a). Second, a prisoner may have five witnesses at his execution under Arizona law, A.R.S. § 13-758, but only three under the BOP protocol, 28 C.F.R. § 26.4(c–d). Third, Arizona Rule of Criminal Procedure 31.23 allows for up to a 60-day delay if the execution is deemed by the Arizona Supreme Court to be "impracticable," while the BOP protocol permits delay only upon a court-ordered stay, 28 C.F.R. § 26.3(a)(1).

Although these three state procedures differ from the 2019 Protocol, the Court concludes that they are not the kinds of procedures incorporated by the FDPA. The FDPA

---

[8] Counsel for Mr. Mitchell argued at the hearing that not requiring the government to follow state protocol procedures in this case would create a "paradox" between the first and second sentences of § 3596(a). The Court does not see the paradox. The first sentence, which applies when a defendant is convicted in a state such as Arizona that imposes the death penalty, provides that the marshal "shall supervise implementation of the sentence in the manner prescribed by the law of the State[.]" 18 U.S.C. § 3596(a). The second sentence, which applies when a defendant is convicted in a state that does not impose the death penalty, provides that "the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law." *Id.* Both sentences require that the government implement the sentence "in the manner prescribed" by the state's law. Thus, the Court's interpretation of that phrase would apply in both sentences, producing no paradox.

calls for "*implementation of the sentence* in the manner prescribed by the law of the State[.]" 18 U.S.C. § 3596(a) (emphasis added). The sentence, of course, is death, and the "manner" of "implementation" of that sentence is the procedures by which death is caused. The Court cannot conclude that matters unrelated to the procedures for effectuating death constitute the manner of implementing the death sentence as referred to in the FDPA. Other judges agree. A unanimous panel of the Seventh Circuit recently held that "Section 3596(a) cannot be reasonably read to incorporate every aspect of the forum state's law regarding execution procedure. We do not understand the word 'manner' as used in § 3596(a) to refer to details such as witnesses. The word concerns how the sentence is carried out, not who watches." *Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020). In the D.C. Circuit case, even Judge Tatel found that § 3596(a) requires the federal government to follow only "those procedures that effectuate the death, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements." *Execution Protocol Cases*, 955 F.3d at 151 (Tatel, J., dissenting).

Mr. Mitchell identifies no procedures in Arizona statutes or criminal rules concerning the means for effectuating death that conflict with the BOP protocol. The Court therefore concludes that the government's planned method of execution is not inconsistent with the salient provisions of Arizona law.[9]

**IT IS ORDERED:**

1.  Mr. Mitchell's motion to strike his execution warrant, vacate his execution date, and enjoin violation of this Court's Judgment (Doc. 606) is **denied**.

2.  Mr. Mitchell's motion to stay his execution (Doc. 609) is **denied**.

Dated this 13th day of August, 2020.

David G. Campbell
Senior United States District Judge

---

[9] By addressing the parties' legal arguments dispassionately in this order, the Court does not mean to minimize the difficult and vexing human issues on both sides of this case.