CUAUHTEMOC ORTEGA (CA Bar No. 257443)
Interim Federal Public Defender
JONATHAN C. AMINOFF (CA Bar No. 259290)
(E-Mail: Jonathan_Aminoff@fd.org)
CELESTE BACCHI (CA Bar No. 307119)
(E-Mail: Celeste_Bacchi@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-5374
Facsimile: (213) 894-0310

Attorneys for Defendant/Movant
LEZMOND CHARLES MITCHELL

# THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lezmond Charles Mitchell, | No. Unassigned |
| Defendant/Movant, | Civil Case No. 3:09-cv-08089-DGC |
| v. | Criminal Case No. 3:02-cr-01062-DGC |
| | **DEATH-PENALTY CASE** |
| United States of America, | **EXECUTION SCHEDULED FOR:** <br> **Date: AUGUST 26, 2020** <br> **Time: To be determined.** |
| Plaintiff/Respondent. | Honorable David G. Campbell <br> United States District Judge |
| | **NOTICE OF MOTION AND MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C, § 2255. IN THE ALTERNATIVE, MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2241** |
| | **Oral Argument Requested** |

CUAUHTEMOC ORTEGA (CA Bar No. 257443)
Interim Federal Public Defender
JONATHAN C. AMINOFF (CA Bar No. 259290)
(E-Mail: Jonathan_Aminoff@fd.org)
CELESTE BACCHI (CA Bar No. 307119)
(E-Mail: Celeste_Bacchi@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-5374
Facsimile: (213) 894-0310

Attorneys for Defendant/Movant
LEZMOND CHARLES MITCHELL

### THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lezmond Charles Mitchell, | No. Unassigned |
| | Civil Case No. 3:09-cv-08089-DGC |
| Defendant/Movant, | Criminal Case No. 3:02-cr-01062-DGC |
| v. | **DEATH-PENALTY CASE** |
| | Honorable David G. Campbell<br>United States District Judge |
| United States of America, | **MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. § 2255. IN THE ALTERNATIVE, MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2241** |
| Plaintiff/Respondent. | |
| | **Oral Argument Requested** |

Movant Lezmond Mitchell moves pursuant to 28 U.S.C. section 2255 for relief from the judgment of this Court. This motion is based on the attached memorandum of points and authorities and all the files and records of this case.

Respectfully submitted,

Dated: August 20, 2020

*/s/ Jonathan C. Aminoff*
JONATHAN C. AMINOFF
CELESTE BACCHI
Deputy Federal Public Defenders

2

# TABLE OF CONTENTS

Page

I. PRELIMINARY INFORMATION ................................................................ 1

II. FACTS AND PROCEDURAL HISTORY .................................................. 8

    A.    Trial ........................................................................................... 8

    B.    Post-Trial Proceedings ............................................................ 9

        1.    Proceedings before U.S. Courts ................................... 9

        2.    Proceedings before the IACHR ................................... 9

III. JURISDICTION ..................................................................................... 11

IV. GENERAL ARGUMENTS IN SUPPORT OF EACH CLAIM ............... 13

    A.    The United States is constitutionally bound to respect the Commission's rulings ............................................................. 13

    B.    The Commission Report finding the U.S. violated Mitchell's human rights is an expression of treaty-based rights and international law that must be enforced. ..................................................................... 16

        1.    The Supremacy Clause requires that Mitchell's death sentence be invalidated, and that he be given a new trial .............. 17

            a.    The United States violated the OAS Charter. ....... 17

            b.    The United States violated the American Declaration. ......... 18

        2.    The Commission Report made Mitchell's inchoate rights under the Charter and American Declaration into specific, enforceable treaty-based rights. ............................................................ 20

        3.    The United States is bound by the Commission Report because it agreed to the Commission's authority to enforce human rights by hearing individual complaints against member states and by interpreting the American Declaration. ............................... 20

        4.    U.S. Courts have recognized the decisions of tribunals and international bodies as authoritative, and *Medellín v. Texas* does not foreclose such a finding here. .................................... 22

V. CLAIMS FOR RELIEF ........................................................................... 25

    A.    Mitchell's right to be free from unlawful and arbitrary arrest was violated. ................................................................................... 25

    B.    Mitchell's right to a fair trial and to due process of law was violated. ..... 26

    C.    Mitchell's right to effective assistance of counsel was violated. ............. 28

    D.    Mitchell's right to effective remedies was violated. .............................. 29

# TABLE OF CONTENTS

Page

E.    Mitchell's right not to receive cruel, infamous, or unusual punishment was violated. ................................................................................ 30

F.    Mitchell's right to life will be violated if he is executed. .......................... 31

VI. PRAYER FOR RELIEF ......................................................................... 32

Lezmond Mitchell moves the Court, pursuant to 28 U.S.C. § 2255, to vacate, set aside, and/or correct his conviction and sentence of death, because they were imposed in violation of the United States Constitution or the laws of the United States. Mitchell seeks a hearing on all disputed issues of fact and respectfully reserves the right to amend this petition in accordance with law. In the alternative, Mitchell moves the Court, pursuant to 28 U.S.C. § 2241, for relief from its Judgment issued on September 30, 2010, denying Mitchell's motion for post-conviction relief pursuant to 28 U.S.C. § 2255.

## I.  PRELIMINARY INFORMATION

1.     This Court has jurisdiction to provide the relief requested herein pursuant to 28 U.S.C. § 2255 and 28 U.S.C. § 2241.

2.     Mitchell is currently incarcerated at the United States Penitentiary in Terre Haute, Indiana (Register #486585-008).

3.     Name and location of court that entered the judgment of conviction you are challenging: United States District Court, District of Arizona, Prescott Division, Phoenix, Arizona

> (a) Criminal docket or case number: CR-01-1062-MHM
>
> (b) Date of the judgment or conviction: May 20, 2003
>
> (c) Date of sentencing: September 15, 2003
>
> (d) Length of sentencing: Death

4.     Nature of crime (on all counts):

Counts 1 and 5: CIR-First Degree Murder, Aid and Abet, 18 U.S.C. § 1153, 1111, and 2, a Class A felony.

Count 2:     Carjacking Resulting in Death, Aid and Abet 18 U.S.C. § 2119 and 2, a Class A felony.

Count 3:     CIR-Felony Murder, Robbery, Aid and Abet, 18 U.S.C. § 1153, 1111, 2111, and 2, a Class A felony.

1

Counts 4, 8, 10: Robbery, Aid and Abet, 18 U.S.C. § 1153, 2111,and 2, Class C felonies.

5.    What was your plea? Not Guilty

    1.    If you went to trial, what kind of trial did you have? Jury

    2.    Did you testify at a pretrial hearing, trial or post-trial hearing? No

    3.    Did you appeal from the judgment of conviction? Yes

    4.    If you did appeal, answer the following:

        (a)    Name of court: United States Court of Appeals for the Ninth Circuit

        (b)    Docket or case number: 9th Cir. Case No. 03-99010

        (c)    Result: Affirmed

        (d)    Date of result: September 5, 2007

        (e)    Citation of the case: 502 F.3d 931

        (f)    Grounds raised:

            1.    The application of the federal death penalty to a carjacking offense that occurred on the Navajo Indian Reservation involving members of the tribe violates the opt-in provision of the Federal Death Penalty Act.

            2.    The use of the kidnaping offense, which was prosecuted under the MCS, as a gateway factor violated the opt-in provision of the FDPA.

            3.    Mitchell was denied his rights to have his petit jury chosen from a fair and representative jury venire when Native Americans were systematically excluded from jury service in his case.

            4.    Mitchell was denied due process and equal protection of the laws when jury selection procedures were used to exclude Native Americans and members of other racial minorities from service on his jury.

5.     The court failed to excuse biased members of Mitchell's jury venire in violation of his rights to due process, a fair trial, and a reliable sentencing determination.

6.     The court committed reversible error in excusing for "cause" Veniremember # 39 based on her belief that the death penalty should be used in approximately two percent of all homicides, an accurate description of this penalty's use nationwide during the past two decades.

7.     The trial court informed members of Mitchell's jury that material elements of the crimes charged were true, impermissibly alleviating the prosecution's burden under *In re Winship* to prove these elements beyond reasonable doubt.

8.     Procedures used to obtain members of Mitchell's jury venire resulted in the under-representation of Native Americans in violation of the Religious Freedom Restoration Act and the American Indian Religious Freedom Act.

9.     The court erred when it admitted Mitchell's post-arrest statements in violation of his rights to remain silent and to counsel, secured by the Fifth and Sixth Amendments.

10.     The court erred in not serving counts.

11.     After its last minute decision to sever out Mitchell's co-defendants, the court erred by not continuing his trial.

12.     The numerous violations of the government's obligation to turn over evidence in a timely way requires reversal of Mitchell's conviction and death sentence.

13.     The court erred in many instances by improperly admitting evidence, violating Mitchell's rights to due process, a fair trial and a reliable sentencing determination.

3

14. The court erred in excluding portions of his post-arrest statements to law enforcement in violation of Mitchell's right to due process, a fair trial, to present evidence and to confrontation.

15. The court violated the dictates of *Bruton v. United States* through the admission of Orsinger's statements.

16. Mitchell's Sixth Amendment Right to confrontation was violated.

17. The questions and references to the race of the decedents and witnesses and the argument that suggested that Mitchell should be sentenced to death because he had offended Navajo culture were improper and violated the FDPA and Mitchell's rights to equal protection, due process, a fair trial, and a reliable sentencing determination.

18. The instructions given by the court on aiding and abetting were inadequate.

19. The improper statements and arguments of the government counsel in both the opening and closing and both the guilt and the penalty phase warrant reversal of Mitchell's conviction and sentence.

20. The court violated Mitchell's right to be present when it questioned the United States Marshal Service on two occasions about different issues outside of the presence of Mitchell.

21. The court erred in accepting Mitchell's waiver of his presence during the penalty phase without conducting a competency determination.

22. The court erred in permitting Mitchell to waive his presence during the penalty phase under Federal Rule of Criminal Procedure 43.

23. Given the total breakdown in communication that occurred between the defendant and defense counsel before the penalty phase began, the court erred in not appointing new counsel.

24. The FDPA is unconstitutional.

4

25.     The jury instructions and verdict forms given during the penalty phase violated Mitchell's rights to due process, and a reliable sentencing determination.

26.     The court erred during the penalty phase by admitting information that was irrelevant and unduly prejudicial and in excluding admissible information which Mitchell attempted to introduce.

27.     18 U.S.C. § 3593(c) is unconstitutional in that it does not allow the defendant rebuttal on the issue for which he carries a burden.

28.     Mitchell's conviction should be reversed because during the trial family members of the decedents sat in the courtroom wearing buttons depicting the pictures of Slim and Doe.

29.     The application of the death penalty to Mitchell, the less culpable co-defendant, violates Mitchell's rights to due process and a reliable sentencing determination.

30.     The death penalty is cruel and unusual punishment and a per se denial of due process.

31.     Death by lethal injection constitutes cruel and unusual punishment.

32.     The application of the death penalty to Mitchell is unconstitutional.

33.     The sentences imposed on all non-death counts must be remanded in light of *U.S. v. Booker*.

34.     Each of the alleged aggravating circumstances were unconstitutional either facially or as applied, or both.

35.     A weighing scheme may not constitutionally utilize non-statutory aggravating factors without also providing for mandatory proportionality review and, therefore, the FDPA is unconstitutional.

5

36.     The Fifth and Eighth Amendments forbid both the execution of Mitchell and his current conditions given that he is prohibited from participating in the Sweat Lodge Ceremony.

37.     The federal death penalty is unconstitutional in its application because it is applied disproportionately to racial minorities, to males in female victim cases in violation of due process, equal protection and the Eighth Amendment.

(g)     Supreme Court?  Did you file a petition for certiorari in the United States? Yes

(1)     Docket or case number: No. 07-9351

(2)     Result: petition for writ of certiorari denied

(3)     Date of result: June 9, 2008.

(4)     Citation to the case: 128 S. Ct. 2902, 171 L. Ed.2d 843 (2008)

(5)     Questions presented:

a.     Can a court of the United States, by virtue of "decisional authority," assume jurisdiction of a criminal case arising in Indian Country, involving a crime between tribal members, and impose a death sentence in the absence of express congressional authorization, where the tribe had not `opted-in' to the death penalty provisions of the Federal Death Penalty Act, and where the imposition of that penalty would violate inherent tribal sovereignty interests?

b.     Did the district court's removal for cause of 433 of 434 (99.8%) of the Native American prospective jurors in a case involving the novel application of the Federal Death Penalty Act to a tribal member for offenses arising between Indians and Indian Country, violates due process, equal protection, the right to a fair trial and this Court's holding in *Alexander v. Louisiana*, 405 U.S. 625 (1972) particularly where the corresponding excusal rate for non-Native American jurors was

6

66%, and the district court repeatedly questioned only the prospective Native American jurors about the effect their race would have on their ability to be fair and impartial?

        c.     Are the protections of the Fifth and Sixth Amendments to the United States Constitution and 18 U.S.C. § 3501 violated when federal agents and a federal prosecutor direct tribal authorities to arrest a tribal member to facilitate federal interrogation of that tribal member, who was held in tribal custody for twenty-eight days, and interrogated by federal authorities many times during that period, without counsel and without presentment to a Federal Magistrate?

        d.     Where the government files an untimely Appellee brief and fails to mention or discuss issues that were expressly raised and argued in Appellant's brief, does it violate equal protection, due process and a fair determination on appeal for the court of appeals to apply waiver rules against the appellant, and to overlook the waivers by the government?

6.     Other than the direct appeals listed above, have you previously filed and other motions, petitions, or applications concerning this judgment of conviction in any court? Yes.

        a.     Date filed: June 8, 2009

        b.     Name of court: District of Arizona

        c.     Nature of the proceeding: 28 U.S.C. § 2255

        d.     Docket or case number: 09-cv-8089

        e.     Result: denied.

        f.     Date of result: 9/30/2010.

        g.     Grounds Raised: see 09-cv-8089, Dkt. No. 9, 30.

7.     Did you appeal? Yes. Affirmed: *Mitchell v. United States*, 790 F.3d 881 (9th Cir. 2015) cert. denied *Mitchell v. United States*, 137 S. Ct. 38 (2016).

8.     Name of each attorney who represented you in the following stages of the judgment you are challenging:

        (a)     At preliminary hearing: Not applicable

(b)     At arraignment and plea: Jeffrey Williams, Deputy Federal Public Defender, Office of the Federal Public Defender, 222 North Central Avenue, Suite 810, Phoenix, Arizona.

(c)     At trial and sentencing: John M. Sears, Esq., 107 North Cortez Str., Ste 104, Prescott, Arizona; Deputy Federal Public Defenders Jeffrey Williams and Gregory Bartolomei, Office of the Federal Public Defender, Phoenix, Arizona.

(d)     On appeal: Celia Rumann, Esq., Office of the Federal Public Defender, Phoenix, Arizona; Michael O'Connor, Esq., 2617 S. Palm Drive, Tempe, Arizona.

(e)     In the first post-conviction proceeding: Sean Kennedy, Federal Public Defender, Statia Peakheart, Gia Kim, Jonathan Aminoff, Deputy Federal Public Defenders 321 East 2nd Street, Los Angeles, California.

(f)     In this second post-conviction proceeding Cuauhtemoc Ortega Interim Federal Public Defender, Celeste Bacchi, Jonathan Aminoff, Deputy Federal Public Defenders 321 East 2nd Street, Los Angeles, California.

9.     Timeliness of Motion: The "final" version of the IACHR Report in *Lezmond C. Mitchell v. United States* was not issued until August 12, 2020. This motion is being filed with one-year of the issuance of the Report, and is therefore timely pursuant to 28 U.S.C. § 2255(f)(4).

## II.  FACTS AND PROCEDURAL HISTORY

### A.    Trial

1.     On May 20, 2003, an Arizona jury recommended that this Court sentence Mitchell to death. On September 15, 2003, this Court formally sentenced Mitchell to death. The details of the trial are well known to the Court and are summarized in *United States v. Mitchell (Mitchell I)*, 502 F.3d 931, 942-946 (9th Cir. 2007) and *Mitchell v. United States (Mitchell II)*, 790 F.3d 881, 883-85 (9th Cir. 2015).

**B.   Post-Trial Proceedings**

  **1.   Proceedings before U.S. Courts**

2.     Mitchell's conviction and sentence were affirmed on direct appeal. *Mitchell I*, 502 F.3d 931. On June 8, 2009, Mitchell filed a motion under 28 U.S.C. § 2255 (or in the alternative, under 28 U.S.C. § 2241) to vacate, set aside, or correct his sentence based on numerous violations of Mitchell's constitutional rights that occurred during the guilt and penalty phases of his trial. *See Mitchell v. United States,* D. Ariz. Case No. 09-CV-8089, Dkt. No 9. Among these was a claim of ineffective assistance of counsel at trial for failure to challenge jury selection. Mitchell moved the Court for authorization to interview jurors from his capital trial. The Court denied the request, and Mitchell amended his § 2255 motion to include a claim that this Court violated his constitutional rights by denying him access to jurors. The Court denied the motion on September 30, 2010, as well as the motion for an evidentiary hearing. *Mitchell v. United States*, 2010 WL 3895691 (D. Ariz. Sept. 30, 2010). Mitchell appealed, and on June 19, 2015, the Ninth Circuit affirmed this Court's judgment, but did not address the juror-interview issue. *Mitchell v. United States*, 790 F.3d 881 (9th Cir. 2015). The Supreme Court denied Mitchell's petition for certiorari on October 3, 2016. *Mitchell v. United States*, 137 S. Ct. 38 (2016).

3.     On March 5, 2018, Mitchell filed a motion in this Court to re-open his § 2255 proceedings pursuant to Federal Rule of Civil Procedure 60(b)(6), arguing that the Supreme Court's decision in *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), established that he was erroneously denied the opportunity to interview jurors from his capital trial. This Court denied the motion on September 18, 2018, and the Ninth Circuit affirmed. *Mitchell v. United States (Mitchell IV)*, 958 F.3d 775 (9th Cir. 2020).

4.     Mitchell's execution is scheduled for August 26, 2020.

  **2.   Proceedings before the IACHR**

5.     After Mitchell's § 2255 motion was denied, on April 3, 2017, Mitchell timely filed a petition against the United States before the Inter-American Commission

on Human Rights ("Commission" or "IACHR"), alleging his death sentence was imposed in violation of the American Declaration of the Rights and Duties of Man ("Declaration" or "American Declaration"), specifically Articles I (right to life and liberty); II (right to equality before the law); III (right to religious freedom and worship); XIII (right to the benefits of culture); XVIII (right to a fair trial); XIX (right to nationality); XXV (right to have the legality of his detention ascertained without delay); and XXVI (right to due process of law). Mitchell requested the Commission issue precautionary measures against the United States, pursuant to Article 25.1 of its Rules of Procedure, to suspend his execution pending consideration of his petition by the Commission. (IACHR, Report No. 209/20, Case 13.570, Report on Admissibility and Merits (Final), Lezmond C. Mitchell, United States of America, August 12, 2020) ("IACHR Mitchell Report").)

6.     On July 2, 2017, the Commission issued Resolution 21/2017 granting precautionary measures in favor of Mitchell, requesting the United States "adopt the necessary measures to preserve the life and physical integrity of Mr. Lezmond Mitchell until the IACHR has ruled on his petition, so as not to render ineffective the processing of his case before the inter-American system," pursuant to the United States' "obligations . . . in regard to human rights as a member of the OAS." (Commission Resolution 21/2017, July 2, 2017). On September 21, 2017, the United States submitted a response to Mitchell's petition. (Petition No. P-627-17, Lezmond C. Mitchell, Response of the United States of America, Sept. 21, 2017.) Over the next three years, the parties engaged in extensive briefing regarding the admissibility and the merits of Mitchell's petition.

7.     On July 14, 2020, the Commission issued a decision in Mitchell's case, ruling the United States had violated Mitchell's rights under Articles I, XVIII, XXV, and XXVI of the Declaration. *See* IACHR Mitchell Report. On August 12, 2020, the Commission issued its final report in Mitchell's case.

### III.  JURISDICTION

1.      Section 2255 of the habeas statute provides that a prisoner may move the court to set aside or correct a sentence imposed in violation of the Constitution or laws of the United States. 28 U.S.C. § 2255(a). This Court has jurisdiction over Mitchell's motion under this provision.

2.      This Court has the power to enforce Mitchell's rights as determined by the Commission because they derive from a treaty made and ratified under the authority of the United States and, as such, are the "supreme Law of the Land" pursuant to Article VI, clause 2, of the United States Constitution. *See, e.g.*, *Amaya v. Stanolind Oil & Gas Co.*, 158 F.2d 554, 556 (5th Cir. 1946) ("[a] treaty lawfully entered into stands on the same footing of supremacy as does the Constitution and Laws of the United States").

3.      Because the Commission only recently issued its decision ruling that Mitchell's human rights were violated, Mitchell was previously unable to bring in any court the claims on which he bases this motion. This Court now has jurisdiction to hear this evidence pursuant to 28 U.S.C. § 2255:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct his sentence.

28 U.S.C. § 2255(a). Mitchell is in custody under sentence of this Court, and he claims the right to vacate his conviction and sentence because they were obtained in violation of Mitchell's rights under the United States Constitution and the American Declaration.

4.      This is the second § 2255 motion Mitchell has filed challenging his conviction and death sentence, but because it raises claims Mitchell could not have raised in his first petition, it is not successive. *See Woods v. Carey*, 525 F.3d 886, 888 (9th Cir. 2008). In many instances, a second-in-time application is considered successive and subject to the limitations of 28 U.S.C. § 2244(a). *See* 28 U.S.C. § 2255(h) (enumerating instances when a successive application may be considered).

11

However, as the Supreme Court has explained, it is well-settled that the phrase "second or successive" does not simply refer to all applications filed second in time. *Magwood v. Patterson*, 561 U.S. 320, 322 (2010) (citing *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007)).

5.      To determine whether a second-in-time pleading should be deemed successive, a court must look to the purposes of AEDPA, which are "to further the principles of comity, finality, and federalism." *Panetti*, 551 U.S. at 945 (quotation marks omitted). The Supreme Court has cautioned courts to ensure that "petitioners [do not] run the risk under the proposed interpretation of forever losing their opportunity for federal review" and to "resist[] an interpretation of the statute that would . . . 'close our doors to a class of habeas petitioners seeking review without a clear indication that such was Congress' intent.'" *Id*. at 945-46 (quotation marks omitted); *see also Castro v. United States*, 540 U.S. 375, 380-81 (2003).

6.      As the Supreme Court observed in *Panetti*,

> We are hesitant to construe a statute, implemented to further the principles of comity, finality, and federalism, in a manner that would require unripe (and, often, factually unsupported) claims to be raised as a mere formality, to the benefit of no party.

551 U.S. at 947.[1] The *Panetti* Court rejected the state's argument that a prisoner contemplating a future *Ford* claim must preserve that claim by filing it in his or her first habeas petition. *Id*. at 946. It explained that were such an interpretation of "second or successive" correct, "the implications for habeas practice would be far reaching and seemingly perverse." *Id*. at 943 (quotation omitted). "A prisoner would be faced with two options: forgo the opportunity to raise a *Ford* claim in federal court; or raise the claim in a first federal habeas application (which generally must be filed within one year of the relevant state-court ruling), even though it is premature." *Id*. at 943.

---

[1] The Court held in *Panetti* that a claim made pursuant to *Ford v. Wainwright*, 477 U.S. 399 (1986), arguing that the petitioner is not legally competent to be executed, cannot be deemed successive because the claim itself will not become ripe until well after the initial habeas petition will have been adjudicated.

12

7.      Mitchell's claims that are the subject of this second-in-time motion arise from a decision by the Commission issued on August 12, 2020; Mitchell, therefore, could not have raised these claims in his first federal petition. As the Fifth Circuit has recognized, a petitioner whose claims in a second-in-time habeas petition are based on a Commission decision issued after the petitioner filed his first federal petition need not seek authorization to file a habeas petition concerning that decision. *In re Tamayo*, 552 F. App'x 371, 374 (5th Cir. 2014); *see also Leal Garcia v. Quarterman*, 573 F.3d 214, 222-24 (5th Cir. 2009) (determining that petitioner's second-in-time § 2255 petition was not successive because it relied on a presidential declaration in light of an International Court of Justice ("ICJ") opinion issued after petitioner's first habeas petition was resolved).

8.      Although *Magwood, Panetti,* and *Tamayo* all concerned petitions filed under 28 U.S.C. § 2254, wherein inmates challenged their convictions and sentences from state court judgments, the same reasoning applies to § 2255 motions, absent the concern for comity and federalism.

## IV.  GENERAL ARGUMENTS IN SUPPORT OF EACH CLAIM

## A.      The United States is constitutionally bound to respect the Commission's rulings.

1.      The United States is a member of the Organization of American States (OAS), which was created in 1948. A central part of the OAS is the Inter-American system of human rights enforcement and promotion. The Commission and the Declaration are integral parts of that system. The United States has participated in each step of the development of the Inter-American system of human rights.

2.      The Inter-American system of human rights was first put in place with the adoption of the OAS Charter and the American Declaration in 1948. As a founding

member of the OAS, the United States was an active participant at the 1948 conference at which both the OAS Charter and the American Declaration were adopted.[2]

3.	The United States ratified the OAS Charter in 1951. 2. U.S.T. 2349, T.I.A.S. No. 2361, 119 U.N.T.S. 3.[3] The OAS Charter shows a clear intention that the state parties to it should respect human rights. In particular, the preamble provides that the States entered into the Charter "[c]onfident that the true significance of American solidarity and good neighborliness can only mean the consolidation on this continent, within the framework of democratic institutions, of a system of individual liberty and social justice based on respect for the essential rights of man." OAS Charter preamble, ¶ 4.

4.	The Commission was created in 1959 as an autonomous entity of the OAS to promote and protect human rights. *See* Fifth Meeting of the Consultation of Ministers of Foreign Affairs (Santiago, Chile 1959). In 1960, the OAS members incorporated the American Declaration into the Statute for the new Commission. Statute of the Commission, art. 2 (1960).[4] In 1965, the Commission's functions and powers were expanded to "give particular attention . . . to the observance of the human

---

[2] The OAS Charter was adopted at the Ninth International Conference of American States (Bogotá, Colombia, April 30, 1948) and entered into force on December 13, 1951, 119 U.N.T.S. 3, 2 U.S.T. 2394, T.I.A.S. No. 2361. The American Declaration was adopted pursuant to Resolution XXX, Ninth International Conference of American States (Bogotá 1948), and is reprinted in Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1 at 17 (1992).

[3] The United States ratified the OAS Charter subject to one reservation not relevant here:

> That the Senate give its advice and consent to ratification of the Charter with the reservation that none of its provisions shall be considered as enlarging the powers of the Federal Government of the United States or limiting the powers of the several states of the Federal Union with respect to any matters recognized under the Constitution as being within the reserved powers of the several states.

[4] The current Statute of the Commission, which contains article 2, can be found at https://www.oas.org/en/iachr/mandate/Basics/statuteiachr.asp.

rights referred to in Articles I through IV, XVIII, XXV and XXVI of the American Declaration," and the Commission was authorized:

> *to examine communications submitted to it* and any other available information, to address to the government of any American State a request for information deemed pertinent by the Commission, and *to make recommendations, when it deems this appropriate, with the objective of bringing about more effective observance of fundamental human rights*.

Res. XXII, "Expanded Functions of the Inter-American Commission on Human Rights," Second Special Inter-American Conference (Rio de Janeiro, Brazil, Nov. 17-30, 1965) (emphasis added).[5]

5.   In 1967, amendments to the OAS Charter made the Commission a principal organ through which the OAS accomplishes its purposes. Amended Charter, art. 106.[6] The Amended Charter specifically provided that "there shall be an Inter-American Commission on Human Rights, whose principal function shall be to promote the observance and protection of human rights and to serve as a consultative organ of the Organization in these matters." *Id*.[7]

6.   The United States signed the amendments to the OAS Charter in 1967, and ratified them without reservation in 1968. 721 U.N.T.S. 324, 21 U.S.T. 607, T.I.A.S. No. 6847.

7.   Thus, with the full consent and ratification of the United States, the Commission acquired an express role under the OAS Charter to promote and protect

---

[5] For the complete text in the Final Act of the Second Conference, *see* OAS Official Documents, OEA/Ser.C/I.13, 1965, pp. 33-35.

[6] The OAS Charter was amended pursuant to the Protocol of Buenos Aires, 721 U.N.T.S. 324, 21 U.S.T. 607, T.I.A.S. No. 6847, entered into force Feb. 27, 1970 ("Amended Charter").

[7] The Amended Charter further provided that "until the inter-American convention on human rights, referred to in Chapter XV, enters into force, the present Inter-American Commission on Human Rights shall keep vigilance over the observance of human rights." Amended Charter, art. 145.

human rights within the Inter-American system.[8] In addition, the United States consented to giving this role to a Commission empowered to hear individual petitions against OAS member states and to determine whether human rights protected by the American Declaration have been violated. *See* ¶ 13, *supra*. As a consequence, the United States' treaty obligations include a recognition of the Commission's authority to promote and protect human rights.

**B.      The Commission Report finding the U.S. violated Mitchell's human rights is an expression of treaty-based rights and international law that must be enforced.**

8.      The Commission Report created rights in Mitchell under international law that are binding on the United States for two reasons: (1) because they are derived directly from the OAS Charter, a treaty within the meaning of the U.S. Constitution; and (2) because they are derived, through the OAS Charter, from the American Declaration, a statement of human rights norms the United States has not only adopted, but helped to draft. Furthermore, the Commission is a tribunal expressly established under the OAS Charter to promote and protect human rights and, therefore, its ruling on the application of human rights principles in Mitchell's case must be considered authoritative. For these reasons, this Court is obligated to follow the Commission's recommendation that Mitchell be granted a new trial, and that if the new trial results in a conviction, that Mitchell's sentence of death be commuted, in light of "the sovereign decision of the Navajo Nation against the use of the death penalty." IACHR Mitchell Report, at 26.

---

[8] International legal scholars have argued "that the effect of this change of status was to incorporate the Commission's Statute into the Charter, thus enhancing the authority of the Declaration and creating an obligation to respect the rights contained therein." 1 *Human Rights: The Inter-American System*, Booklet 5, at ii (Thomas Buergenthal & Robert E. Norris, 3ds., 1982).

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**1.    The Supremacy Clause requires that Mitchell's death**

**sentence be invalidated, and that he be given a new trial.**

**a.    The United States violated the OAS Charter.**

9.    The Commission ruled that for the Government to proceed with Mitchell's execution would be a serious and deliberate violation of the United States' international obligations under the OAS Charter. IACHR Mitchell Report, at 26. The Commission's findings based on the OAS Charter referred specifically to Mitchell's rights and the circumstances of his trial and sentencing. IACHR Mitchell Report, at 26.

10.    The Supremacy Clause of the Constitution binds courts to enforce treaties: "[A]ll Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby." U.S. Const. art. VI, cl. 2.

11.    As established above, the OAS Charter is a treaty that has been in full force and effect since the United States ratified it in 1951. Thus, the OAS Charter, as a treaty duly signed and ratified by the United States, "is binding on the United States as an OAS member," and this Court is bound to enforce it. *See United States v. BCCI Holdings (Luxembourg), S.A.*, 73 F.3d 403, 405 (D.C. Cir. 1996) ("*BCCI*").

12.    Furthermore, Mitchell may invoke the human rights protections of the OAS Charter. The OAS Charter expressly authorizes the Commission to promote and protect human rights, and the Commission is authorized to hear individual petitions and to interpret the scope and meaning of human rights under the OAS Charter and the American Declaration. Thus, the OAS Charter implicitly, if not expressly, provides a private right of action to enforce human rights. *United States v. Noriega*, 808 F. Supp. 791, 799 (S.D. Fla. 1992) (holding that "if a treaty expressly or impliedly provides a private right of action, it is self-executing and can be invoked by the individual").

13.    The Court, however, need not decide whether the OAS Charter is self-executing; even if it is not, the United States is still obligated to honor its international

commitments under the treaty. *See Noriega*, 808 F. Supp. at 799 (holding that the United States is obligated to observe the provisions of the Geneva Convention regardless of whether the treaty was self-executing).

14.     In *Medellín v. Texas*, the Supreme Court held that an ICJ judgment "creates an international law obligation on the part of the United States," but "does not of its own force constitute binding federal law *that pre-empts state restrictions on the filing of successive habeas petitions*." 552 U.S. 491, 522-23 (2008) (emphasis added). Mitchell is not asking this Court to determine the relationship of the United States' obligations under the OAS Charter to state law; indeed, the Court's decision in Mitchell's case has nothing to do with state law at all. Instead, Mitchell is asking a federal court to adjudicate a determination by an international body (whose authority the federal government acceded to in a treaty it helped draft and ratified), that the federal government violated Mitchell's human rights, in violation of that treaty. It would be inconsistent with both the language and spirit of the OAS Charter, as well as with the purpose it proclaims for the Commission, to find that the Commission's decisions cannot be enforced by an individual in a court of law.

15.     Therefore, to prevent a violation of the OAS Charter through disregard of Mitchell's rights based on that treaty, the Supremacy Clause requires this Court to enforce the Commission Report by invalidating Mitchell's sentence of death and requiring that he be given a new trial.

           **b.     The United States violated the American Declaration.**

16.     The Commission's interpretation of the American Declaration is also an expression of treaty-based rights that must be enforced under the Supremacy Clause. The Commission found that for the Government to proceed with Mitchell's execution would also be a serious and deliberate violation of the United States' international obligations under the American Declaration. IACHR Mitchell Report, at 26. Again, the Commission's interpretation of the American Declaration referred specifically to

Mitchell's rights and the circumstances of his trial and sentencing. IACHR Mitchell Report, at 26.

17.     Although the American Declaration is itself a non-binding declaration of human rights norms, those rights become binding, enforceable rights when applied in a specific case by the Commission, a treaty-based tribunal specifically empowered to interpret and promote the rights contained in the American Declaration. As described in detail in paragraphs 4-7 above, the OAS Charter established the Commission as the organ for authoritatively determining the obligations of member states in the matter of international human rights. In ratifying the Charter, the United States assented to the creation of the Commission. The rights set forth in the American Declaration are, as the name of the instrument suggests, *declared* as human rights norms, and become treaty-based obligations to the extent they are adjudicated by the Commission in a particular case. Hence, even if Mitchell had no judicially enforceable rights under the American Declaration until the Commission issued its final decision, that decision gave him a treaty-based right to have the Government respect and enforce the Commission's determination.[9]

18.     Therefore, to prevent a violation of Mitchell's rights under the American Declaration, and thereby prevent a violation of the OAS Charter from which it derives its authority, the Supremacy Clause requires this Court to enforce the Commission Report by invalidating Mitchell's conviction and sentence of death, and requiring a new trial.

_____

[9] The Commission also determined that the American Declaration is a source of legal obligation for the United States in *Roach & Pinkerton v. United States*, Case 9647, Inter-Am. C.H.R. 147, OEA/ser.L/V/11.71, doc. 9 rev. 1 (Sept. 22, 1987), http://www.cidh.org/annualrep/86.87eng/EUU9647.htm. In the *Roach & Pinkerton* case, the petitioners had already been executed when the Commission issued its report. In the instant petition, this Court is being asked to apply a Commission Report when a petitioner is still alive. *See also* Statute of the Commission, art. 20.

**2.    The Commission Report made Mitchell's inchoate rights under the Charter and American Declaration into specific, enforceable treaty-based rights.**

19.    Because the Commission is an organization established pursuant to the terms of a treaty, and is authorized by treaty to interpret and promote human rights under the OAS Charter and the American Declaration, its decisions when it carries out its official functions must be considered to be treaty-based. The rights set forth in the OAS Charter and the American Declaration are general human rights norms. The Commission accepted evidence and arguments presented by Mitchell and the Government, and issued a reasoned Report concerning Mitchell. In doing so, the Commission applied the American Declaration to the specific facts of Mitchell's trial and sentencing hearing. The Commission made specific findings, *inter alia*, as to whether the general—and universally recognized—right to a fair trial and right to due process were observed in Mitchell's case. When applied to a specific case by a treaty-based organization, Mitchell's inchoate rights under the OAS Charter and the American Declaration became specific, enforceable treaty-based rights. Accordingly, a report of the Commission—a treaty-based body—interpreting the Government's obligations under the American Declaration as to Mitchell, must be regarded as authoritative. Failure to enforce the Commission's decision would place the United States in violation of its obligations under the OAS Charter and the American Declaration.

**3.    The United States is bound by the Commission Report because it agreed to the Commission's authority to enforce human rights by hearing individual complaints against member states and by interpreting the American Declaration.**

20.    The United States has, through the OAS Charter, accepted treaty obligations establishing the authority of the Commission to promote observance and protection of human rights. Moreover, at the time the Commission acquired an express

role under the OAS Charter to promote and protect human rights within the Inter-American system, it had already been empowered to hear individual complaints against OAS member states and to determine whether human rights protected by the American Declaration have been violated, including specifically those Articles of the American Declaration at issue here, i.e., Articles I, XVIII, XXV, and XXVI. *See* ¶¶ 1-7, *supra*.

21.     Indeed, the U.S. Government has admitted "that under the Charter of the OAS, the Commission has of course the competence and responsibility to promote observance of and respect for the standards and principles set forth in the [American] Declaration." *Andrews v. United States*, Case 11.139, Inter-Am. C.H.R. No. 57/96; OEA/Sec. L/V/II.95, doc. 7 rev. 570 (1997). The United States has consistently displayed its respect for and support of the Commission in this regard, *inter alia*, by "responding to petitions presented against it on the basis of the Charter and the Declaration." *Id.*; *see also Roach & Pinkerton* (*supra*, n.9); *White & Potter v. United States*, Case 2141, Inter-Am. C.H.R. 25, OEA/ser. L/V/II.54 doc. 9 rev. 1 (1981).

22.     The American Declaration has "become the standard[] by which the human rights policies of the American nations are judged." 1 *Human Rights: The Inter-American System*, Booklet 5, at i (Thomas Buergenthal & Robert E. Norris, 3ds., 1982). Moreover, the U.S. Government itself has repeatedly cited to the responsiveness to complaints before, and recommendations from, the Commission as indicators of OAS members' human rights records. *See, e.g.*, 2019 Country Reports on Human Rights Practices: Mexico, released by the State Dep't's Bureau of Democracy, Human Rights, and Labor (2019).[10]

23.     "[T]he American Declaration is for . . . States [who are OAS members] a source of international obligations related to the Charter of the Organization." *Interpretation of the American Declaration of the Rights and Duties of Man Within the Framework of Article 64 of the American Convention on Human Rights*, Advisory

---

[10] The full text of the report is available at https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/mexico/.

Opinion OC-10/89, July 14, 1989, Inter-Am. Ct. H.R. (Ser. A) No. 10 (1989). Thus, a breach of the obligations contained in the American Declaration is a violation of the Charter and thereby a violation of the United States' treaty obligations under international law.

> **4.** **U.S. Courts have recognized the decisions of tribunals and international bodies as authoritative, and *Medellín v. Texas* does not foreclose such a finding here.**

24.     Courts have recognized and relied upon decisions by similar international tribunals. For example, in *United States v. Duarte-Acero*, the court considered whether the government had violated the double jeopardy clause in the International Covenant on Civil and Political Rights ("ICCPR")[11] by trying and convicting a person for crimes for which he had already been convicted and served time in Colombia. 208 F.3d 1282 (11th Cir. 2000). In deciding that there was no treaty violation, the Court relied upon an opinion of the Human Rights Committee ("HRC"), the body charged under the ICCPR with monitoring the implementation and interpretation of the treaty. The HRC had found that the ICCPR prohibited only double jeopardy within a single State and not multiple adjudications in different States. *Id.* at 1287. Recognizing the authoritative nature of the HRC's interpretation, the court observed that "[m]ost importantly perhaps, the HRC, the body charged under the ICCPR with monitoring its implementation, has spoken on this issue." *Id.* (alteration in original) (citation omitted). The court stated that the "Appellant fails to explain why we should depart from the HRC's revealing view." *Id.*; *Maria v. McElroy*, 68 F. Supp. 2d 206, 232 (E.D.N.Y. 1999) (relying on the views and decisions of the HRC as "authoritative" interpretations of the ICCPR), *overruled on other grounds by Restrepo v. McElroy*, 369 F.3d 627, 632 (2d Cir. 2004).

---

[11] The ICCPR is a treaty that was ratified by the United States on June 8, 1992. G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976.

25.     Like the HRC, the Commission is a body charged with interpreting human rights obligations under a treaty. This Court should, therefore, treat the Commission Report as an authoritative interpretation of the United States' obligations under the OAS Charter and, through the Charter, of the American Declaration, and should, as the court in *Duarte-Acero* did with the HRC decision, follow the decision of the Commission.

26.     Similarly, the court in *Bodner v. Banque Paribas* found that customary international law as reflected in the work of the Nuremberg tribunals as well as in United Nations resolutions provided a sufficient basis to assert jurisdiction under the Alien Tort Claims Act. 114 F. Supp. 2d 117, 127-28 (E.D.N.Y. 2000); *see also Rodriguez Fernandez v. Wilkinson*, 505 F. Supp. 787, 798 (D. Kan. 1980) (finding that "arbitrary detention is prohibited by customary international law" even where there was no violation of the Constitution or statutory law), *aff'd on other grounds*, 654 F.2d 1382 (10th Cir. 1981); *see also Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1179, 1181 (C.D. Cal. 2005) (holding that "there is a customary international law norm against cruel, inhuman, and degrading treatment" and "torture," which are "binding" and recognized by "numerous federal courts").

27.     Courts have even relied upon commentaries of international bodies not charged with hearing cases or controversies for authoritative interpretations of treaty obligations. For example, in interpreting the meaning of the Geneva Conventions, the court in *Noriega* relied heavily upon a published commentary about the Geneva Conventions by the International Committee of the Red Cross as a "widely recognized" and "respected authority." *Noriega*, 808 F. Supp. at 795 & n.6.[12] Based on the Red Cross Commentary, the Court ruled that the defendant was entitled to certain rights set forth in the Geneva Convention Relative to the Treatment of Prisoners of War. *Id*. at 800-03.

---

[12] Specifically, the court in *Noriega* relied upon 3 International Committee of the Red Cross, *Commentary on the Geneva Conventions*, (J. Pictet, ed., 1960).

23

28.     As discussed *supra* at ¶ 14, the Supreme Court's decision in *Medellín v. Texas* does not preclude this Court from granting relief to Mitchell. In *Medellín*, the petitioner filed a § 2254 petition in federal court challenging his conviction and sentence under state law, based on a decision by the ICJ finding that the U.S. had violated the Vienna Convention by failing to advise more than fifty Mexican nationals, including Medellín, of their post-detention right to speak to a consular official. *See Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. 12 (*Avena*). The President then issued a memorandum stating that the U.S. would comply with its international obligations "by having State courts give effect to the decision." *Id.* at 503. Medellín then filed a state habeas petition in the Texas Court of Criminal Appeals, which denied relief, and Medellín appealed to the U.S. Supreme Court. Thus, the Supreme Court in *Medellín* was directly reviewing the decision of a State court that the ICJ's decision was not binding on state courts reviewing a conviction and sentence under state law. The Supreme Court took issue with the fact that "Medellín argues that the *Avena* judgment has the effect of enjoining the operation of *state* law" because "the judgment *would force the State to take action* to 'review and reconside[r]' his case." *Id.* at 522 (emphasis added) (alteration in original). The Court continued, "[i]n sum, while the ICJ's judgment in *Avena* creates an international law obligation on the part of the United States, it does not of its own force constitute binding federal law *that pre-empts state restrictions* on the filing of successive habeas petitions," because "the basic rights guaranteed by our own Constitution do not have the effect of *displacing state procedural rules*." *Id.* at 523 (emphasis added).

29.     Mitchell's petition has nothing to do with state procedural rules, or any action the federal government or courts might take with respect to state law. Accordingly, the *Medellín* decision does not preclude this Court from enforcing the decision of an international tribunal, whose authority the federal government recognizes, with respect to federal law and federal procedural issues raised with respect to a conviction and sentence imposed under federal law.

24

# V.  CLAIMS FOR RELIEF

## A.   Mitchell's right to be free from unlawful and arbitrary arrest was violated.

1.      Article XXV of the American Declaration guarantees Mitchell protection from unlawful or arbitrary interference with his liberty by the State; specifically, "among the protections guaranteed are the requirements that any deprivation of liberty be carried out in accordance with pre-established law, that a detainee be informed of the reasons for the detention and promptly notified of any charges against them, that any person deprived of liberty is entitled to juridical recourse, to obtain, without delay, a determination of the legality of the detention, and that the person be tried within a reasonable time or released pending the continuation of proceedings." IACHR, Report on Terrorism and Human Rights, OEA/Ser.L/V/II.116.Doc.5 rev.1, October 22, 2002, para. 120.

2.      Mitchell established that in September 2001, he was arrested by Navajo Nation law enforcement and charged with criminal damage, a misdemeanor, for vandalizing tribal property. He was released, and a hearing was set for September 17, 2001. On November 4, 2001, pursuant to a bench warrant for failing to appear in court on the misdemeanor, the Federal Bureau of Investigations (FBI) and the Navajo Nation police arrested Mitchell. The FBI interrogated Mitchell intermittently for at least twelve hours over the course of November 4 and 5, including at the location where the bodies were found. On November 7, 2001, three days after Mitchell was arrested, he pled guilty to the criminal damage charge in tribal court. His sentence was deferred until a sentencing hearing, and Mitchell was to be committed to the custody of the keeper of the Navajo jail until this judgment had been satisfied.[13] On November 29, 2001,

---

[13] On January 24, 2002, the tribal court granted the Navajo Nation's request for an "Order of Indefinite Continuance" until the Navajo Nation could make arrangements with the United States Attorney's Office for the proper disposition of this case. In October 2003, five months after Mitchell was convicted and sentenced to death, the Navajo Nation requested and was granted closure of the tribal case due to Mitchell's federal conviction and long-term federal incarceration.

pursuant to a federal indictment, FBI and Navajo Nation agents transported Mitchell to the federal courthouse in Flagstaff, Arizona, where FBI agents again interrogated Mitchell. Thereafter, Mitchell made his initial appearance; counsel was appointed; and the agents had no further ability to interrogate Mitchell.

3. The effect of keeping Mitchell in tribal custody on a minor offense was to allow the FBI to repeatedly interrogate him, without counsel present, over the course of several weeks, and to acquire significant incriminating evidence against him in violation of his due process rights.

4. The Commission found that Mitchell's arrest was unlawful because he was held in tribal custody for seventeen days for a misdemeanor that did not authorize jail time. Mitchell's detention was therefore illegal. The Commission also found that there was a delay in reviewing the legality of Mitchell's detention because he was only taken before a federal judge twenty-five days after his arrest for a misdemeanor, during which period FBI agents interrogated him about the robbery and murder charges. IACHR Mitchell Report, at 15-17. These issues constitute violations of the Declaration, and therefore this Court must vacate Mitchell's convictions and death sentence.

**B.     Mitchell's right to a fair trial and to due process of law was violated.**

5. Article XVIII of the American Declaration provides: "Every person may resort to the courts to ensure respect for his legal rights. There should likewise be available to him a simple, brief procedure whereby the courts will protect him from acts of authority that, to his prejudice, violate any fundamental constitutional rights." Article XXVI provides: "Every accused person is presumed to be innocent until proved guilty. Every person accused of an offense has the right to be given an impartial and public hearing, and to be tried by courts previously established in accordance with pre-existing laws, and not to receive cruel, infamous or unusual punishment." In particular, the Commission recognizes the right to cultural identity and self-determination of indigenous peoples as an evolving rule and principle of human rights law in the

Americas, and "it is in this context that the content of the rights established in the American Declaration must be interpreted." IACHR Mitchell Report, at 17.

6.     In 1994, Congress enacted "a small but important development toward tribal self-determination" with respect to prosecutions by the federal government of crimes committed on tribal lands: the so-called "tribal option," which allowed Native American tribes to decide whether the death penalty applies to most crimes committed by an Indian against another Indian on tribal lands. 18 U.S.C. § 3598. In late 2001, the United States Attorney's Office for the District of Arizona ("USAO") specifically inquired whether the Navajo Nation would support a capital prosecution in Mitchell's case. The Attorney General for the Navajo Nation formally requested that the USAO not seek the death penalty against Mitchell. IACHR Mitchell Report, at 19, 20. In accordance with their obligation under the "tribal option," the local USAO recommended to the Department of Justice that capital punishment not be sought against Mitchell; however, then-Attorney General John Ashcroft overrode the recommendation, and the Navajo Nation's wishes, and instructed the USAO to seek death against Mitchell. *Mitchell v. United States*, 790 F.3d 881, 896 (9th Cir. 2015).

7.     The Commission ruled that "it is clear that the application of the death penalty in this case is against the will of the Navajo Nation," and that the U.S. Government engaged in "legal subterfuge" by seeking the death penalty "not for the murder but for a car robbery, an offence involving the protection of a minor legal interest." IACHR Mitchell Report, at 20-21. Imposing the death penalty "using this legal maneuver" violated the autonomy of the Navajo Nation, and their ability to protect their culture "in conformity with their own worldview." *Id*., at 21. Mitchell's right to be sentenced in accordance with the Navajo Nation's values "is a component of the right to a fair trial and to the protection against the arbitrary imposition of a penalty." Accordingly, the Government also violated Mitchell's right to due process and a fair trial under Articles XVIII and XXVI. *Id*., at 21. As a result of these violations of the American Declaration, Mitchell's death sentence must be vacated.

## C.    Mitchell's right to effective assistance of counsel was violated.

8.      Articles XVIII and XXVI of the American Declaration, which guarantee the right to due process and to a fair trial, include the obligation to afford adequate legal representation. IACHR Mitchell Report, at 21, 23. The Commission has established that "the fundamental due process requirements for capital trials include the obligation to afford a defendant with a full and fair opportunity to present mitigating evidence for consideration in determining whether the death penalty is the appropriate punishment in the circumstances of his or her case." IACHR Mitchell Report, at 22, *quoting* IACHR, Report No. 90/09, Case 12.644, Admissibility and Merits (Publication), Medellín, Ramírez Cárdenas and Leal García, United States, August 7, 2009, para. 134. The "fundamental nature of this guarantee" is reflected in the American Bar Association's guidelines and related commentaries, which emphasize the importance of investigating and presenting mitigating evidence in death penalty cases. *See, e.g.*, American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (Revised editions) (February 2003), Guideline 10.7 – Investigation.

9.      Mitchell established that his lead counsel at the penalty trial had never tried a murder case and had no capital litigation experience. Trial counsel failed to adequately investigate the guilt and penalty phases of Mitchell's trial, which deprived Mitchell of the ability to rebut the prosecution's case for guilt and for death, and prevented him from presenting compelling mitigation. Mitchell was charged with specific-intent crimes, including the capital count of carjacking resulting in death. Evidence of a defendant's intoxication may negate an element of the crime, specifically "his capacity to form specific intent at the time of the offense." *United States v. Echeverry*, 759 F.2d 1451, 1454 (9th Cir. 1985). Despite the fact that Mitchell gave a recorded statement to the FBI and Navajo Nation investigators during which he repeatedly claimed to have been drinking at the time of the murders, and had "blackened out," Mitchell's attorney did not present a voluntary intoxication defense,

28

and did not request a jury instruction on impaired capacity as a mitigating factor. IACHR Mitchell Report, at 23. Indeed, Mitchell's counsel ignored the opinion of the mitigation specialist, who believed very strongly Mitchell was in fact intoxicated at the time of the crimes, and advised counsel to follow up with a psycho-pharmacologist to support a voluntary intoxication defense—recommendations Mitchell's counsel dismissed.

10.    The Commission ruled that Mitchell's right to due process and to a fair trial under Articles XVIII and XXVI of the American Declaration were violated because "[g]iven the strict scrutiny applied in death penalty cases and the interests at stake, this readily available evidence" of Mitchell's intoxication at the time of the crimes should have been presented, as it represented the possibility of a different outcome had it been raised. IACHR Mitchell Report, at 23. The Commission further found that Mitchell's rights were violated because "the only public defender in charge of the penalty phase, who had never tried a murder case, did not request an instruction on impaired capacity as a mitigating factor," resulting in "a breach to the fundamental due process and fair trial requirements for capital trials." IACHR Mitchell Report, at 23. Accordingly, Mitchell's convictions and death sentence must be vacated.

**D.    Mitchell's right to effective remedies was violated.**

11.    The right to due process under the American Declaration "include[s] a right of effective review or appeal from a determination that the death penalty is an appropriate sentence in a given case." IACHR Mitchell Report, at 23, *quoting* IACHR, Report 48/01, Case No 12.067, Michael Edwards et al., Bahamas, April 4, 2001, para. 149. A remedy must be effective, i.e., "it must provide results or responses consistent with the objectives that it was intended to serve, which is to avoid the consolidation of an unjust situation." IACHR Mitchell Report, at 23-24. "[I]n some circumstances, rejection of appeals based on failure to comply with formal requirements established by statute or defined in judicial practice may be a violation of the right to appeal a judgment." IACHR Mitchell Report, at 5.

12. Mitchell established that after exhausting his direct appeal, he filed a motion to vacate his conviction and sentence, raising several claims, including ineffective assistance of counsel, and requested an evidentiary hearing to contest factual issues relevant to his claims for relief. This Court denied the motion and the request for the evidentiary hearing.

13. The Commission concluded that because Mitchell's right to effective assistance of counsel was violated, and given the specific interests at stake, the lack of access to an evidentiary hearing to address this claim in post-conviction review constitutes a violation of Mitchell's right to an effective remedy. The Commission "underscore[d] . . . that States have an enhanced obligation to ensure that any deprivation of life which may occur through the application of the death penalty is in strict compliance with the right to a timely, effective, and accessible remedy." IACHR Mitchell Report, at 24. Accordingly, Mitchell's execution must be stayed, and he is entitled to a further factual development on his claim ineffective assistance of counsel claims including subpoena power, discovery, and an evidentiary hearing.

**E.    Mitchell's right not to receive cruel, infamous, or unusual punishment was violated.**

14. Articles XXV and XXVI of the American Declaration guarantee the right to humane treatment, and the right to be free from cruel, infamous, or unusual punishment. IACHR Mitchell Report, at 25. This includes a duty on the part of the State "to inform the person sentenced to death, in a timely manner, about the drug and method of execution that will be used," so as not to preclude the petitioner from "litigating the right to be executed in a manner devoid of cruel and unusual suffering." IACHR Mitchell Report, at 24. This also includes a State's "special duty . . . to ensure that the method of execution does not constitute cruel, infamous, or unusual punishment." IACHR Mitchell Report, at 23-24. In addition, the deprivation of liberty on death row—e.g., the prolonged solitary confinement, even for as little as four years—violates Articles XXVI and XXVI.

15.     Mitchell established that on July 8, 2014, he joined a federal lawsuit in the U.S. District Court for the District of Columbia alleging that the means by which the government seeks to impose the death penalty would violate the U.S. Constitution, as well as federal law. He subsequently removed himself from the lawsuit. On July 25, 2019, the Warden informed Mitchell that he would be executed on December 11, 2019. Although the execution was stayed by the Ninth Circuit, the execution was subsequently rescheduled on July 29, 2020, and Mitchell is currently scheduled to be executed on August 26, 2020. The Government has provided no information regarding the origins of the drugs that will be used to execute Mitchell. Mitchell has been on death row for eighteen years.

16.     The Commission concluded that Mitchell's right to humane treatment, and to be free from cruel, infamous, or unusual punishment under Articles XXV and XXVI of the American Declaration, has been violated. Specifically, "the uncertainty surrounding federal death penalty executions . . . is exposing Mitchell to anguish and fear that amount to a violation of his right[s]," and Mitchell's eighteen years on death row "under such conditions is, by any account, excessive and inhuman [*sic*], and is aggravated by the prolonged expectation that the death sentenced could be executed." IACHR Mitchell Report, at 25, 26. As a result of these violations of the American Declaration, Mitchell's death sentence must be vacated.

**F.      Mitchell's right to life will be violated if he is executed.**

17.     The Commission further concluded that executing Mitchell after, *inter alia*, "the United States unlawfully arrested Mr. Mitchell, violated his due process rights, as well as his right to humane treatment and not to receive cruel, infamous or unusual punishment, by virtue of the 18 years that he has been on death row[]," "would be extremely grave and constitute a deliberate violation of the right to life established in Article I of the American Declaration." IACHR Mitchell Report, at 26. As a result of these violations of the American Declaration, Mitchell's death sentence must be vacated.

31

# VI.  PRAYER FOR RELIEF

Wherefore, Mitchell respectfully moves this Court to:

1.   Vacate his convictions and death sentence in accordance with the guarantees of a fair trial, due process, and right to life set forth in Articles I, XVIII, XXV, and XXVI of the American Declaration, and in recognition of the sovereign decision of the Navajo Nation to exercise its "tribal option" against the death penalty in this case, and order that he either be released or re-tried in a manner consistent with international law;

2.   Permit Mitchell sufficient time to file such amendments to this Motion as may be necessary to bring all proper matters before this Court and ensure a reliable and fair resolution of his claims for relief;

3.   Grant Mitchell an evidentiary hearing on all claims raised herein;

4.   Grant Mitchell leave to pursue such discovery as may be necessary to fully develop the facts in support of his claims for relief; and

5.   Grant such other relief as may be appropriate.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Interim Federal Public Defender

DATED:  August 20, 2020          By */s/ Jonathan C. Aminoff*

JONATHAN C. AMINOFF
CELESTE BACCHI
Deputy Federal Public Defender

Attorneys for Petitioner
Lezmond Charles Mitchell

32

# EXHIBIT 1



OEA/Ser.L/V/II
Doc. 223
August 12, 2020
Original: English

# REPORT No. 209/20
# CASE 13.570

REPORT ON ADMISSIBILITY AND MERITS (FINAL)

LEZMOND C. MITCHELL
UNITED STATES OF AMERICA

Approved electronically by the Commission on August 12, 2020.

**Cite as:** IACHR, Report No. 209/20. Case 13.570. Admissibility and Merits (Final). Lezmond C. Mitchell. United States of America. August 12, 2020.

www.cidh.org



Exhibit 1 - 001

**INDEX**

I.     INTRODUCTION ..............................................................................................................................2

II.    POSITIONS OF THE PARTIES.......................................................................................................2

  A.   Petitioners...........................................................................................................................................2

  B.   State ...................................................................................................................................................3

III.   ADMISSIBILITY ...............................................................................................................................5

  A.   Competence, duplication of procedures and international *res judicata*........................................5

  B.   Exhaustion of domestic remedies and timeliness of the petition..................................................5

  C.   Colorable claim .................................................................................................................................6

IV.    FINDINGS OF FACT..........................................................................................................................6

  A.   The federal death penalty system ...................................................................................................6

  B.   The federal death penalty, Indian jurisdiction and the Navajo Nation .......................................7

  C.   Relevant legal framework ................................................................................................................8

  D.     Factual background, trial and death sentence ...........................................................................8

  E.   Post-conviction proceedings .........................................................................................................11

  F.   Civil procedure's motion (60(b) motion) ....................................................................................13

  G.     Legal proceedings regarding the lethal injection protocol ....................................................14

V.     ANALYSIS OF LAW ........................................................................................................................14

  A.   Preliminary considerations............................................................................................................14

  B.   Right of protection from arbitrary arrest ...................................................................................15
     1.   General considerations on the right not to be illegally or arbitrary arrested ............................15
     2.   Analysis of the case ........................................................................................................................16

  C.   Right to a fair trial and right to due process of law....................................................................17
     1.   General considerations on the right to self-determination and cultural identity of indigenous
     peoples, in relation to the rights to a fair trial and to due process of law....................................17
     2.   Analysis of the case ........................................................................................................................18
     3.   Right to counsel ..............................................................................................................................21
     4.   Ineffective assistance of court-appointed counsel........................................................................21
     5.   Analysis of the case ........................................................................................................................22
     6.   Access to effective remedies ..........................................................................................................23

  D.   Right not to receive cruel, infamous or unusual punishment....................................................24
     1.   Method of execution .......................................................................................................................24
     2.   The deprivation of liberty on death row and the right of protection against cruel, infamous or
     unusual punishment ...........................................................................................................................25

  E.   Right to life and to protection against cruel, infamous or unusual punishment with respect to
  the eventual execution of Lezmond M. Mitchell ...............................................................................26

VI.    REPORT No. 193/20 AND INFORMATION ABOUT COMPLIANCE ......................................26

VII.   CONCLUSIONS AND RECOMMENDATIONS .............................................................................27

Exhibit 1 - 002

IACHR Inter-American Commission on Human Rights

## I.   INTRODUCTION

1.   On April 3, 2017, the Inter-American Commission on Human Rights (the "Inter-American Commission", "Commission" or "IACHR") received a petition and request for precautionary measures[1] submitted by Hilary Potashner, Federal Public Defender, and Gia Kim and Jonathan C. Aminoff, Deputy Federal Public Defenders (the "petitioners"),[2] alleging the international responsibility of the United States of America (the "State" or "the United States") for the violation of the rights of Lezmond M. Mitchell ("Mr. Mitchell"), a citizen of the United States and a member of the Navajo Nation, who is on federal death row.

2.   On April 26, 2018, the Commission notified the parties of the application of Article 36 (3) of its Rules of Procedure, since the petition falls within the criteria established in its Resolution 1/16, and placed itself at the disposition of the parties to reach a friendly settlement. The parties enjoyed the time periods provided for in the IACHR's Rules to present additional observations on the merits. All the information received by the Commission was duly transmitted to the parties.

## II.   POSITIONS OF THE PARTIES

### A.   Petitioners

3.   According to the petitioners, this case represents the only time in the history of the modern death penalty that the United States Government has sought the death penalty over the objection of a Native American tribe when the criminal conduct in question was committed on tribal land. They state that the Navajo Nation has consistently maintained its position against capital punishment generally and as applied to Mr. Mitchell. According to the petitioners, Mr. Mitchell remains the only Native American on federal death row.

4.   Mr. Mitchell was convicted of murdering two Navajo people on Navajo reservation land in 2001. The petition alleges six claims of violations of the American Declaration of the Rights and Duties of Man (the "American Declaration" or the "Declaration").

5.   First, the petitioners allege that the decision to seek the death penalty was arbitrary given that, to secure a death sentence, the Government relied on a legal loophole. They indicate that the Government had given the tribes the right to decide whether they wanted the federal death penalty to apply to intra-Indian crimes committed on tribal lands, and, in a near-unanimous decision, the tribes opted out of the federal death penalty act. Thus, according to the petitioners, when Mr. Mitchell's prosecution was being considered, the Government acknowledged that it could not seek death against Mr. Mitchell for the murder counts. Mr. Mitchell was also charged with carjacking, a crime of general applicability for which federal jurisdiction did not depend on tribal status or tribal land, and to which the Navajo Nation's opt-out did not apply. Therefore, the Government sought, and obtained, the death penalty against Mr. Mitchell for carjacking resulting in death. He received life sentences for the murder counts.

6.   The petitioners also allege that the trial was rife with due process violations and that the U.S. Government colluded with Navajo Nation law enforcement officers to deprive Mr. Mitchell of his due process rights. They allege that Mr. Mitchell was unlawfully detained for a misdemeanor that did not authorize jail time; was illegally held in custody for several weeks; and repeatedly interrogated by the FBI without being afforded counsel. Once counsel was appointed, the lawyers allegedly failed to adequately investigate the case at the guilt phase of the trial. The petitioners also allege ineffective assistance of trial counsel in preparing and presenting a case for leniency at the penalty phase. According to the petitioners, Mr. Mitchell's counsel was inadequate and inexperienced. Counsel allegedly ignored the advice of a mitigation specialist with extensive experience working with death penalty cases and with Native American clients.

---

[1] On July 2, 2017, the IACHR granted precautionary measures on behalf of Mr. Mitchell pursuant to Article 25(1) of its Rules of Procedure and requested the United States to take the measures necessary to preserve his life and physical integrity so as not to hinder the processing of his case before the Inter-American system.

[2] On July 6, 2018, the petitioner informed that the International Human Rights Clinic at Loyola Law School joined the case as co-counsel for Mr. Mitchell.

Exhibit 1 - 003

IACHR Inter-American Commission on Human Rights

7.   The petitioners also state that no domestic court allowed Mr. Mitchell the opportunity to develop his claims in the post-conviction process. They assert that the U.S. District Court for the District of Arizona refused to grant discovery or an evidentiary hearing on contested factual issues relevant to Mr. Mitchell's claims for relief. According to the petitioners, the summary dismissal of Mr. Mitchell's claims deprived him of a fair opportunity to present his habeas claims. Finally, the petitioners argue that Mr. Mitchell's execution via lethal injection is cruel and unusual punishment. They allege that this mode of execution as currently practiced in the United States creates an unacceptable and unnecessary risk of inflicting excruciating pain and suffering.

8.   With regard to the requirement of exhaustion of domestic remedies, the petitioners allege that the first five claims were raised in and rejected by domestic courts, with a final decision being rendered by the Supreme Court of the United States on October 3, 2016. Regarding the lethal injection claim, the petitioners assert that, despite pendency for several years of a litigation challenging the lethal injection in domestic courts, the U.S. Government has not developed a protocol to protect death-sentenced inmates from cruel and unusual punishment.

9.   Finally, the petitioners indicated that on April 30, 2020, a three-judge panel of the United States Court of Appeals for the Ninth Circuit affirmed the district court's denial of Lezmond Mitchell's motion pursuant to Federal Rule of Evidence 60(b). Regarding the requirement of exhaustion of domestic remedies, petitioners reiterate that Mr. Mitchell has not only exhausted all direct review proceedings, but also post-conviction proceedings.

10.  The petitioners conclude that the United States has violated Mr. Mitchell's rights under Articles I (right to life, liberty and personal security), II (right to equality before the law), III (right to religious freedom and worship), XIII (right to the benefits of culture), XVII (right to recognition of juridical personality and civil rights), XVIII (right to a fair trial), XIX (right to nationality), XXIV (right of petition), XXV (right to protection from arbitrary arrest), and XXVI (right to due process of law) of the American Declaration.

**B.   State**

11.  According to the United States, the petition is inadmissible because Mr. Mitchell continues to pursue and exhaust domestic remedies and has not stated facts that tend to establish a violation of any rights of the American Declaration. It also states that the Commission should decline the invitation to operate as a court of fourth instance to review claims which have been carefully adjudicated by domestic courts. Should the Commission declare the petition admissible and examine its merits, the United States urges it to find the petition without merit.

12.  As an initial matter, the United States reiterates its position that the American Declaration does not itself create legal rights or impose legal obligations on Member States. It further asserts that the "proposition that the American Declaration subsequently attained binding force, through some of *ipse dixit*, is unsupported as a matter of international law." It notes, however, that although it has never undertaken an obligation that would render the American Declaration binding and has persistently objected to any such notion, as a sovereign State, it voluntarily undertakes international law obligations and takes those obligations seriously.

13.  According to the State, the petitioners' allegation of infringement on Navajo sovereignty is beyond the Commission's competence to review and the petitioners have not effectively demonstrated this allegation. With regard to the allegation that the application of the death penalty violates the tribal sovereignty of the Navajo Nation, the State argues that the Commission must limit itself to the American Declaration, an instrument setting forth individual rights that makes no mention of the collective rights of indigenous peoples. Moreover, the State asserts that Mr. Mitchell's sentencing was entirely lawful because federal jurisdiction over the crime for which he received the death penalty was not dependent on it having taken place on tribal land.

14.  Regarding the petitioners' general references to the United Nations Declaration on the Rights of Indigenous Peoples ("UNDRIP") and the American Declaration on the Rights of Indigenous Peoples ("OAS DRIP"), the State alleges that the Commission must decline to review the petition through those instruments because it lacks competence to apply any instrument beyond the American Declaration to the United States. It further asserts

Exhibit 1 - 004

that neither instrument was intended to create new international law as they are aspirational statements of political and moral commitment, and are therefore not binding under international law. The United States also highlights its persistent objection to the OAS DRIP and the IACHR's assertion in the case of Mary and Carrie Dann v. United States, that aspects of this instrument reflect general external legal principles and could thus be considered in interpreting and applying the American Declaration. With respect to the UNDRIP, the State expresses its support to that instrument, but points to the fact that it did not change the U.S. domestic legal framework. It also indicates that there is no domestic law that precludes the United States from imposing the death penalty for federal crimes committed by Native-Americans in Native-American territory.

15.  According to the State, the U.S. Supreme Court has long acknowledged that federally recognized tribes retain inherent powers of self-government by virtue of their preexisting sovereignty, but these powers may be limited by federal law. The State also asserts that federal jurisdiction over "crimes of general applicability" derives from Congress's plenary power under the U.S. Constitution to regulate interstate commerce; and that carjacking resulting in death, is one such crime of general applicability. Further, according to the State, there is no requirement under U.S. law for federal prosecutors to defer to the tribe's preferences in criminal proceedings involving the death penalty, nor was there a requirement to do so under any binding international instrument to which the United States is a party.

16.  The State alleges that Mr. Mitchell's domestic proceedings were conducted in compliance with the rights set forth in the American Declaration and U.S. law. Mr. Mitchell's pretrial due process claim, according to the State, is without merit because he offered no evidence that he ever asked for counsel; and he requested and received a trial hearing on the issue of voluntariness. The State notes that Mr. Mitchell did not raise a collusion claim at this hearing; instead, he testified that he knowingly cooperated with police and waived his *Miranda* rights in the hope of receiving a lighter sentence.

17.  The United States asserts that Mr. Mitchell's ineffective assistance of counsel claim is without merit and was carefully considered by domestic courts, consistent with due process. It indicates that, in addressing Mr. Mitchell's claim, the district court noted that trial counsel employed an experienced mitigation specialist and conducted a thorough investigation. Mr. Mitchell was also examined by a team of experts, including a psychiatrist, a neurologist, and a neuropsychologist. The State also notes that the court of appeals, like the district court, concluded that Mr. Mitchell's trial counsel performed his duties consistent with standards of professional competence and did not fall below an "objective standard of reasonableness." The court noted that given the brutal, premeditated nature of the crime and Mr. Mitchell's refusal to attend the trial's penalty phase, the fact that the jury found several mitigating factors at all was a "remarkable tribute to Mitchell's lawyers."

18.  According to the State, multiple layers of careful state and federal judicial review provided Mr. Mitchell extended opportunities to challenge his trial and conviction, and he fully availed himself of these opportunities. It further notes that, over many years, his claims have been reviewed through both direct appeals and the habeas procedure, at each of three levels of the federal court system: the U.S. District Court for the District of Arizona, the U.S. Court of Appeals for the Ninth Circuit, and the U.S. Supreme Court. In addition, the State alleges that the Commission should dismiss Mr. Mitchell's claims because it lacks competence to sit as a court of fourth instance.

19.  Finally, in its last communication dated November 19, 2019, the State alleged that Mr. Mitchell continues to pursue post-conviction relief in domestic courts. The State points to a pending appeal regarding a district court's denial of a motion, and an oral argument scheduled for December 13, 2019. The State also informs that the circuit court stayed Mr. Mitchell's execution pending resolution of the appeal. It alleges that, because he continues to pursue and exhaust remedies in the United States, the petition cannot satisfy the requirement under Article 31 of the Commission's Rules.

Exhibit 1 - 005

**IACHR** Inter-American Commission on Human Rights

## III.  ADMISSIBILITY

### A.   Competence, duplication of procedures and international *res judicata*

| | |
|---|---|
| Competence *Ratione personae:* | Yes |
| Competence *Ratione loci:* | Yes |
| Competence *Ratione temporis:* | Yes |
| Competence *Ratione materiae:* | Yes, American Declaration of the Rights and Duties of Man (ratification of the OAS Charter on June 19, 1951) |
| Duplication of procedures and international *res judicata:* | No |

20.  With regard to the State's allegation that the Commission must decline to review the petition through the UNDRIP and the OAS DRIP, the Commission emphasizes that it is only competent to apply the American Declaration with respect to petitions filed against the United States. However, the Commission notes that, when interpreting and applying the American Declaration, it takes into account developments in the *corpus juris* of international human rights law that are relevant in the specific case. These developments may in turn be drawn from the provisions of other prevailing international and regional human rights instruments. The Commission has noted in this regard that:[3]

> [...] in interpreting and applying the Declaration, it is necessary to consider its provisions in the context of the international and inter-American human rights systems more broadly, in the light of developments in the field of international human rights law since the Declaration was first composed and with due regard to other relevant rules of international law applicable to member states against which complaints of violations of the Declaration are properly lodged.

21.  Therefore, the Commission concludes that, although it lacks competence to directly apply the UNDRIP and the OAS DRIP, it can consider these instruments when interpreting and applying the provisions of the American Declaration.

### B.   Exhaustion of domestic remedies and timeliness of the petition

22.  According to the available information, and as established in the facts described below, Mr. Mitchell was sentenced to death on September 15, 2003, in the Federal District Court for the District of Arizona. The U.S. Court of Appeals for the Ninth Circuit affirmed the conviction and sentence on September 5, 2007. The U.S. Supreme Court of Justice denied Mr. Mitchell's petition of certiorari on June 9, 2008.

23.  Mr. Mitchell pursued post-conviction habeas corpus relief. On September 30, 2010, the district court denied the motion to vacate the conviction and sentence. On June 15, 2015, the Ninth Circuit Court affirmed the judgment and on October 3, 2016, the Supreme Court denied Mr. Mitchell's application for certiorari.

24.  The Commission notes the State's allegation in its last communication regarding the lack of exhaustion of domestic remedies given the existence of a pending appeal. Based on the established facts described above, on March 5, 2018, Mr. Mitchell filed a 60(b) motion in the district court to re-open section 2255 proceedings. The district court denied the motion on September 18, 2018. Mr. Mitchell appealed and on April 25, 2019, the Ninth Circuit Court granted the motion for a certificate of appealability.

25.  According to the latest information available, on April 30, 2020, the United States Court of Appeals for the Ninth Circuit affirmed the district court's denial of Lezmond Mitchell's motion pursuant to Federal Rule of Evidence 60(b).

26.  Based on the available information, the IACHR notes that the alleged victim has not only exhausted all direct review proceeding, but also post-conviction proceedings. Therefore, the Inter-American Commission

---

[3] IACHR. Report No. 75/02. Case 11.140. Mary and Carrie Dann. United States. December 27, 2002, para. 96.

Exhibit 1 - 006

concludes that the petitioners properly exhausted domestic remedies available within the domestic legal system and, therefore, that the alleged victim's claims before the Commission are not barred from consideration by the requirement of exhaustion of domestic remedies under Article 31(1) of its Rules of Procedure. The petition before the IACHR was presented on April 3, 2017, and the application for *certiorari* was denied by the Supreme Court on October 3, 2016. Therefore, the Commission also concludes that the requirement specified in Article 32(1) of its Rules of Procedure has been met.

## C.   Colorable claim

27. The Commission considers that, if proven, the facts alleged by the petitioner would tend to establish violations of the rights set forth in Articles I, XVIII, XXV and XXVI of the American Declaration, to the detriment of Mr. Mitchell.

28. With regard to the alleged violation of the rights to equality before the law, to religious freedom and worship, to the benefits of culture, to recognition of juridical personality and civil rights, to petition, and to nationality set forth in Articles III, XIII, XVII, XXIV and XIX of the Declaration, and based on the information provided, the Commission finds that the facts described in the petition do not tend to establish a colorable claim. The petitioners allege that the lack of a representative sample of members of the Navajo Nation in Mr. Mitchell's petit jury constitutes a violation of Article II of the American Declaration.  The information provided, however, is not sufficient to establish a colorable claim.

## IV.   FINDINGS OF FACT

29. In application of Article 43(1) of its Rules of Procedure, the IACHR will examine the arguments and evidence provided by the petitioners and the State. Likewise, the Commission will take into account publicly available information that may be relevant for the analysis and decision of the instant case.

## A.   The federal death penalty system

30. In 1972, the Supreme Court invalidated capital punishment throughout the United States. The federal government revised its procedures to withstand constitutional scrutiny on November 18, 1988, when the President signed the Anti-Drug Abuse Act of 1988. A part of this law made the death penalty available as a possible punishment for certain drug-related offenses. The availability of capital punishment in federal criminal cases expanded significantly further on September 13, 1994, with the passage of the Violent Crime Control and Law Enforcement Act. A part of this law, known as the Federal Death Penalty Act (FDPA), provided that over 40 federal offenses could be punished as capital crimes. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) added another four federal offenses to the list of capital crimes.[4]

31. On January 27, 1995, the Department of Justice (DoJ) adopted the policy still in effect today – known as the death penalty "protocol" – under which U.S. Attorneys are required to submit for review all cases in which a defendant is charged with a capital-eligible offense, regardless of the U.S. Attorney's desire to seek the death penalty in that case. The United States Attorney's Manual provides the following:[5]

> *9-10.030 – Purposes of the Capital Case Review Process*
> The review of cases under this Chapter culminates in a decision to seek, or not to seek, the death penalty against an individual defendant. Each such decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws. Arbitrary or impermissible factors—such as a defendant's race, ethnicity, or religion—will not inform any stage of the decision-making process. The overriding goal of the review process is to allow proper individualized consideration of the appropriate factors relevant to each case.
>
> *9-10.140 – Standards for Determination*

---

[4] The Federal Death Penalty System: a statistical survey (1988-2000). United States Department of Justice. Washington, D.C. September 12, 2000.

[5] The United States Department of Justice Archives. United States Attorney's Manual. Available at: https://www.justice.gov/archives/usam/archives/usam-9-10000-capital-crimes#9-10.030

Exhibit 1 - 007

The standards governing the determination to be reached in cases under this Chapter include fairness, national consistency, adherence to statutory requirements, and law-enforcement objectives.
[...]
B.   National consistency requires treating similar cases similarly, when the only material difference is the location of the crime. Reviewers in each district are understandably most familiar with local norms or practice in their district and State, but reviewers must also take care to contextualize a given case within national norms or practice. For this reason, the multi-tier process used to make determinations in this Chapter is carefully designed to provide reviewers with access to the national decision-making context, and thereby, to reduce disparities across districts.

32.  If the defendant is convicted and sentenced to the death penalty and fails to obtain relief on direct appeal, he or she may also seek collateral review by filing a motion to vacate, set aside or correct the sentence pursuant to 28 U.S.C. § 2255. Such collateral review goes through three levels of the federal judiciary: the motion is made in the district court in which the defendant was convicted; the district court's resolution of the § 2255 motion is subject to direct appeal by the losing party; the judgment by the Court of Appeals concerning the § 2255 motion is subject to discretionary review by the Supreme Court. If the defendant's sentence of death is upheld on both direct and collateral review, an execution date is set. Once the defendant has received notification of the scheduled execution date, he or she may petition the President for a grant of executive clemency.[6]

**B.   The federal death penalty, Indian jurisdiction and the Navajo Nation**

33.  The U.S. federal government recognizes tribal nations as "domestic dependent nations."[7] Therefore, tribes have an inherent right to govern themselves and tribal sovereignty can be limited only through a treaty with the federal Government or a federal statute.

34.  In 1885 the U.S. Congress passed the Major Crimes Act which places the following crimes under federal jurisdiction if they are committed by a Native American in Native territory: murder, manslaughter, kidnapping, maiming, sexual abuse, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, assault on a person less than 16 years old, felony child abuse or neglect, arson, burglary, robbery, theft under 18 U.S.C., section 661.[8]

35.  Under a special provision of the Federal Death Penalty Act, it is up to the tribes to choose, under the death penalty legislation, to "opt in:"[9]

18 U.S. Code § 3598. Special provisions for Indian country

Notwithstanding sections 1152 and 1153, no person subject to the criminal jurisdiction of an Indian tribal government shall be subject to a capital sentence under this chapter for any offense the Federal jurisdiction for which is predicated solely on Indian country (as defined in section 1151 of this title) and which has occurred within the boundaries of Indian country, unless the governing body of the tribe has elected that this chapter have effect over land and persons subject to its criminal jurisdiction.

36.  Almost all the tribes have opted out of using the federal death penalty.[10]

37.  The Navajo Nation's reservation is the largest in the United States; it extends into the states of Utah, Arizona and New Mexico and has a population of more than 250,000 persons. The Navajo Nation was effectively established as a sovereign nation after the adoption of the Navajo Treaty or the Treaty of Bosque Redondo on

---

[6] The Federal Death Penalty System: a statistical survey (1988-2000). United States Department of Justice. Washington, D.C. September 12, 2000.
[7] The United States Department of Justice. Native American Policies. Available at: https://www.justice.gov/oti/native-american-policies
[8] The United States Department of Justice. Indian country criminal jurisdiction chart for crimes committed within Indian Country. Available at: https://www.justice.gov/sites/default/files/usao-wdok/legacy/2014/03/25/Indian%20Country%20Criminal%20Jurisdiction%20ChartColor2010.pdf
[9] Federal Death Penalty Act, 18 U.S.C. § 3598.
[10]  Death Penalty Information Center. Background on the Federal Death Penalty. Native Americans. Available at: https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty/background-on-the-federal-death-penalty

Exhibit 1 - 008

IACHR Inter-American Commission on Human Rights

June 1, 1868. This treaty with the federal Government ended the Navajo Wars and allowed for the return of members of the Navajo Nation who had been held in internment camps at Fort Summer.[11]

38. The Navajo Nation has opted out of using the federal death penalty. In pressing for the tribal option, representatives of the Navajo Nation explained to Congress:[12]

> It is incumbent upon the federal government to allow Indian tribes the choice of whether the death penalty should be extended to our territory [...] [T]he death penalty is counter to the cultural beliefs and traditions of the Navajo people who value life and place great emphasis on the restoration of harmony through restitution and individual attention. The vast majority of major crimes committed on the Navajo Nation and within other Indian reservations are precipitated by the abuse of alcohol. The death penalty will not address the root of the problem; rather rehabilitation efforts will be more effective.

## C.  Relevant legal framework

39. Title 18. Crimes and Criminal Procedures of the United States Code § 2119, amended on September 13, 1994, reads as follows:

> Whoever, with intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall (1) be fined under this title or imprisoned not more than 15 years or both, (2) if serious bodily injury results, be fined under this title or imprisoned not more than 25 years, or both, and (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both or sentenced to death.

40. Rule 60(b) of the Federal Rule of Civil Procedure establishes the following:

> (b) GROUND FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR PROCEEDING. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons:
> [...]
> (6) any other reason that justifies relief.

## D.  Factual background, trial and death sentence

41. The facts described below were established by domestic courts and have not been disputed by the petitioners:[13]

> Lezmond Mitchell, then 20 years old, plotted with three others to carjack a vehicle for use in an armed robbery of a trading post located on the Navajo reservation in Arizona. On October 28, 2001, Mitchell and his 16-year-old accomplice, Johnny Orsinger, abducted 63-year-old Alyce Slim and her nine-year old granddaughter. Slim and the child were traveling to New Mexico in Slim's GMC pickup truck. Somewhere near Sawmill, Arizona, Mitchell and Orsinger killed Slim by stabbing her 33 times. Her dead body was pulled into the rear of the truck, where the child was made to sit beside it. Mitchell then drove the truck into the nearby mountains.

> Thirty or forty miles later, Slim's body was dragged out of the truck. Mitchell told the little girl to get out and "lay down and die." Mitchell then cut her throat twice. When she did not die, Mitchell and Orsinger each dropped large rocks on her head. Twenty-pound rocks bearing the child's blood were later found at the scene.

> Mitchell and Orsinger left the murder scene, but later returned to hide evidence. While Mitchell dug a hole in the ground, Orsinger severed the heads and hands of both victims in an effort to prevent their identification. The

---

[11] The Navajo Nation Government. Official Site of the Navajo Nation. Available at: http://www.navajo-nsn.gov/index.htm  Navajo Treaty of 1868. Available at: https://www.navajotreaty1868.navajo-nsn.gov.

[12] Statement of Helen Elaine Avalos, Assistant Attorney General, Navajo Department of Justice, on behalf of Peterson Zah, President of the Navajo Nation. Hearing before the Subcommittee on Crime and Criminal Justice of House Judiciary Committee, 103. Cong., 2d Sess., Feb. 22, 1994. Petitioners' original petition submitted on April 3, 2017, p. 33.

[13] Mitchell v. United States. United States Court of Appeals for the Ninth Circuit. June 19, 2015. Exhibit 2, submitted with petitioners' original petition on April 3, 2017.

Exhibit 1 - 009

dismembered parts were buried in the hole; the torsos were pulled into the woods. Mitchell and Orsinger later burned the victims' clothing and other personal effects. Mitchell washed the knives with alcohol to remove any blood.

Three days later, on October 31, 2001, Mitchell and two accomplices (Jason Kinlicheenie and Jakegory Nakai) drove to the Red Rock Trading Post in the GMC pickup truck stolen from Slim. The three men wore masks when they entered the store. Mitchell carried a 12-gauge shotgun. Nakai had a .22 caliber rifle. One of the gunmen struck the store manager in the head with his gun. When another employee said that she did not know the combination to the safe, one of the robbers said, "If you lie to me or you don't cooperate with us, we are going to kill you." Ultimately, the robbers made off with $5,530 from the safe and cash registers, and the store manager's purse.

The robbers drove the stolen GMC pickup truck back to Kinlicheenie's car. Kinlicheenie followed Mitchell in the truck to an area near Wheatfield, Arizona, where Mitchell set the truck on fire with kerosene stolen from the trading post. They then went to Jakegory and Gregory Nakai's house and split up the money.

42.  Mr. Mitchell was arrested by the Federal Bureau of Investigations (FBI) and Navajo Nation police early on November 4, 2001. According to information provided by the petitioners, not controverted by the State, the arrest was pursuant to an arrest warrant for vandalism of tribal property, a misdemeanor that allegedly took place in September 2001.[14] Later that morning he was transported to the Navajo Department of Criminal Investigations, where he signed a waiver of his *Miranda* rights[15] and was interrogated by an FBI agent for 12 hours. Mr. Mitchell admitted his involvement in the trading post robbery, and also confirmed that he was present when "things happened" to the victims. He agreed to help investigators find the bodies. The following day he directed Navajo police officers to the site. While there, he acknowledged the FBI agent that his *Miranda* rights were in effect and agreed to answer more questions. Mr. Mitchell stated that he had murdered the "old lady" and the girl. Mr. Mitchell was returned to tribal jail and taken before a tribal judge on November 7. Mr. Mitchell pled guilty to the criminal damage charge in tribal court and was returned to tribal jail.[16]

43.  A federal indictment was issued on November 21, 2001.[17] On November 29, 2001, FBI and Navajo Nation agents transported Mr. Mitchell to the federal courthouse in Flagstaff, Arizona, where FBI agents again interrogated him. Mr. Mitchell was then brought to a federal courthouse where he made his initial appearance and had counsel appointed. Once counsel was appointed, FBI agents had no further ability to interrogate Mr. Mitchell.[18]

44.  According to the information provided by the petitioners, not disputed by the State, Mr. Mitchell was represented at trial by two federal public defenders and an attorney in private practice who joined the defense team several months later. One of the public defenders, who had no experience in federal capital cases, and the attorney, focused on the guilt phase. The other public attorney, who had not tried a murder case and had no capital litigation experience, focused on the penalty phase and was primarily responsible for developing mitigation. According to said information, jail records indicate that in the sixteen months before trial, the attorney visited Mr. Mitchell for 28 minutes in May 2002, the public defender in charge of the guilt phase visited for 8 hours and 5 minutes (las visiting in October 2002), and the public defender focused on the penalty phase visited for 39 hours and 40 minutes.[19]

45.  In late 2001 the U.S. Attorney's Office for the District of Arizona inquired whether the Navajo Nation would support a capital prosecution in Mr. Mitchell's case. On January 22, 2002, the Attorney General for the Navajo Nation responded that the consensus of the Public Safety Committee and the Judiciary Committee of the Navajo Nation Council was to "maintain the historic position of the Navajo Nation opposing the sentencing option of capital punishment for crimes committed on the Navajo Nation under any section of the United States criminal

---

[14] Original petition submitted on April 3, 2017, p. 38.
[15] *Miranda* rights include the right to remain silent and the right to have an attorney present at the time of the police interrogation.
[16] Original petition submitted on April 3, 2017, p. 39; United States v. Lezmond C. Mitchell. 502 F.3d 931 (9th Cir. 2007). Exhibit 1, submitted with petitioners' original petition on April 3, 2017.
[17] United States v. Lezmond C. Mitchell. 502 F.3d 931 (9th Cir. 2007).
[18] Original petition submitted on April 3, 2017, p. 39.
[19] Original petition submitted on April 3, 2017, pp. 7-8.

Exhibit 1 - 010

code."[20] He formally requested that the U.S. Attorney's Office not seek the death penalty against Mitchell. Marlene Slim, the daughter and mother of the victims, also requested that the U.S. Attorney's Office not seek death against Mr. Mitchell.[21]

46. After receiving input from the Navajo Nation, the local U.S. Attorney's Office recommended to the Department of Justice that capital punishment not be sought against Mr. Mitchell. However, the Attorney General instructed the office to seek death.[22] On July 2, 2002, a superseding indictment was returned charging Mr. Mitchell with murder; felony murder; robbery; carjacking resulting in death; several robbery-related counts; kidnapping; and felony murder, kidnapping. On September 12, 2002, the government filed a notice of intent to seek the death penalty based on the 18 U.S.C. § 2119 charge of carjacking resulting in death.[23]

47. According to the available information, at the first status hearing, the district court asked whether there was any evidence of intoxication. The government acknowledged that some of Mr. Mitchell's statements referred to drinking alcohol. Before his initial appearance in federal court, Mr. Mitchell gave four statements to the FBI which mentioned drinking on or about October 28, 2001. Prior to trial, the defense requested that the district court instructed the jury to consider evidence of intoxication but did not request an instruction on impaired capacity as a mitigating factor in the penalty phase.[24]

48. Jury selection began on April 1, 2003, and opening statements were given on April 29. The government's theory of the case was that Mr. Mitchell and Johnny Orsinger killed the victims to obtain a truck for use in the trading post robbery. The defense conceded that the crimes were horrible, and that Mr. Mitchell was present when they occurred, but argued that the killings were committed by Johnny Orsinger alone.[25]

49. On May 8, 2003, the jury convicted Mr. Mitchell on all counts. After the verdicts were read, Mr. Mitchell indicated that he did not want to be present during the penalty phase, and his attorneys explained to the court that he had become uncooperative and was breaking off contact with them. For this reason, they felt obliged to withdraw. After time to reconsider, Mr. Mitchell stated that he saw no benefit or relevance to being there and wished to waive his presence, but did not have a problem with his attorneys. Accordingly, the court granted his request not to be present but denied counsels' request to withdraw.[26]

50. The penalty phase began on May 14, 2003. The government presented testimony from family members who described what the victims were like and the emotional impact of the murders on them. The defense presented as mitigating evidence the testimony of family members, friends, and teachers of Mr. Mitchell whom they portrayed as an excellent high school student. An FBI agent testified and noted that Mr. Mitchell claimed to have been drinking heavily at the time of the murders. Evidence was introduced that the Navajo Nation did not condone capital punishment in general or for Mr. Mitchell's crimes in particular.[27]

51. The jury unanimously found all four "gateway intent factors," each of the statutory aggravating factors, and one non-statutory aggravating factor with respect to both victims. At least one juror found the existence of each of the mitigating factors. After weighing the aggravating and mitigating factors, on May 20, 2003, the jury recommended imposition of a sentence of death. On September 15, 2003, the Federal District Court for the District of Arizona imposed the death sentence on the carjacking count, and two life sentences plus 384 months on the remaining counts.[28]

---

[20] Letter from Levon Henry, Attorney General of the Navajo Nation. January 22, 2002. Attachment A, submitted with original petition on April 3, 2017.

[21] Letter from Chief Justice Yazzie, Supreme Court of the Navajo Nation. July 21, 2014. Attachment C, submitted with original petition on April 3, 2017.

[22] Original petition submitted on April 3, 2017, pp. 33, 34 and 36.

[23] Mitchell, Lezmond (D. Az. 2002). Notice of intent to seek the death penalty.
Available at: https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/public/notices_of_intent/mitchell_-_d._az.pdf

[24] Original petition submitted on April 3, 2017, pp. 7-9.

[25] Original petition submitted on April 3, 2017, p. 9.

[26] United States v. Lezmond C. Mitchell. 502 F.3d 931 (9th Cir. 2007).

[27] United States v. Lezmond C. Mitchell. 502 F.3d 931 (9th Cir. 2007).

[28] United States v. Lezmond C. Mitchell. 502 F.3d 931 (9th Cir. 2007).

Exhibit 1 - 011

IACHR Inter-American Commission on Human Rights

52. On September 5, 2007, a divided panel of the Ninth Circuit affirmed Mr. Mitchell's conviction and sentence on direct appeal.[29]

53. Mr. Mitchell challenged, among other aspects, the application of the FDPA based on the allegation that it does not extend to carjackings committed "by one Indian against other Indians in Indian country." He further maintained that the Major Crimes Act is the sole source of federal criminal jurisdiction over intra-Indian crimes, and that, because carjacking resulting in death is not one of the crimes identified in the Act, he could not be prosecuted for it in federal court. The court recognized that the Navajo Nation opposes the death penalty on cultural and religious grounds but held that ideological opposition to the death penalty by its own force does not exempt tribal members from the reach of federal criminal laws. The court also ruled that the FDPA unambiguously requires opt-in only where jurisdiction is based on Indian country, not, as Mr. Mitchell alleged, whenever the federal government seeks capital punishment. Therefore, according to the court, the fact that the Navajo Nation opted out of the FDPA does not render the carjacking statute inapplicable. Mr. Mitchell further raised a number of issues related to jury selection, both of the venire and the panel.[30]

54. The U.S. Supreme Court of Justice denied Mr. Mitchell's petition of certiorari on June 9, 2008.[31]

### E. Post-conviction proceedings

55. On June 8, 2009, Mr. Mitchell filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255 alleging, *inter alia*, ineffective assistance of counsel at trial and failure to challenge jury selection. Before filing his section 2255 motion, however, Mr. Mitchell moved the district court for authorization to interview the jurors from his capital trial and specifically requested to speak with jurors out of a concern that the jury panel "allowed bias or prejudice to cloud their judgment." The district court denied the request based on procedural grounds. Alternatively, the court concluded that Mr. Mitchell had not shown "good cause" for contacting the jurors. Mr. Mitchell then amended his section 2255 motion to include a claim that the lower court violated his constitutional rights by denying him access to the jurors.[32]

56. On September 30, 2010, the district court denied the motion to vacate Mr. Mitchell's conviction and sentence, as well as the motion for an evidentiary hearing.[33]

57. In its decision the court stated that, on the day of his arrest, Mr. Mitchell gave a recorded statement to FBI and Navajo Nation investigators during which he repeatedly claimed to have been drinking and said he "blacked out" at times while in the truck. The next day, at the crime scene, he claimed that he was so drunk at the time of the murder he could not remember how many times he had stabbed the victim. In a statement several weeks later, Mr. Mitchell asserted that he had consumed a couple of forty-ounce bottles of beer prior to going to Gallup and bought more liquor once there. To his defense attorneys he claimed that he was sober at the time of the crimes.[34]

58. In his motion Mr. Mitchell argued that trial counsel failed to thoroughly investigate intoxication as a defense because they did not seek any evidence independent of their own client regarding his state of intoxication. He asserted that, because counsel failed to uncover his longstanding substance abuse history, they unreasonably accepted his claimed sobriety even though it was contradicted by significant portions of the discovery and by percipient witnesses. According to Mr. Mitchell, there was a reasonable probability he would not have been convicted of carjacking - the capital count - had evidence of impaired executive functioning been presented to the jury. Mr. Mitchell also proffered a declaration from a mitigation specialist for his defense team who asserted that she prepared an exhaustive study of Mr. Mitchell's social and psychological background and "that there was substantial evidence that Mr. Mitchell was drunk and high on drugs at the time of the killings." The defense

---

[29] United States v. Lezmond C. Mitchell. 502 F.3d 931 (9th Cir. 2007).
[30] United States v. Lezmond C. Mitchell. 502 F.3d 931 (9th Cir. 2007).
[31] Mitchell v. United States, 553 U.S. 1094 (2008).
[32] Mitchell v. United States, Appellant's motion for stay of execution (Sep. 9, 2019). Available at: http://cdn.ca9.uscourts.gov/datastore/general/2019/09/12/18-17031StayMotion.pdf
[33] Mitchell v. United States, 2010 WL 3895691 (D. Ariz. Sept. 30, 2010).
[34] Mitchell v. United States, 2010 WL 3895691 (D. Ariz. Sept. 30, 2010).

Exhibit 1 - 012

team stated, *inter alia*, that they opted against an intoxication defense, not only because there was little supporting evidence, but because it would have contradicted the theme that Mr. Mitchell "was a good person led astray under circumstances" and that the co-defendant was the impetus for the violence.[35]

59.   The court concluded that the choice, not to present a voluntary intoxication defense, was reasonable given the lack of evidentiary support. This, based on the fact that Mr. Mitchell denied being intoxicated and chose not to testify and there was no evidence particularly probative of his mental state on the day of the murders. The court further considered the choice reasonable given that evidence of drug and alcohol abuse is a "two-edge sword." The court also denied Mr. Mitchell's claim that counsel were ineffective in failing to assert that his *Miranda* waiver was involuntary as a result of his mental deficiencies and cultural heritage in combination with the investigators' interrogations techniques. The court concluded that there was no evidence to support the claim that Mr. Mitchell's statements were not knowing, intelligent, and voluntary and thus, the failure to introduce evidence of his alleged deficiencies and Navajo upbringing did not prejudice him.[36]

60.   Regarding the alleged counsel's failure to challenge jury selection, Mr. Mitchell argued that trial counsel failed to challenge or appropriately question some venirepersons, failed to adequately challenge seated jurors, and made almost no attempt to rehabilitate any juror who expressed opposition to capital punishment. He also alleged that appellate counsel was ineffective for not arguing on appeal that the district court had improperly excused Native American venirepersons due to their alleged opposition to the death penalty and the fact that Navajo was their first language. The court found each allegation meritless.

61.   On July 21, 2014, Chief Justice Yazzie of the Supreme Court of the Navajo Nation, sent a letter to U.S. Attorney Vincent Q. Kirby expressing again the view of the Navajo Nation that Mr. Mitchell should not be subject to the federal death penalty and requesting that the Department of Justice stipulate to a re-sentencing whereby Mr. Mitchell would receive a sentence of less than death. The letter stated, *inter alia*, the following:[37]

> Capital punishment is a sensitive issue for the Navajo people. Our laws have never allowed for the death penalty. It is our belief that the negative force that drives a person to commit evil acts can only be extracted by the Creator. People, on the other hand, are vehicles only for goodness and healing. By subjecting Mr. Mitchell to capital punishment, the Department of Justice has violated our laws and our belief system, and impeded the healing process our tribe must undertake in the wake of this tragic crime.

> In addition to [these] moral issues [...], capital prosecutions of Navajos implicate issues of tribal sovereignty that are troubling to the Navajo Nation. One of the primary reasons we chose not to opt in to the federal death penalty act was the fear of losing authority over prosecutions. [...] The United States government has consistently used its power to reduce the Navajo Nation's sovereignty. Had the Nation opted-in to the federal death penalty act, our sovereignty would have been further diminished. The decision whether to seek the death penalty against a Navajo would have been solely left to the discretion of the United States Attorney for the relevant district and the United States Attorney General. We would have had no voice in the discussion for justice regarding Navajo victims and defendants. This was not a tolerable reality for the Navajo people, and fueled our decision to reject the federal death penalty. However, despite our wishes, this was precisely the reality of Mr. Mitchell's case. After we made clear that we should not support a capital prosecution for Mr. Mitchell, the Department of Justice relied on a technicality to bypass us. Instead of respecting the opt-in provisions, the Department of Justice sought death against Mr. Mitchell not for murder, but for carjacking resulting in death. The difference was in name only. The federal jurisdictional basis for first-degree murder was based on the fact that the crime took place on Navajo land, thus implicating the Federal Death Penalty Act requirement of the tribe's approval. But the jurisdictional basis for the carjacking charge was interstate commerce, which allowed the Department of Justice to disregard our wishes. This loophole allowed the federal government to bypass our wishes, and we view this action as both a moral and political affront to Navajo sovereignty.

62.   Mr. Mitchell appealed the district court's denial issued on September 30, 2010, to the U.S. Court of Appeals for the Ninth Circuit. On June 15, 2015, the Ninth Circuit affirmed the judgment. The Ninth Court's decision did

---

[35] Mitchell v. United States, 2010 WL 3895691 (D. Ariz. Sept. 30, 2010).
[36] Mitchell v. United States, 2010 WL 3895691 (D. Ariz. Sept. 30, 2010).
[37] Letter from Chief Justice Yazzie, Supreme Court of the Navajo Nation. July 21, 2014. Attachment C, submitted with original petition on April 3, 2017.

Exhibit 1 - 013

not address the juror interviews as it was limited to issues for which the district court had granted a certificate of appealability.[38]

63.   On October 3, 2016, the Supreme Court denied Mr. Mitchell's application for certiorari.[39]

### F.   Civil procedure's motion (60(b) motion)

64.   Most states and federal government have a rule of evidence, known colloquially as "no impeachment", generally prohibiting the introduction of juror testimony regarding statements made during deliberations when offered to challenge the jury's verdict. In Peña-Rodriguez v. Colorado,[40] the United States Supreme Court was presented with the question whether a no-impeachment rule constitutionally may bar evidence of racial bias offered to prove a violation of the Sixth Amendment right to an impartial jury. The U.S. Supreme Court held that, when a juror makes a clear statement indicating that he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.

65.   On March 5, 2018, Mr. Mitchell filed a motion in the district court to re-open section 2255 proceedings pursuant to Federal Rule of Civil Procedure 60(b)(6), arguing that the Supreme Court's decision in Peña-Rodriguez v. Colorado, established that he was erroneously denied the opportunity to interview the jurors from his trial. As established above, before filing his section 2255 motion, Mr. Mitchell moved the district court for authorization to interview the jurors from his capital trial and specifically requested to speak with jurors out of a concern that the jury panel "allowed bias or prejudice to cloud their judgment." The district court denied the request based on procedural grounds and, alternatively, the court concluded that Mr. Mitchell had not shown "good cause" for contacting the jurors. In its 60(b) motion, Mr. Mitchell alleged that this error prevented him from presenting a fully investigated section 2255 motion and prevented the court from conducting a full merits determination. On September 18, 2018, the district court denied the motion on the merits and denied a certificate of appealability ("COA").[41]

66.   Mr. Mitchell appealed the district court's decision and on April 25, 2019, the Ninth Circuit Court granted the motion for a COA on the following issue: "whether the district court properly denied appellant's motion to re-open his case pursuant to Fed. R. Civ. P. 60(b)(6) following the Supreme Court's opinion in Peña-Rodriguez v. Colorado." Mr. Mitchell filed his opening brief on August 28, 2019.[42]

67.   On July 25, 2019, the Warden at the Federal Correctional Complex (FCC), Terre Haute, Indiana, notified Mr. Mitchell that the Director of the Federal Bureau of Prisons set December 11, 2019, as the date for his execution by lethal injection. On August 5, 2019, Mr. Mitchell filed a motion for stay of execution in the district court. On August 30, 2019, the district court denied the motion for lack of jurisdiction, finding that jurisdiction had passed to the Ninth Circuit Court.[43]

68.   On September 9, 2019, Mr. Mitchell filed a motion for stay of execution before the Ninth Circuit Court. On October 4, 2019, the court stayed the execution pending resolution of the appeal. On December 13, 2019, the court conducted a hearing on the 60(b) motion for authorization to interview jurors from his 2003 criminal trial to investigate potential juror bias.[44] On April 30, 2020, a three-judge panel of the United States Court of Appeals for the Ninth Circuit affirmed the district court's denial of Mr. Mitchell's motion. The panel held that Mr. Mitchell presented no extraordinary circumstances or district court errors that would justify reopening the

---

[38] Mitchell v. United States, 790 F.3d 881 (9th Cir. 2015).
[39] Mitchell v. United States, 137 S. Ct. 38 (2016).
[40] Peña-Rodriguez v. Colorado, 137 S. Ct. 855 (2017).
[41] Mitchell v. United States, Appellant's motion for stay of execution (Sep. 9, 2019).
[42] Mitchell v. United States, Appellant's motion for stay of execution (Sep. 9, 2019).
[43] Mitchell v. United States, Appellant's motion for stay of execution (Sep. 9, 2019).
[44] Mitchell v. United States, Order, No. 18-17031 (CA9 Oct. 4, 2019). Exhibit submitted with State's observations on the merits on November 19, 2019.

Exhibit 1 - 014

case, and that the district court therefore did not abuse its discretion by denying the motion. Two judges appended separate opinions.[45]

### G.  Legal proceedings regarding the lethal injection protocol

69.  On July 8, 2014, Mr. Mitchell joined a federal lawsuit in the U.S. District Court for the District of Columbia claiming that the means by which the government seeks to implement the death penalty would violate the U.S. Constitution as well as federal law. On January 13, 2012, the district court ordered that the civil case be stayed pending the Federal Bureau of Prisons' issuance of a revised lethal injection protocol.[46]

70.  As indicated above, on July 25, 2019, the Federal Bureau of Prisons filed a notice indicating that they had adopted a revised lethal injection protocol. That same day, the Warden informed Mr. Mitchell of his December 11, 2019, execution. Neither the Warden's letter, nor a press release issued by the Department of Justice,[47] indicated an awareness of the current litigation before the Ninth Circuit.

71.  According to publicly available information, in November 2019 a judge of the U.S. District Court for the District of Columbia issued an injunction putting a temporary hold on the federal executions of Mr. Mitchell and three other death-row inmates, while their attorneys challenged the government's lethal injection procedure. The judge found that the procedure "very likely exceeds" the government's authority under federal law. On December 2, 2019, the U.S. Court of Appeals for the D.C. Circuit denied the Justice Department's request to scuttle the injunction while it appealed, and on December 6, 2019, the United States Supreme Court refused to let the Justice Department immediately resume federal executions.[48] In April 2020, the appeals court reversed the initial injunction issued by the U.S. District Court, and the U.S. Justice Department scheduled the executions of four federal death row inmates for July and August 2020.[49]

### V.  ANALYSIS OF LAW

### A.  Preliminary considerations

72.  Before embarking on its analysis of the merits in the case Lezmond C. Mitchell the Inter-American Commission reiterates its previous rulings regarding the heightened scrutiny to be used in cases involving the death penalty. The right to life has received broad recognition as the supreme human right and as a sine qua non for the enjoyment of all other rights.

73.  That gives rise to the particular importance of the IACHR's obligation to ensure that any denial of life that may arise from the enforcement of the death penalty strictly abides by the requirements set forth in the applicable instruments of the Inter-American human rights system, including the American Declaration. That heightened scrutiny is consistent with the restrictive approach adopted by other international human rights bodies in cases involving the imposition of the death penalty,[50] and it has been set out and applied by the Inter-

---

[45] Mitchell v. United States Ninth Circuit Case No. 18-17031. Attachment A submitted with petitioner's additional information dated May 13, 2020.

[46] Robinson v. Mukasey et al., No. 1:07-cv-02145-RWR, U.S. District Court for the District of Columbia.

[47] NPR. Lethal Injection Drug's Efficacy And Availability For Federal Executions. July 26, 2019. Available at: https://www.npr.org/2019/07/26/745722219/lethal-injection-drugs-efficacy-and-availability-for-federal-executions

[48] The Washington Post. Justice Dept. asks Supreme Court to let federal executions proceed after appeals court denial. December 2, 2019. Available at: https://www.washingtonpost.com/national/appeals-court-rejects-justice-department-request-to-let-federal-executions-proceed/2019/12/02/db76cf96-1541-11ea-9110-3b34ce1d92b1_story.html  and The Washington Post. Supreme Court won't let Justice Dept. immediately resume federal executions after hiatus. December 6, 2019. Available at: https://www.washingtonpost.com/politics/courts_law/supreme-court-wont-let-justice-dept-immediately-resume-federal-executions-after-hiatus/2019/12/06/7103d8e6-1773-11ea-a659-7d69641c6ff7_story.html.

[49] BBC News. US schedules first federal inmate executions since 2003. June 16, 2020. Available at: https://www.bbc.com/news/world-us-canada-53069070

[50] See, for example: I/A Court H. R., Advisory Opinion OC-16/99 (October 1, 1999), *The Right to Information on Consular Assistance in the Framework of the Guarantees of the Due Process of Law*, para. 136; United Nations Human Rights Committee, *Baboheram-Adhin et al. v. Suriname*, Communications Nos. 148-154/1983, adopted on April 4, 1985, para. 14.3; *Report of the United Nations Special Rapporteur on Extrajudicial Executions*, Bacre Waly Ndiaye, submitted pursuant to Commission on Human Rights Resolution 1994/82, Question of the

Exhibit 1 - 015

American Commission in previous capital cases brought before it.[51] As the Inter-American Commission has explained, this standard of review is the necessary consequence of the specific penalty at issue and the right to a fair trial and all attendant due process guarantees, among others.[52] In the words of the Commission:

> due in part to its irrevocable and irreversible nature, the death penalty is a form of punishment that differs in substance as well as in degree in comparison with other means of punishment, and therefore, warrants a particularly stringent need for reliability in determining whether a person is responsible for a crime that carries a penalty of death.[53]

74. The Inter-American Commission will therefore review the petitioner's allegations in the present case with a heightened level of scrutiny, to ensure in particular that the rights to life, not to receive cruel, infamous or unusual punishment, to due process, and to a fair trial as prescribed under the American Declaration, have been respected by the State. With regard to the legal status of the American Declaration, the IACHR reiterates that:[54]

> [t]he American Declaration is, for the Member States not parties to the American Convention, the source of international obligations related to the OAS Charter. The Charter of the Organization gave the IACHR the principal function of promoting the observance and protection of human rights in the Member States. Article 106 of the OAS Charter does not, however, list or define those rights. The General Assembly of the OAS at its Ninth Regular Period of Sessions, held in La Paz, Bolivia, in October 1979, agreed that those rights are those enunciated and defined in the American Declaration. Therefore, the American Declaration crystallizes the fundamental principles recognized by the American States. The OAS General Assembly has also repeatedly recognized that the American Declaration is a source of international obligations for the member states of the OAS.

75. Finally, the Commission recalls that its review does not consist of determining that the death penalty in and of itself violates the American Declaration. What this section addresses is the standard of review of the alleged human rights violations in the context of criminal proceedings in a case involving the application of the death penalty.

**B.   Right of protection from arbitrary arrest[55]**

**1.   General considerations on the right not to be illegally or arbitrary arrested**

76. Article XXV of the American Declaration provides for guarantees aimed at protecting persons from unlawful or arbitrary interference with their liberty by the State. The IACHR has established in this regard that, "[a]mong the protections guaranteed are the requirements that any deprivation of liberty be carried out in accordance with pre-established law, that a detainee be informed of the reasons for the detention and promptly notified of any charges against them, that any person deprived of liberty is entitled to juridical recourse, to obtain, without delay, a determination of the legality of the detention, and that the person be tried within a reasonable time or released pending the continuation of proceedings."[56]

77. According to inter-American human rights standards, no one shall be subjected to arrest or imprisonment for reasons or by methods that – although classified as legal – may be incompatible with the fundamental rights

---

Violation of Human Rights and Fundamental Freedoms in any part of the World, with particular reference to Colonial and Other Dependent Countries and Territories, UN Doc.E/CN.4/1995/61 (December 14, 1994), para. 378.

[51] IACHR, Report No. 57/96, Andrews, United States, IACHR Annual Report 1997, para. 170-171; Report No. 38/00 Baptiste, Grenada, IACHR Annual Report 1999, paras. 64-66; Report No. 41/00, McKenzie *et al.*, Jamaica, IACHR Annual Report 1999, paras. 169-171.

[52] IACHR, The death penalty in the Inter-American System of Human Rights: From restrictions to abolition, OEA/Ser.L/V/II.Doc. 68, December 31, 2011, para. 41.

[53] IACHR, Report No. 78/07, Case 12.265, Merits (Publication), Chad Roger Goodman, The Bahamas, October 15, 2007, para. 34.

[54] IACHR, Report No. 44/14, Case 12,873, Report on Merits (Publication), Edgar Tamayo Arias, United States, July 17, 2014, para. 214.

[55] Article XXV of the American Declaration establishes: No person may be deprived of his liberty except in the cases and according to the procedures established by pre-existing law.

[...]

Every individual who has been deprived of his liberty has the right to have the legality of his detention ascertained without delay by a court, and the right to be tried without undue delay or, otherwise, to be released. He also has the right to humane treatment during the time he is in custody.

[56] IACHR, Report on Terrorism and Human Rights, OEA/Ser.L/V/II.116.Doc.5 rev.1, October 22, 2002, para. 120.

Exhibit 1 - 016

of the individual because they are, *inter alia*, unreasonable, unpredictable or disproportionate.[57] Therefore, any detention must be carried out not only in accordance with the provisions of domestic law, but it is also necessary that domestic law, the applicable procedure and the express or implied general principles involved, are themselves compatible with inter-American instruments and standards.[58]

78. Further, according to the United Nations Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment "any form of detention or imprisonment and all measures affecting the human rights of a person under any form of detention or imprisonment shall be ordered by, or be subject to the effective control of, a judicial or other authority."[59] The requirement that detention not be left to the sole discretion of the State agents responsible for carrying it out is so fundamental that it cannot be overlooked in any context. Supervisory control over detention is an essential safeguard, because it provides effective assurance that the detainee is not exclusively at the mercy of the detaining authority. Under normal circumstances, review of the legality of detention must be carried out without delay, which generally means as soon as practicable.[60]

79. According to the IACHR, the analysis of the compatibility of the deprivation of liberty with the prohibition of illegal and arbitrary detention should be done in three phases. The first consists of determining the legality of the detention from a material and formal standpoint. To do so, it must be determined whether the action is compatible with the domestic legislation of the State in question. The second step involves the analysis of these domestic provisions within the context of the guarantees established by inter-American human rights instruments, in order to determine whether they are arbitrary. Finally, even if the detention meets the requirements of a domestic legal provision that is compatible with said instruments, it should be determined whether the application of the law in the specific case was arbitrary.[61]

2. **Analysis of the case**

80. The petitioners allege that Mr. Mitchell was unlawfully detained for a misdemeanor that did not authorize jail time; that he was illegally held in custody for several weeks, and repeatedly interrogated by the FBI without being afforded counsel. The State claims that Mr. Mitchell's pretrial due process claim is without merit because he offered no evidence that he ever asked for counsel, and he requested and received a trial hearing on the issue of voluntariness.

81. The Commission will now consider whether Mr. Mitchell's arrest was compatible with the prohibition of illegal and arbitrary detention. The alleged lack of counsel during the interrogation will be addressed in section C below.

82. According to the facts established in this report, Mr. Mitchell was arrested by the FBI and Navajo Nation police early on November 4, 2001, pursuant to an arrest warrant for vandalism of tribal property, a misdemeanor that had taken place in September 2001. Later that morning he was transported to the Navajo Department of Criminal Investigations and then taken to tribal jail. On November 7 he pled guilty to the criminal damage charge before a tribal judge. A federal indictment was issued on November 21, 2001, and on November 29, Mr. Mitchell was transported to the federal courthouse.

83. Based on these facts, the Commission notes that Mr. Mitchell was originally arrested pursuant to a misdemeanor on November 4, 2001, and taken to a tribal jail. Three days later he pled guilty before a tribal judge and was returned to tribal jail. On November 29 he was transported to a federal courthouse pursuant to

[57] IACHR, Application to the Inter-American Court of Human Rights in the case of Juan Carlos Chaparro and Freddy Hernan Lapo. Case 12.091. Ecuador. June 23, 2006, para 59.

[58] See in this regard, IACHR. Merits. Carlos Alberto Fernandez and Carlos Alejandro Tumbeiro, *supra* XX, para. 50.

[59] United Nations, Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, adopted by the General Assembly in Resolution 43/173 of 9 December 1988, Principle 4.

[60] IACHR. Report No. 8/16. Case 11.661. Merits (Publication). Manickavasagam Suresh. Canada. April 13, 2016, para. 73.

[61] IACHR, Application to the Inter-American Court of Human Rights in the case of Juan Carlos Chaparro and Freddy Hernan Lapo. Case 12.091. Ecuador. June 23, 2006, para. 72.

Exhibit 1 - 017

IACHR Inter-American Commission on Human Rights

a federal indictment issued on November 21. According to the information provided, not contested by the State, the misdemeanor did not authorize jail time.

84. Therefore, based on this information and on the standards mentioned above, the Commission finds that Mr. Mitchell's arrest was unlawful given that he was held in tribal custody during 17 days for a misdemeanor that did not authorize jail time. His arrest, thus, does not comply with the first step of the analysis of compatibility with inter-American standards. Further, the Commission notes that, during the period in which Mr. Mitchell was formally held for this misdemeanor, FBI agents interrogated him regarding his involvement in the trading post robbery and the victims' murder. Given that he was taken before a federal judge only 25 days after his arrest, the Commission also finds that there was a delay in the review of the legality of Mr. Mitchell's detention. Based on these facts, the IACHR concludes that the United States violated Mr. Mitchell's right not to be illegally arrested established under Article XXV of the American Convention.

**C.   Right to a fair trial[62] and right to due process of law[63]**

**1.   General considerations on the right to self-determination and cultural identity of indigenous peoples, in relation to the rights to a fair trial and to due process of law**

85. The Inter-American Commission has further held that States shall "ensure that national judicial systems operate in accordance with the cultural diversity existing within them, as well as to adopt mechanisms to enable effective recognition and promotion of indigenous law, respecting both its traditional rules and international human right law."[64] The IACHR has also noted that although indigenous legal systems in the Americas have been recognized to varying degrees, there are still obstacles to their full recognition. To this end, the IACHR has recommended States to engage in intercultural dialogue and offer flexibility to indigenous authorities in the establishment of indigenous jurisdictions, the implementation of their legal systems, and in the areas of competence of indigenous justice authorities, with full respect for their right to cultural perspectives and differences, autonomy and self-determination, as long as they respect international human rights standards.[65]

86. In the case of Mary and Carrie Dann, the IACHR held that complaints of violations of the American Declaration should be considered in the context of the evolving rules and principles of human rights law in the Americas and in the international community more broadly, as reflected in treaties, custom and other sources of international law. Therefore, the Commission considered that this broader corpus of international law included the developing norms and principles governing the human rights of indigenous peoples. Ensuring the full and effective enjoyment of human rights by indigenous peoples requires consideration of their particular historical, cultural, social and economic situation and experience. In most instances, this has included identification of the need for special measures by states to compensate for the discrimination to which these societies have been subjected.[66]

87. The cultural identity and self-determination of indigenous peoples are part of this particular history and culture recognized by the inter-American human rights system. Although the rights of indigenous peoples to cultural identity and self-determination are not expressly established in the American Declaration or Convention, they have been recognized in the context of the evolving rules and principles of human rights law in the Americas, and it is in this context that the content of the rights established in the American Declaration must be interpreted.

---

[62] Article XVIII of the American Declaration provides: "Every person may resort to the courts to ensure respect for his legal rights. There should likewise be available to him a simple, brief procedure whereby the courts will protect him from acts of authority that, to his prejudice, violate any fundamental constitutional rights."

[63] Article XXVI of the American Declaration provides: "Every accused person is presumed to be innocent until proved guilty.
Every person accused of an offense has the right to be given an impartial and public hearing, and to be tried by courts previously established in accordance with pre-existing laws, and not to receive cruel, infamous or unusual punishment."

[64] IACHR. Indigenous Women and Their Human Rights in the Americas. OEA/Ser.L/V/II., April 17, 2017, para. 173.

[65] IACHR. Indigenous Women and Their Human Rights in the Americas, *supra* XX, para. 174.

[66] IACHR. Merits. Mary and Carrie Dann, *supra* XX, paras. 124 and 125.

Exhibit 1 - 018

88.  Since its first case on indigenous peoples rights, decided under the American Declaration, the IACHR has established that international law "recognizes the right of ethnic groups to special protection" regarding "all those characteristics necessary for the preservation of their cultural identity."[67] The Commission notes that States must ensure the full exercise and enjoyment of the rights of members of indigenous communities who are under its jurisdiction. Therefore, in interpreting and applying their domestic legislation, States must take into consideration the specific characteristics that differentiate members of the indigenous peoples from the general population and that shape their cultural identity.[68]

89.  The American Declaration on the Rights of Indigenous Peoples adopted in 2016, recognizes in Article XXI the right to autonomy or self-government of indigenous peoples in matters relating to their internal and local affairs. It also recognizes the right to cultural identity in Article XIII as well as the "protection, preservation, maintenance, and development of that cultural heritage for their collective continuity and that of their members and so as to transmit that heritage to future generations."

90.  Regarding indigenous law and jurisdiction, the American Declaration on the Rights of Indigenous Peoples provides for regional recognition of the status and importance of indigenous law and jurisdiction, as well as the need to ensure that these systems are respected at the domestic level. Article XXII protects indigenous peoples' right to "promote, develop and maintain their institutional structures and their distinctive customs, spirituality, traditions, procedures, practices and, in the cases where they exist, juridical systems or customs, in accordance with international human rights standards." Article XXIX further recognize their right to maintain and determine their own priorities with respect to their political, economic, social, and cultural development in conformity with their own worldview.

91.  At the universal level, Article 4 of the United Nations Declaration on the Rights of Indigenous Peoples states that in exercising the right to self-determination, indigenous peoples "have the right to autonomy or self-government in matters relating to their internal and local affairs, as well as ways and means for financing their autonomous functions". Article 5 asserts the right of indigenous peoples to maintain and strengthen their political, legal, economic, social and cultural institutions and Article 34 the right to promote, develop and maintain their institutional structures, including their juridical systems or customs in accordance with international human rights standards.

92.  Therefore, it is in the context of the rights to self-determination and cultural identity of indigenous peoples that justice systems and customs have been developed. As a part of the protection against arbitrary interference with these rights, States must respect them when ensuring a fair trial and due process, including the sanction that might be imposed against a member of an indigenous community.

## 2.  Analysis of the case

93.  According to the facts established in this report, tribes in the United States have an inherent right to govern themselves and tribal sovereignty can be limited only through a treaty with the federal Government or a federal statute. In 1885, the U.S. Congress passed the Major Crimes Act, which placed the crime of murder under federal jurisdiction if committed by a native American in native territory. In 1994 Congress passed the Violent Crime Control and Law Enforcement Act, a part of which, known as the Federal Death Penalty Act, established the imposition of the death penalty for three categories of offenses, among which was homicide. Under a special provision of the FDPA, it is up to the tribes to choose, under the death penalty legislation, to "opt in." The Navajo Nation, a sovereign nation effectively recognized on June 1, 1868, opted out of using the federal death penalty. Therefore, taking into account the will of the Navajo Nation, federal courts have jurisdiction over cases of murder committed by a native American in native territory, but the death penalty cannot be imposed.

94.  Mr. Mitchell, a member of the Navajo Nation, murdered two persons who were travelling in their pickup truck in Navajo territory in 2001. A federal indictment was issued and the U.S. Attorney's Office for the District

---

[67] IACHR. Resolution No. 12/85. Case No. 7615. Yanomami Indigenous People. Brazil. March 5, 1985, para. 7.
[68] See, *mutatis mutandi*, I/A Court H.R., Case of the Yakye Axa Indigenous Community v. Paraguay. Merits, Reparations and Costs. Judgment of June 17, 2005. Series C No. 125, para. 51.

Exhibit 1 - 019

of Arizona inquired whether the Navajo Nation would support a capital prosecution in the case. The Attorney General for the Navajo Nation formally requested that the U.S. Attorney's Office not seek the death penalty. The daughter and mother of the victims made the same request. After receiving these inputs, the local U.S. Attorney's Office recommended to the Department of Justice that capital punishment not be sought against Mr. Mitchell. The Attorney General, however, instructed the office to seek the death penalty. A superseding indictment was returned, and the government filed a notice of intent to seek the death penalty based on the charge of carjacking resulting in death. Mr. Mitchell was subsequently convicted and sentenced to death on the carjacking count and to two life sentences plus 384 months on the remaining counts, which included murder.

95. The Inter-American Commission must now establish whether these facts conform to the aforementioned inter-American standards. The Commission finds that the federal government made legitimate use of its jurisdiction to judge the facts of this case based on the provisions of the Major Crimes Act. The issue to be determined by the IACHR in this case is whether the sentence applied was in accordance with the right to autonomy and cultural identity of indigenous peoples, and the rights of Mr. Mitchell's to a fair trial.

96. The Commission notes that it has no competence to replace domestic courts in the appraisal of evidence or to declare that an individual convicted of a criminal offense is or not guilty. According to the "fourth instance formula," the Commission in principle will not review the judgments issued by the domestic courts acting within their competence and with due judicial guarantees. The fourth instance formula does not, however, preclude the Commission from considering a case where the petitioner's allegations entail a possible violation of any of the rights set fort in the American Declaration. In this regard, the IACHR has affirmed in death penalty cases that the application of the heightened scrutiny test to due process questions is not, in any way, precluded by the fourth instance formula. The analysis that follows thus concerns the right to autonomy and cultural identity of indigenous peoples, taking into account the rights of Mr. Mitchell's to a fair trial under the American Declaration.

97. First, the Commission notes that the State recognizes the right to self-determination of indigenous peoples within the framework of the application of the federal death penalty regarding crimes committed on tribal lands. The Navajo people, by making use of their sovereign power recognized by the U.S. government to opt-out of the FDPA, expressed their rejection to the use of the death penalty for crimes committed by its members on their territory. This is due to the particular indigenous people's worldview, their relationship to life, and the means used to resolve conflicts. As the Navajo Nation's representatives explained to Congress when opting-out of the FDPA: "the death penalty is counter to the cultural beliefs and traditions of the Navajo people who value life and place great emphasis on the restoration of harmony through restitution and individual attention."

98. Second, the Commission observes that Mr. Mitchell was sentenced to the death penalty on the count of carjacking resulting in death, a federal crime which, although not covered by the FDPA, allows for the application of capital punishment because of its outcome, namely death. Therefore, unlike murder, the Navajo Nation was not allowed to opt against the application of the federal death penalty in cases of carjacking resulting in death, although the outcome of both crimes is the same. The Commission also notes that, according to available information, the federal death penalty was not applicable in cases of carjacking resulting in death until 1994.[69]

99. Third, the Commission notes that neither the relatives of the victims, nor the Navajo Nation, and the local U.S. Attorney's Office agreed to impose the capital punishment against Mr. Mitchell. However, there is no information before the Commission that helps explain the reason why the Attorney General instructed to seek the application of the death penalty, which resulted in a superseding indictment charging Mr. Mitchell of carjacking, and how or if the will of the Navajo Nation was taken into account in that decision.

100. Fourth, the Commission notes that in the absence of the carjacking count, Mr. Mitchell would not have been eligible for the death penalty. Accordingly, the application of the death penalty was only possible because Mr. Mitchell violently committed the murders as a means to stealing an occupied car.

---

[69] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 60003(a)(14), 108 Stat. 1796, 1968 (1994).

Exhibit 1 - 020

101. Finally, the Commission notes that, although the United States Court of Appeals for the Ninth Circuit affirmed the denial of Mr. Mitchell's motion pursuant to Federal Rule of Evidence 60(b), judges Christen and Hurwitz appended separate opinions that are highly critical of the United States Government and the decision to seek the death penalty:

- Judge Christen stated that:

> The decision to seek the death penalty in Mitchell's case was made against the express wishes of the Navajo Nation, several members of the victims' family, and the United States Attorney for the District of Arizona [...]
> The imposition of the death penalty in this case is a betrayal of a promise made to the Navajo Nation, and it demonstrates a deep disrespect for tribal sovereignty. People can disagree about whether the death penalty should ever be imposed, but our history shows that the United States gave tribes the option to decide for themselves.[70]

- Judge Huwtiz indicated that:

> The Attorney General nonetheless decided to override the decision of the United States Attorney for the District of Arizona not to seek the death penalty. Because this case involved a carjacking [...] the government had the right to make this decision does not necessarily make it right, and I respectfully suggest that the current Executive should take a fresh look at the wisdom of imposing the death penalty. When the sovereign nation upon whose territory the crime took place opposes capital punishment of a tribal member whose victims were also tribal members because it conflicts with that nation's "culture and religion," a proper respect for tribal sovereignty requires that the federal government not only pause before seeking that sanction, but pause again before imposing it. That is particularly true when imposition of the death penalty would contravene the express wishes of several members of the victims' family.[71]

102. Also, in his partial dissent vote in 2015 Circuit Judge Reinhardt from the Court of Appeals for the Ninth Circuit held that:

> The arbitrariness of the death penalty in this case is apparent. Mitchell raises a number of serious constitutional issues regarding both his conviction and his death sentence.
> Some were litigated on his direct appeal and decided against him by a fiercely contested two to one vote. Another critical fundamental constitutional question is decided on this appeal by a similar division and despite equally strong views expressed by both sides. Whatever a particular jurist, or even two, may believe regarding these issues, uncertainty remains, to say the least, as to whether the judicial proceedings afforded Mitchell comported with the constitutional protections to which he is entitled. That uncertainty alone is sufficient to raise serious questions regarding whether Mitchell should be put to death by his government. Further, although Mitchell committed a horrible crime, it was hardly one of national import or of particular federal interest other than the fact that it involved the Navajo Nation, and all of the persons with the greatest stake in the outcome of the case oppose his execution. The novel use of carjacking as a loophole to circumvent the tribal option also renders this an anomalous case. Mitchell will, unless spared by executive clemency, in all likelihood, suffer the ignominious fate of being the first person to be executed for an intra-Indian crime that occurred in Indian country. While this court's jurisprudence indeed gives the federal government the legal authority to exercise jurisdiction over this case for the purpose of obtaining capital punishment, succeeding in that objective over the express objections of the Navajo Nation and the victims' family reflects a lack of sensitivity to the tribe's values and autonomy and demonstrates a lack of respect for its status as a sovereign entity. Should the federal government pursue a death warrant for Mitchell, I hope that it will have better reasons for doing so than adherence to the wishes of a former attorney general.[72]

103.   Taking into account these considerations, it is clear that application of the death penalty in this case is against the will of the Navajo Nation. The Commission also finds that the application of the carjacking count with the sole purpose of seeking the death penalty contravenes, in practice, the *raison d' être* behind the

---

[70] Mitchell v. United States Ninth Circuit Case No. 18-17031, p.33. Attachment A submitted with petitioner's additional information dated May 13, 2020.
[71] *Idem.*
[72] Mitchell v. United States, 790 F.3d 881, 894–97 (9th Cir. 2015) (Reinhardt, J., dissenting in part).

Exhibit 1 - 021

sovereign decision taken by the Navajo Nation, that is, that death by a member of their nation on Navajo territory should not be punishable by death. In fact, this legal subterfuge resulted in practice in the application of a death sentence not for the murder but for a car robbery, an offence involving the protection of a minor legal interest. Further, as established above, both the Navajo Nation and the relative of the victims were against the use of the death penalty in this case.

104.    In addition, the application of the death penalty using this legal maneuver resulted in a violation of a collective dimension, and affects the values and autonomy of the Navajo Nation. The Commission notes that neither the State nor the Attorney General have presented an explanation to justify the reasons why the application of death penalty in the specific case would seek a better interest than the interest of the Navajo Nation and the protection of its autonomy and culture in conformity with their own worldview.

105.    Further, when interpreting and applying the provisions of the American Declaration to a member of an indigenous community, the Commission should consider compliance with the State's obligations regarding the right to a fair trial. These obligations, in turn, should respect the autonomy and cultural identity of the indigenous peoples. In the instant case, Mr. Mitchell's right to be sentenced in accordance with the general understanding of the Navajo Nation that the commission of a murder by a Navajo on tribal territory should not lead to the death penalty, is a component of the right to a fair trial and to the protection against the arbitrary imposition of a penalty. Therefore, in the absence of a justification to override this decision of the Navajo Nation, the State also infringed Mr. Mitchell's rights to a fair trial.

106.    Therefore, the IACHR concludes that the United States, by circumventing the Navajo Nation's rejection, as a sovereign nation, of the death penalty and without any justification, violated the right to autonomy and cultural identity of the Navajo Nation in relation to Mr. Mitchell's fair trial under Article XXVI of the American Declaration.

### 3.    Right to counsel

107.    The right to defense is one of the rights contemplated under the guarantees of due process of law. The IACHR has held that the right to legal representation must be exercised from the moment a person is accused of an unlawful action and only ends when the proceeding concludes.[73]

108.    In the present case, the petitioners allege that Mr. Mitchell was interrogated by the FBI without being afforded counsel. The State, for its part, indicates that he knowingly cooperated with the police and waived his *Miranda* rights in the hope of receiving a lighter sentence.

109.    According to the facts established in this report, the day of his arrest Mr. Mitchell was interrogated by an FBI agent after having signed a waiver of his *Miranda* rights. The following day, while at the site of the murders, he acknowledged that his *Miranda* rights were in effect and agreed to answer more questions by the FBI agent . Therefore, based on the available information, the IACHR concludes that the State has not violated Mr. Mitchell's right to counsel.

### 4.    Ineffective assistance of court-appointed counsel

110.    Adequate legal representation is a fundamental component of the right to a fair trial. The IACHR has found that "[t]he right to due process and to a fair trial includes the right to adequate means for the preparation of a defense, assisted by adequate legal counsel."[74] According to the Commission, "[t]he State cannot be held responsible for all deficiencies in the conduct of State-funded defense counsel. National authorities are, however, required [...] to intervene if a failure by legal aid counsel to provide effective representation is manifest or sufficiently brought to their attention. Rigorous compliance with the defendant's right to competent counsel is compelled by the possibility of the application of the death penalty."[75]

---

[73] IACHR. Report No. 131/17. Case 11.678. Admissibility and Merits. Mario Montesinos Mejía. Ecuador. October 25, 2017, para. 116.
[74] IACHR, The death penalty in the Inter-American System of Human Rights: From restrictions to abolition, *supra* XX, p. 123.
[75] IACHR, The death penalty in the Inter-American System of Human Rights: From restrictions to abolition, *supra* XX, p. 123.

Exhibit 1 - 022

111.   The appointment of an attorney by the state does not, in and of itself, ensure effective assistance of counsel.  At the same time, while the State is responsible for ensuring that such assistance is effective, it is not responsible for what may be understood as decisions of strategy or for every possible shortcoming. Rather, the Commission must evaluate whether the assistance of counsel was effective in the overall context of the process and taking into account the specific interests at stake.[76]

112.   The Commission has established that "the fundamental due process requirements for capital trials include the obligation to afford a defendant a full and fair opportunity to present mitigating evidence for consideration in determining whether the death penalty is the appropriate punishment in the circumstances of his or her case."[77] The Commission has also indicated that due process protections, under the Declaration:

> guarantee an opportunity to make submissions and present evidence as to whether a death sentence may not be a permissible or appropriate punishment in the circumstances of the defendant's case, in light of such considerations as the offender's character and record, subjective factors that might have motivated his or her conduct, the design and manner of execution of the particular offense, and the possibility of reform and social readaptation of the offender.[78]

113.   It may be noted that the fundamental nature of this guarantee has been reflected in practice guidelines for lawyers. The American Bar Association has prepared and adopted guidelines and related commentaries that emphasize the importance of investigating and presenting mitigating evidence in death penalty cases.[79] According to these guidelines, the duty of counsel in the United States to investigate and present mitigating evidence is now well-established and "[b]ecause the sentencer in a capital case must consider in mitigation, anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history.[80] The Guidelines also emphasize that the "mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations."[81]

## 5.   Analysis of the case

114.   The petitioners allege ineffective assistance of trial counsel in preparing and presenting a case for leniency at the penalty phase. According to the petitioners, counsel was inadequate and inexperienced and ignored the advice of an experienced mitigation specialist. The State asserts that trial counsel conducted a thorough investigation and that Mr. Mitchell was examined by a team of experts.

115.   The IACHR notes that the information on the record shows that Mr. Mitchell was represented at trial by two federal public defenders and an attorney in private practice who joined the defense team several months later. The public defender in charge of the guilt phase had no prior experience in federal capital cases. The other public attorney, who focused on the penalty phase and was primarily responsible for developing mitigation, had not tried a murder case and had no capital litigation experience.

116.   According to the record before the Commission, Mr. Mitchell stated to his defense attorneys that he was sober at the time of the crimes. In post-conviction, the district court concluded that the choice not to present a voluntary intoxication defense was reasonable given the lack of evidentiary support.

[76] IACHR, Report No. 79/15, Case 12.994. Merits (Publication). Bernardo Aban Tercero. United States. October 28, 2015, para. 111.
[77] IACHR, Report No. 90/09, Case 12.644, Admissibility and Merits (Publication), Medellín, Ramírez Cárdenas and Leal García, United States, August 7, 2009, para. 134.
[78] IACHR. Admissibility and Merits. Medellín, Ramírez Cárdenas and Leal García, *supra* XX, para. 134.
[79] American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (Revised editions) (February 2003), Guideline 10.7 – Investigation.
[80] American Bar Association. Guideline 10.7 – Investigation, *supra* XX, at 82.
[81] American Bar Association. Guideline 10.7 – Investigation, *supra* XX, at 83.

Exhibit 1 - 023

117.   The information available shows, however, that Mr. Mitchell gave a recorded statement to FBI and Navajo Nation investigators during which he repeatedly claimed to have been drinking at the time of the murders and said he "blackened out" at times while in the truck. The next day, at the crime scene, he claimed again that he was drunk at the time of the murder. In a statement several weeks later he asserted that he had consumed alcohol prior to going to Gallup and bough more liquor once there. Further, a mitigation specialist hired by the defense team asserted that there was substantial evidence that Mr. Mitchell was drunk and high on drugs at the time of the killings.

118.   Prior to trial, the defense requested that the district court instruct the jury to consider evidence of intoxication but did not request an instruction on impaired capacity as a mitigating factor in the penalty phase. The defense team opted against an intoxication defense because it considered that there was little supporting evidence and because it would have contradicted their argument that Mr. Mitchell "was a good person led astray under circumstances" and that the co-defendant was the impetus for the violence. During the penalty phase, an FBI agent testified and noted that Mr. Mitchell claimed to have been drinking heavily at the time of the murders.

119.   Therefore, the IACHR notes that, despite available information regarding Mr. Mitchell's intoxication at the time of the murders, the defense chose neither to follow an intoxication defense nor to request a jury's instruction on impaired capacity as a mitigating factor. This, despite the advice of a mitigation specialist with extensive experience working with death penalty cases and with Native American clients. The Commission also notes that, in pressing for the trial option and opting out of using the federal death penalty, the representatives of the Navajo Nation explained to Congress that the vast majority of major crimes committed on the Navajo Nation and within other Indian reservations are precipitated by the abuse of alcohol.

120.   Given the strict scrutiny applied in death penalty cases and the interests at stake, this readily available evidence and the sole possibility of a different outcome if an intoxication defense had been raised, warrants that such failure should have been corrected by the courts. Further, the IACHR finds that the fact that the only public defender in charge of the penalty phase, who had never tried a murder case, did not request an instruction on impaired capacity as a mitigating factor, was a breach to the fundamental due process and fair trial requirements for capital trials. Considering that these requirements, as determined by this Commission in similar cases,[82] include the obligation to afford adequate legal representation, the Inter-American Commission concludes that the United States violated Mr. Mitchell's right to due process and to a fair trial under Articles XVIII and XXVI of the American Declaration. The Commission also concludes that Mr. Mitchell lacked an effective remedy to assert his claim.

## 6.   Access to effective remedies

121.   The right to appeal a sentence is a fundamental guarantee of due process for avoiding the consolidation of an injustice.  In that regard, the IACHR has stated that "due process guarantees should also be interpreted to include a right of effective review or appeal from a determination that the death penalty is an appropriate sentence in a given case."[83]

122.   According to the standards developed by the inter-American human rights system, a remedy must be effective, i.e., it must provide results or responses consistent with the objectives that it was intended to serve, which is to avoid the consolidation of an unjust situation.[84] The efficacy of a remedy is closely linked to the scope of the review. Judicial error is not confined to the application of the law, but may occur in other aspects of the process such as the determination of the facts or the weighing of evidence.[85] Hence, the remedy of appeal

---

[82] See, *i.e.*, IACHR, Report No. 11/15, Case 12.833. Merits (Publication). Felix Rocha Diaz. United States. March 23, 2015, para. 78; IACHR, Report No. 44/14, Case 12.873. Merits (Publication). Edgar Tamayo Arias. United States.  July 17, 2014, para. 151; and IACHR, Report No. 13/14, Case 12.422. Merits (Publication). Abu-Ali Abdur' Rahman. United States. April 2, 2014, para 62.

[83] IACHR, Report 48/01, Case N° 12.067, Michael Edwards et al., Bahamas, April 4, 2001, para. 149.

[84] IACHR, Report 79/15, Case 12.994. Merits (Publication), Bernardo Aban Tercero, United States, October 28, 2015, para. 134.

[85] IACHR, Report 53/13, Case 12.864, Merits (Publication), Ivan Teleguz, United States, July 15, 2013, para. 103.

Exhibit 1 - 024

will be effective in accomplishing the purpose for which it was conceived if it makes a review of such issues possible without *a priori* limiting that review to certain aspects of the court proceedings.[86]

123.  In this respect, the IACHR has considered that:

> to guarantee the full right of defense, this remedy should include a material review of the interpretation of procedural rules that may have influenced the decision in the case when there has been an incurable nullity or where the right to defense was rendered ineffective, and also with respect to the interpretation of the rules on the weighing of evidence, whenever they have led to an erroneous application or non-application of those rules.[87]

124.  With respect to the accessibility of the remedy, the Commission has considered that, in principle, the regulation of some minimum requirements for the presentation of the appeal is not incompatible with the right to appeal. Some of these requirements are, for example, the presentation of the appeal itself or the regulation of a reasonable period within which it must be filed.[88] However, in some circumstances, rejection of appeals based on failure to comply with formal requirements established by statute or defined in judicial practice may be a violation of the right to appeal a judgment.[89]

125.  As established in the findings of fact, after exhausting his direct appeal, Mr. Mitchell filed a motion to vacate his conviction and sentence, raising several claims, among which ineffective assistance of counsel, and requested an evidentiary hearing to contest factual issues relevant to his claims for relief. The district court, however, denied the motion and the request for the evidentiary hearing. The Commission has already determined that the right of Mr. Mitchell to effective assistance of court-appointed counsel has been violated. Therefore, the IACHR finds that, given the specific interests at stake, the lack of access to an evidentiary hearing to address this claim in post-conviction review constitutes a violation of Mr. Mitchell's right to an effective remedy. The Commission underscores in this regard that States have an enhanced obligation to ensure that any deprivation of life which may occur through the application of the death penalty is in strict compliance with the right to a timely, effective and accessible remedy.[90]

**D.  Right not to receive cruel, infamous or unusual punishment**

**1.  Method of execution**

126.  In capital cases the State has an enhanced obligation to ensure that the person sentenced to death has access to all the relevant information regarding the manner in which he or she is going to die. In particular, the convicted person must have access to information related to the precise procedures to be followed, the drugs and doses to be used in case of executions by lethal injection, and the composition of the execution team as well as the training of its members.[91]

127.  Any person subjected to the death penalty must have the opportunity to challenge every aspect of the execution procedure and such information is necessary to file a challenge. The IACHR notes in this regard that the due process requirement is not limited to the conviction and post-conviction proceedings.[92] Therefore, the State has the duty to inform the person sentenced to death, in a timely manner, about the drug and method of execution that will be used, so he or she is not precluded from litigating the right to be executed in a manner devoid of cruel and unusual suffering.

128.  Further, the IACHR highlights the reinforced special duty of the State to ensure that the method of execution does not constitute cruel, infamous or unusual punishment. In this regard, the U.N. Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment stated that "[t]he fact

---

[86] IACHR. Merits. Ivan Teleguz, *supra* XX, para. 103.
[87] IACHR, Report 55/97, Case 11.137, Merits, Juan Carlos Abella, Argentina, November 18, 1997, para. 261.
[88] IACHR. Merits. Ivan Teleguz, *supra* XX, para. 105.
[89] IACHR. Merits. Ivan Teleguz, *supra* XX, para. 103.
[90] IACHR. Merits. Ivan Teleguz, *supra* XX, para. 106.
[91] IACHR. Merits. Edgar Tamayo Arias, *supra* XX, para. 189.
[92] IACHR. Merits. Edgar Tamayo Arias, *supra* XX, para. 190.

Exhibit 1 - 025

that a number of execution methods have been deemed to constitute torture or CIDT, together with a growing trend to review all methods of execution for their potential to cause severe pain and suffering, highlights the increasing difficulty with which a state may impose the death penalty without violating international law."[93]

129.   The IACHR also notes that the United Nations Committee Against Torture received substantiated information indicating that executions in the United States can be accompanied by severe pain and suffering and requested the State to "carefully review its execution methods, in particular lethal injection, in order to prevent severe pain and suffering."[94]

130.   As indicated above, on July 8, 2014, Mr. Mitchell joined a federal lawsuit in the U.S. District Court for the District of Columbia claiming that the means by which the government seeks to implement the death penalty would violate the U.S. Constitution as well as federal law. On July 25, 2019, the Warden informed Mr. Mitchell of his December 11, 2019, execution. On October 4, 2019, the Ninth Circuit Court stayed the execution pending resolution of an appeal. With regard to the new federal lethal injection protocol, there is no information regarding the origins of the drugs that will be used.

131.   Based on the above considerations, and the uncertainty surrounding federal death penalty executions, the IACHR concludes that the State is exposing Mr. Mitchell to anguish and fear that amount to a violation of his right to humane treatment and not to receive cruel, infamous or unusual punishment set forth in Articles XXV and XXVI of the Declaration.

### 2.   The deprivation of liberty on death row and the right of protection against cruel, infamous or unusual punishment

132.   In both international human rights law and comparative law, the issue of long term deprivation of liberty on death row, known as the "death row phenomenon," has been developed for decades, in light of the prohibition of cruel, inhuman or degrading punishment in Constitutions and in multiple international treaties, including the American Declaration (Articles XXV and XXVI).[95] Based on those standards, in the case of Russell Bucklew the IACHR found that "the very fact of spending 20 years on death row is, by any account, excessive and inhuman."[96]

133.   Specifically, regarding the matter of prolonged solitary confinement on death row, the Inter-American Commission has determined that deprivation of liberty under certain conditions on death row, including solitary confinement for four years, constituted inhuman treatment.[97]

134.   The UN Special Rapporteur on Torture has found that:

Individuals held in solitary confinement suffer extreme forms of sensory deprivation, anxiety and exclusion, clearly surpassing lawful conditions of deprivation of liberty. Solitary confinement, in combination with the foreknowledge of death and the uncertainty of whether or when an execution is to take place, contributes to the risk of serious and irreparable mental and physical harm and suffering to the inmate. Solitary confinement used on death row is by definition prolonged and indefinite and thus constitutes cruel, inhuman or degrading treatment or punishment or even torture.[98]

---

[93] The death penalty and the absolute prohibition of Torture and Cruel, Inhuman, and Degrading Treatment or Punishment, Juan E. Mendez, Human Right Brief, Volume 20, Issue 1, Article 1, p. 3.

[94] Committee Against Torture, Considerations of Reports submitted by State Parties under Article 19 of the Convention, United States, CAT/C/USA/CO/2, July 25, 2006, para. 31.

[95] IACHR, Report No. 71/18, Case 12.958. Merits. Russell Bucklew. United States, May 10, 2018, paras. 86-90. In this report the Commission has cited a number of developments in the inter-American and other protections systems, including the regional and United Nations systems.

[96] IACHR. Merits. Russell Bucklew, *supra* XX, para. 83.

[97] IACHR, Report No. 24/17, Case 12.254. Merits. Victor Saldaño. United States. March 18, 2017, para. 246, citing IACHR, Report No. 58/02. Merits. Case 12.275. Denton Aitken. Jamaica. October 21, 2002, paras. 133 and 134.

[98] United Nations. Interim report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment of punishment. 9 August 2012. A/67/279. para 48.

Exhibit 1 - 026

135.   As established in this report, Mr. Mitchell has been deprived of his liberty on death row for 18 years. The Commission notes that the fact of spending 18 years on death row under such conditions is, by any account, excessive and inhuman, and is aggravated by the prolonged expectation that the death sentence could be executed. Consequently, the United States is responsible for violating, to the detriment of Mr. Mitchell, the right to humane treatment, and not to receive cruel, infamous or unusual punishment established in Articles XXV and XXVI of the American Declaration.

**E.   Right to life[99] and to protection against cruel, infamous or unusual punishment with respect to the eventual execution of Lezmond M. Mitchell**

136.   As indicated above, the Inter-American Commission considers that it is incumbent upon the national courts, not the Commission, to interpret and apply national law. Nevertheless, the IACHR must ensure that any deprivation of life resulting from imposition of the death penalty complies with the requirements of the American Declaration.[100]

137.   Throughout this report, the Commission established that, *inter alia*, the United States unlawfully arrested Mr. Mitchell, violated his due process rights, as well as his right to humane treatment and not to receive cruel, infamous or unusual punishment, by virtue of the 18 years that he has been on death rows.

138.   Under these circumstances, the IACHR has maintained that executing a person after proceedings that were conducted in violation of his rights would be extremely grave and constitute a deliberate violation of the right to life established in Article I of the American Declaration.[101] Further, based on the conclusions regarding the deprivation of liberty on death row, the eventual execution of Mr. Mitchell would constitute, by any account, a violation of the right to protection against cruel, infamous or unusual punishment. In light of the foregoing and taking into account the determinations made throughout this report, the IACHR concludes that the execution of Mr. Mitchell would constitute a serious violation of his right to life established in Article I of the American Declaration.

**VI.   REPORT No. 193/20 AND INFORMATION ABOUT COMPLIANCE**

139.   On July 14, 2020, the Commission approved Report No. 193/20 on the merits of the instant case, which encompasses paragraphs 1 to 138 supra, and issued the following recommendations to the State:

1.   Grant Lezmond M. Mitchell effective relief, including the review of his trial and sentence in accordance with the guarantees of fair trial and due process set forth in Articles XVIII, XXV and XXVI of the American Declaration, and the payment of pecuniary compensation. Taking into account the sovereign decision of the Navajo Nation against the use of the death penalty, the Commission recommends that if the new trial results in a conviction, that Mr. Mitchell's sentence be commuted.

2.   Review its laws, procedures, and practices at the federal level to ensure that persons accused of capital crimes are tried and, if convicted, sentenced in accordance with the rights established in the American Declaration,[102] including Articles I, XVIII, XXV and XXVI thereof, and, in particular that:
    a.   the sovereign decision of the Navajo Nation, and other Native American Nations, against the use of the death penalty in their territory, are respected; and
    b.   court-appointed counsel provide adequate legal representation in death penalty cases and, in the case of Native American/indigenous defendants, represent specific considerations that might involve issues of indigenous self-determination, jurisdiction, culture and religion.

---

[99] Article I of the American Declaration establishes: Every human being has the right to life, liberty and the security of his person.
[100] IACHR, Report No. 53/13, Case 12.864, Merits (Publication), Ivan Teleguz, United States, July 15, 2013, para. 129.
[101] IACHR. Merits. Félix Rocha Díaz, *supra* XX, para. 106.
[102] See in this regard, IACHR, The death penalty in the Inter-American Human Rights System: From restrictions to abolition, *supra* XX, December 31, 2011.

Exhibit 1 - 027

3.   Review its laws, procedures, and practices to ensure that the persons sentenced to the death penalty have access to effective judicial remedies to challenge the possible impact of the method of execution on their fundamental rights in accordance with the standards set forth in this merits report.

4.   Given the violations of the American Declaration the IACHR has established in the present case and in others involving application of the death penalty, the Inter-American Commission also recommends to the United States that it abolishes the federal death penalty.[103]

140.   On July 30, 2020 the IACHR transmitted the report to the State and the petitioners with a time period of one week to inform the Commission on the measures taken to comply with its recommendations. To date, the Commission has not received any response from the United States regarding report No. 193/20.

## VII. CONCLUSIONS AND RECOMMENDATIONS

141.   On the basis of determinations of fact and law, the Inter-American Commission concludes that the State is responsible for the violation of Articles I, XVIII, XXV and XXVI of the American Declaration.

**THE INTER-AMERICAN COMMISSION ON HUMAN RIGHTS REITERATES THAT THE UNITED STATES OF AMERICA,**

1.   Grant Lezmond M. Mitchell effective relief, including the review of his trial and sentence in accordance with the guarantees of fair trial and due process set forth in Articles XVIII, XXV and XXVI of the American Declaration, and the payment of pecuniary compensation. Taking into account the sovereign decision of the Navajo Nation against the use of the death penalty, the Commission recommends that if the new trial results in a conviction, that Mr. Mitchell's sentence be commuted.

2.   Review its laws, procedures, and practices at the federal level to ensure that persons accused of capital crimes are tried and, if convicted, sentenced in accordance with the rights established in the American Declaration,[104] including Articles I, XVIII, XXV and XXVI thereof, and, in particular that:
      a.   the sovereign decision of the Navajo Nation, and other Native American Nations, against the use of the death penalty in their territory, are respected; and
      b.   court-appointed counsel provide adequate legal representation in death penalty cases and, in the case of Native American/indigenous defendants, represent specific considerations that might involve issues of indigenous self-determination, jurisdiction, culture and religion.

3.   Review its laws, procedures, and practices to ensure that the persons sentenced to the death penalty have access to effective judicial remedies to challenge the possible impact of the method of execution on their fundamental rights in accordance with the standards set forth in this merits report.

4.   Given the violations of the American Declaration the IACHR has established in the present case and in others involving application of the death penalty, the Inter-American Commission also recommends to the United States that it abolishes the federal death penalty.[105]

Approved by the Inter-American Commission on Human Rights on the 12 day of the month of August 2020. (Signed): Joel Hernández García, President; Antonia Urrejola Noguera, First Vice President; Flávia Piovesan, Second Vice President; Esmeralda E. Arosemena Bernal de Troitiño and Julissa Mantilla Falcón, Commissioners

---

[103] See in this regard, IACHR, The death penalty in the Inter-American Human Rights System: From restrictions to abolition, OEA/Ser.L/V/II.Doc 68, December 31, 2011.

[104] See in this regard, IACHR, The death penalty in the Inter-American Human Rights System: From restrictions to abolition, *supra* XX, December 31, 2011.

[105] See in this regard, IACHR, The death penalty in the Inter-American Human Rights System: From restrictions to abolition, OEA/Ser.L/V/II.Doc 68, December 31, 2011.

Exhibit 1 - 028

**IACHR** Inter-American Commission on Human Rights

The undersigned, Marisol Blanchard, Assistant Executive Secretary of the Inter-American Commission on Human Rights, in keeping with Article 49 of the Commission's Rules of Procedure, certifies that this is an accurate copy of the original deposited in the archives of the IACHR Secretariat.

Marisol Blanchard
Assistant Executive Secretary

Exhibit 1 - 029

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of August, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

William G. Voit, Assistant U.S. Attorney
Arizona State Bar No. 025808
William.Voit@usdoj.gov

Sharon Sexton, Assistant U.S. Attorney
Arizona State Bar No. 012359
Sharon.Sexton@usdoj.gov

Krissa M. Lanham
Arizona State Bar No. 035085
Krissa.Lanham@usdoj.gov

*/s/ Iliana Hernandez*
Iliana Hernandez