FILED

AUG 19 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>LEZMOND C. MITCHELL,<br><br>Defendant-Appellant. | No. 20-99009<br><br>D.C. No.<br>3:01-cr-01062-DGC-1<br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted August 18, 2020
Pasadena, California

Before: Sandra S. Ikuta, Morgan B. Christen, and Andrew D. Hurwitz, Circuit Judges.

Per Curiam

Lezmond Mitchell has filed an emergency motion to stay his execution pending appeal of the denial of his motion to strike his execution warrant, vacate his execution, and enjoin violation of the district court's original judgment. We deny the motion because Mitchell has not carried his burden of demonstrating

either that he is likely to succeed on the merits or that it is probable that he would suffer an irreparable injury in the absence of a stay.

I

Lezmond Mitchell was convicted of numerous offenses and sentenced to death in September 2003.[1] The district court's judgment (the "Judgment") provides, "When the sentence is to be implemented, the Attorney General shall release the defendant to the custody of the United States Marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State of Arizona."[2] The parties agree that, for present purposes, there is no

[1] We have described the facts of this case in detail in three prior opinions. *See generally Mitchell v. United States*, 958 F.3d 775 (9th Cir. 2020); *Mitchell v. United States*, 790 F.3d 881 (9th Cir. 2015); *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007).

[2] The district court amended the Judgment on January 8, 2004, but left the provision quoted above unchanged.

meaningful difference between the language of the Judgment and the language of the Federal Death Penalty Act (FDPA). *See* 18 U.S.C. § 3596(a).[3]

On July 25, 2019, T.J. Watson, the warden of the Federal Correctional Complex at Terre Haute, Indiana, served Mitchell with a letter indicating that the Bureau of Prisons had set an execution date of December 11, 2019.[4] On October 4, 2019, however, we stayed Mitchell's execution pending resolution of his third appeal. *Mitchell v. United States*, No. 18-17031, ECF No. 26 (Oct. 4, 2019).

On July 29, 2020, after we rejected Mitchell's appeal but before the mandate issued, *see* Fed. R. App. P. 41(b), Watson served Mitchell with another letter

---

[3] The FDPA provides, in pertinent part:

> A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a).

[4] On July 31, 2019, Watson served Mitchell with an amended letter that corrected the name of the sentencing judge, which had been misstated on the prior version.

indicating that the Bureau of Prisons had set a new execution date of August 26, 2020 (the "Execution Warrant"). The Execution Warrant states that it "serve[s] as official notification that pursuant to [28 C.F.R. § 26.3(a)(1)], the Director of the Federal Bureau of Prisons has set August 26, 2020, as the date for your execution by lethal injection."[5]

On August 6, 2020, Mitchell filed a motion in district court to strike the Execution Warrant, vacate his execution date, and enjoin any violation of the Judgment. Mitchell argued that if the Bureau of Prisons follows its execution protocols his execution will not be "implement[ed] . . . in the manner prescribed by the law of [Arizona]" and thus will be in violation of the Judgment and 18 U.S.C. § 3596(a). In support of his argument, Mitchell identified specific procedures set forth in Arizona statutes, the Arizona Rules of Criminal Procedure, and the Arizona Department of Corrections's Department Order 710 (the "Department Order Manual"). According to Mitchell, the Bureau of Prisons' protocols are inconsistent with or allow it to deviate from these Arizona procedures.

---

[5] 28 C.F.R. § 26.3(a)(1) establishes how the Bureau of Prisons will determine the date and time for an execution.

The district court denied the motion. Mitchell filed a notice of appeal with the district court and moved to stay his execution pending resolution of the appeal. We heard argument on Tuesday, August 18, 2020.

II

We consider Mitchell's motion for a stay pending appeal using the "traditional test for stays" set out in *Nken v. Holder*, 556 U.S. 418, 433 (2009). This test considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The party seeking the stay bears the burden of showing that these factors favor a stay. *Id.* at 433–34. "The first two factors . . . are the most critical," and the "mere possibility" of success or irreparable injury is insufficient to satisfy them. *Id.* at 434 (cleaned up). As to likelihood of success, the movant must show a "reasonable probability" or "fair prospect" of success. *Leiva-Perez v. Holder*, 640 F.3d 962, 967 (9th Cir. 2011) (citation omitted). As to irreparable harm, the standard is higher: the movant must demonstrate that irreparable harm is probable—as opposed to merely possible—if the stay is not granted; that is, irreparable harm

must be "the more probable or likely outcome." *Id.* at 968. We consider the final two factors only "[o]nce an applicant satisfies the first two." *Nken*, 556 U.S. at 435.

Mitchell argues that he is entitled to a stay pending appeal of the district court's order because the district court erred in denying his motion for injunctive relief. Mitchell claims that on appeal of the district court's order, he would have a likelihood of success on the merits of his claim that inconsistencies between the Bureau of Prisons' protocol for implementing his execution and Arizona's procedures violate the Judgment and the FDPA. Mitchell likewise asserts that he would prevail on the second injunctive relief factor, that he will suffer an irreparable harm, due to the possibility that he "could be executed by means of an illegal protocol."

For purposes of Mitchell's stay motion, we need not comprehensively delineate the scope of the FDPA. *Cf. In re Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020), *cert. denied sub nom. Bourgeois v. Barr*, No. (19A1050), 2020 WL 3492763 (U.S. June 29, 2020). We assume without deciding that the Department Order Manual constitutes "law of the State" for purposes of the FDPA and the Judgment. *See* 18 U.S.C. § 3596(a) (requiring the sentence to be implemented "in the manner prescribed by the law of the State in which the

sentence is imposed”). In addition, we hold that procedures that do not effectuate death fall outside the scope of 18 U.S.C. § 3596(a). *See Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020). The FDPA incorporates only those state laws that prescribe the manner for “implementation” of a death sentence. *See* 18 U.S.C. § 3596(a) (“When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed.”). In this context, “implement” means “to carry out” or “to give practical effect to and ensure of actual fulfillment by concrete measures.” *Implement*, Webster’s Third New International Dictionary 1134 (1961). Therefore, 18 U.S.C. § 3596(a) addresses, at most, state laws that set forth procedures for giving practical effect to a sentence of death. We therefore agree with the Seventh Circuit’s conclusion that, even under a broad reading, the FDPA incorporates “only ‘those [state] procedures that effectuate the death, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements.’” *Peterson*, 965 F.3d at 554 (citation omitted).

In his stay motion, Mitchell identifies six purported inconsistencies between the Bureau of Prisons' execution protocol and the procedures in the Department Order Manual.[6] We consider each in turn.

First, he points to the Department Order Manual's requirement that the IV Team be "currently certified or licensed within the United States to place IV lines." The Bureau of Prisons' protocol provides that "[q]ualified personnel includes currently licensed physicians, nurses, EMTs, Paramedics, Phlebotomists, other medically trained personnel, including those trained in the United States Military having at least one year professional experience and other personnel with

---

[6] In district court, Mitchell identified five additional purported inconsistencies relating to: (1) the presence of witnesses and spiritual advisers, Ariz. Rev. Stat. § 13-758; (2) notice of an execution date, Ariz. Rev. Stat. § 13-759; (3) judicial postponement of execution dates upon a finding of impracticality, Ariz. R. Crim. P. 31.23(c); (4) accommodations for defense counsel during the execution, such as the provision of temporary office space and access to mobile devices; and (5) discretion given the Director of the Arizona Department of Corrections to modify the execution protocol. Because Mitchell has not raised these purported inconsistencies in connection with his motion to stay his execution pending appeal, we do not consider them. *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994). Moreover, the first four purported inconsistencies fall outside the scope of 18 U.S.C. § 3596(a), because they are not pertinent to effectuating death. *See Peterson*, 965 F.3d at 554.

At oral argument, Mitchell argued for the first time that the Bureau of Prisons' protocol calls for the use of a saline flush in a manner that is different from the Department Order Manual. Mitchell forfeited any reliance on this difference because it was neither raised to the district court nor raised in the briefing. *See Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1223 (9th Cir. 2018).

necessary training and experience in a specific execution related function." We see little difference between these requirements; both require that the persons placing IV lines have the appropriate qualifications. Given the substantial overlap between the two protocols, Mitchell argues only that it is possible that the "[q]ualified personnel" referred to in the Bureau of Prisons' protocol might not be "currently certified or licensed within the United States to place IV lines."

As to the second and third examples of purported inconsistencies, Mitchell points to the Department Order Manual's requirements that "[a] central femoral venous line will not be used unless the person placing the line is currently qualified" to do so and that "[t]he IV Team shall be responsible for inserting either peripheral IV catheters or a central femoral line as determined by the Director acting upon the recommendation of the IV Team Leader." The Bureau of Prisons' protocol provides that a "suitable venous access line or lines will be inserted and inspected by qualified personnel" and that "[t]he Director or designee shall determine the method of venous access (1) based on the training and experience of personnel establishing the intravenous access; (2) to comply with specific orders of federal courts; or (3) based upon a recommendation from qualified personnel." Again, we see little difference between the protocols; both give the Director discretion to determine, based on a recommendation from qualified personnel, the

method of venous access, and both protocols require that the venous access line be placed by qualified personnel. At oral argument, Mitchell primarily focused on the possibility that under the Bureau of Prisons' protocol, the decision to insert a peripheral IV catheter or a central femoral line may be made without a recommendation of a person "currently certified or licensed within the United States to place IV lines." This argument therefore merges with his first claim—that it is possible that the Bureau of Prisons may allow persons without the proper qualifications to place IV lines.

Fourth, Mitchell points to the Department Order Manual's requirement that a chemical used in execution "have an expiration or beyond-use date that is after the date that an execution is carried out." The Bureau of Prisons' protocol also prohibits the use of expired drugs: its March 10, 2020 General Guidelines for Compounding and Testing Pentobarbital Sodium for Use in Executions (the "General Guidelines") provide that an injectable solution is "available for use" only if, among other things, "its expiration date has not passed." Therefore, the state and federal requirements are substantially the same. Mitchell argues only that it is possible that the Bureau of Prisons will not comply with its protocol or will make last-minute changes to its protocol.

Fifth, Mitchell points to the Department Order Manual's requirement that the "decision to use a compounded or non-compounded chemical . . . be provided to the inmate and their counsel of record in writing at the time the state files a request for Warrant of Execution in the Arizona Supreme Court." Because the Bureau of Prisons has made public its decision to use compounded Sodium Pentobarbital in the General Guidelines, Mitchell has received notice that the Bureau of Prisons intends to use compounded Pentobarbital Sodium to carry out the execution.

Sixth, Mitchell points to the Department Order Manual's requirement that "[a] quantitative analysis of any compounded or non-compounded chemical to be used in the execution shall be provided upon request within ten calendar days after the state seeks a Warrant of Execution." At oral argument, Mitchell conceded that he had not requested such a quantitative analysis from the Bureau of Prisons, but such information has been made readily available to him. The government represented in district court that the "BOP has tested its compounded pentobarbital for quality assurance," and has publicly filed certificates of analysis and laboratory reports regarding Pentobarbital Sodium in the United States District Court for the

District of Columbia. *See In re BOP Execution Protocol Cases*, 1:19-mc-00145-TSC, ECF No. 39-1 at 975–1020; ECF No. 97-2 at 1–9.[7]

We are not persuaded by Mitchell's arguments. The Bureau of Prisons' protocol and the Department Order Manual procedures on which Mitchell relies are largely indistinguishable. To the extent there is any difference between the federal and Arizona procedures with respect to the first four examples, the Bureau of Prisons has provided a declaration certifying that it will comply with those procedures.[8] As to the fifth and sixth examples, the Bureau of Prisons has complied with the Department Order Manual's procedures. Therefore, Mitchell has not carried his burden of proving a "reasonable probability," *Leiva-Perez*, 640 F.3d at 967 (citations omitted), that his execution will be carried out in a manner inconsistent with Arizona law (assuming that the Department Order Manual is state law). It is not enough to show a "mere possibility" that the Bureau of Prisons might use protocols inconsistent with Arizona procedures. *Id.* (cleaned up). Nor

---

[7] This procedure arguably also falls outside the scope of 18 U.S.C. § 3596(a), because providing such information is not pertinent to the effectuation of death. *See Peterson*, 965 F.3d at 554.

[8] Mitchell filed a reply to the Bureau of Prisons' declaration, to which he attached a 37-page document setting forth additional purported inconsistencies between the Bureau of Prisons' protocol and Arizona procedures. Reliance on these purported differences was forfeited. *See supra* note 6; *Greenwood*, 28 F.3d at 977.

has Mitchell carried his burden of showing that it is more probable than not, *id.* at 968, that he will suffer any irreparable harm. Therefore, Mitchell is not entitled to the "extraordinary remedy" of a stay pending appeal, *Nken*, 556 U.S. at 428 (citation omitted), and we do not address the final two factors, *see id.* at 435.

***

In sum, Mitchell has not carried his burden of demonstrating a likelihood of success on the merits or that it is probable that he will suffer irreparable harm, and therefore he is not entitled to a stay or to the underlying injunctive relief he seeks. We also recognize that the Supreme Court has instructed us that last-minute stays of executions "should be the extreme exception, not the norm." *Barr v. Lee*, No. 20A8, 2020 WL 3964985, at *2 (U.S. July 14, 2020) (citation omitted). We therefore deny Mitchell's motion for a stay of execution pending appeal and affirm the district court's order denying his motion to strike the Execution Warrant, vacate the execution date, or enjoin violation of the Judgment.

**IT IS SO ORDERED**.